CAROLYN F. McNIVEN (SBN 163639)
GREENBERG TRAURIG, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111
Telephone: (415) 655-1270
Facsimile: (415) 707-2010
mcnivenc@gtlaw.com

Attorneys for Applicant
JSC BTA BANK

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Application of JSC BTA Bank for an Order Seeking Discovery Under 28 U.S.C. § 1782 | Case No.   8:20-MC-00126 <br><br> **EX PARTE APPLICATION FOR DISCOVERY ORDER PURSUANT TO 28 U.S.C. § 1782 IN AID OF FOREIGN PROCEEDING** <br><br> CTRM:          TBD <br> JUDGE:         TBD <br> DATE FILED:    December 2, 2020 |

## APPLICATION OF JSC BTA BANK FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782

Applicant JSC BTA Bank ("Applicant," "BTA," or "BTA Bank"), by its counsel, hereby applies to the Court for an Order under 28 U.S.C. § 1782(a) granting it leave to take discovery from: (a) certain Wells Fargo entities, namely, Wells Fargo Bank, NA, Wells Fargo & Company, Wells Fargo Clearing Services, LLC, Wells Fargo Financial Advisors Network LLC, and related entities; (b) accountant/tax preparer Yvgeny Bukrinsky (d/b/a Omega Enterprises); (c) certain business entities owned or operated by Elvira Kudryashova ("Elvira Kud"), namely, Anthill Shopnplay (a/k/a Anthill Fashion Market, Anthill Shopnplay LLC, and Kud Vintage) and  Edward Hill Bakery party N beyond; (d) Granite Escrow and Settlement Services; (e) Escrow of the West; (f) real estate agent Jason Bradshaw d/b/a Bradshaw Residential Group; and (f) Coldwell Banker Real Estate LLC ("Coldwell Banker")   (collectively, "Respondents"), by issuing subpoenas *duces tecum* pursuant to Rule 45 of the Federal Rules of Civil Procedure to produce documents and, as to Respondents Bukrinsky and Jason Bradshaw, through depositions under Rule 30 of the Federal Rules of Civil Procedure to give testimony for use in an ongoing civil court case in London, England, and related investigations.  This Application is supported by the Memorandum of Points and Authorities below, as well as the Declaration of Jason Kislin ("Kislin Decl.") and attached exhibits.  A proposed discovery order and subpoenas have been contemporaneously filed as attachments to this Application. BTA is filing this application *ex parte* and without notice to any person.

In its accompanying Memorandum of Points and Authorities in Support of this Application ("MOPA"), BTA establishes the factual and legal elements for obtaining discovery under Section 1782.  Specifically, BTA demonstrates that (1) the person(s) from whom discovery is sought reside or can be "found" in this district; (2) that it is an "interested person" in an ongoing proceeding in a foreign tribunal; and (3) that the discovery sought is "for use in a proceeding in a foreign or international tribunal."  *See Govan Brown & Assocs. Ltd. v. Does 1 & 2*, No. C 10-02704 PVT, 2010 WL 3076295, *2 (N.D. Cal. Aug. 6, 2010)

As described further in the MOPA, BTA Bank is the plaintiff/complaining victim in a pending civil action filed in the United Kingdom in which it has obtained judgments in excess of $5 Billion (the "UK Case") against some but not all defendants. BTA is also the complaining victim in a criminal investigation arising from the same facts currently being pursued by Kazakhstan law enforcement authorities and has shared information of its own investigation with those authorities.

The UK Case was initially brought against BTA Bank's former Chairman and primary shareholder, Mukhtar Ablyazov ("Ablyazov"), upon BTA Bank's discovery that Ablyazov had illegally misappropriated as much as $7.5 Billion in BTA Bank's assets and laundered the proceeds through financial institutions in Switzerland and the United States. Ablyazov's primary co-conspirator in the money-laundering scheme was initially determined to be his son-in-law, Ilyas Khrapunov ("Khrapunov"), and in 2015, BTA initiated proceedings against Khrapunov in the UK based on his direct involvement in laundering the funds stolen from BTA.

His sister Elvira Kud was also suspected of being involved in laundering the proceeds of this scheme, and after BTA obtained evidence confirming her involvement, it added her as a defendant in the UK Case, along with other defendants that it discovered were co-conspirators in the money-laundering scheme. BTA Bank has obtained judgments against defendants Ablyazov and Khrapunov, but the UK Case as to Elvira Kud and her other co-defendants is pending and discovery is underway.

Elvira Kud is a resident of this district and maintains bank accounts and operates businesses here. BTA Bank is presently gathering evidence for the UK case concerning Elvira Kud's unlawful money laundering activities, including acting as nominee for her brother Khrapunov. BTA has learned that she recently received payments from shell companies into which tainted proceeds of the crimes against BTA were transferred; that she has bought and sold numerous luxury properties in the Los Angeles area with so-called dirty money; and that she has financial accounts in this district, including at Respondent Wells Fargo Bank, N.A., at a branch in either Costa Mesa or Newport Beach.

Recently, after being presented with certain of the evidence BTA has collected to date, the UK High Court of Justice issued a World Wide Freezing Order Injunction ("WFO"), against Elvira Kud, and others.  With respect to Elvira Kud, the WFO freezes certain assets held by Elvira Kud pending adjudication on the merits. The WFO specifically identifies two accounts maintained by Elvira Kud at one of Wells Fargo's local branches.

BTA is now seeking financial records regarding these and any other accounts that Elvira Kud or entities associated with her may have at Well Fargo Bank, NA, and financial services firms operated under the same corporate umbrella.  BTA Bank is also seeking to issue subpoenas to an accountant Yvgeny Bukrinsky, who acted for at least one of Elvira Kud's shell companies; Elvira Kud's active business entities, Anthill Shopnplay and Edward Hill Bakery party N beyond, both of which may be recipients of tainted funds; Granite Escrow and Settlement Services and Escrow of the West, both of which processed the escrow for certain of her real estate transactions in the district; realtor Jason Bradshaw and his real estate firm, Bradshaw Residential Group (n/k/a Coldwell Banker), who acted as Elvira Kud's real estate agent with respect to certain of her real estate transactions in the district.

The requested discovery is relevant to the UK Case insofar as it produce evidence of Elvira Kud's knowing participation in laundering the proceeds of the fraud against BTA and/or lead to the discovery of other evidence thereof.  Further, these records can be used to determine whether her accounts at the Respondent bank hold tainted assets and/or identify other assets and accounts for which a freezing order or other court order can be obtained in the UK Case.  Accordingly, the information in Respondents' possession would not only be relevant but may be essential to the progress of BTA's efforts to recover the misappropriated assets and prove the merits of their case.

As detailed above, BTA's Application demonstrates that (1) the Respondents from whom discovery is sought reside or can be "found" in this district; (2) that BTA is an "interested person" in the UK Case; and (3) that the requested discovery is sought for the purpose of recovering the judgment entered in the UK Case.  *See Govan Brown & Assocs.*

*Ltd. v. Does 1 & 2*, No. C 10-02704 PVT, 2010 WL 3076295, *2 (N.D. Cal. Aug. 6, 2010). Given the history of rapid movement of assets and acts of concealment, BTA is filing this motion *ex parte*, without notice to Elvira Kud or her legal counsel.

WHEREFORE, Applicant BTA respectfully requests that the Court grant its Application for an Order pursuant to 28 U.S.C. § 1782(a) to obtain evidence from Respondents Wells Fargo Bank, NA, Wells Fargo & Company, Wells Fargo Clearing Services, LLC., Wells Fargo Financial Advisors Network LLC, and related entities; accountant Yvgeny Bukrinsky (d/b/a Omega Enterprises); Elvira Kud's businesses, Anthill Shopnplay and Edward Hill Bakery party N beyond; Granite Escrow and Settlement Service and Escrow of the West; and real estate agent Jason Bradshaw and Bradshaw Residential Group (n/k/a Coldwell Banker) and, pursuant to Rule 45 of the Federal Rules of Civil Procedure by serving the subpoenas *duces tecum* attached as Exhibits to the Memorandum of Points and Authorities in Support of this Application and, as to Yvgeny Bukrinsky and Jason Bradshaw, through deposition pursuant to Rule 30 of the Federal Rules of Civil Procedure.

Dated this 2nd day of December 2020.


Respectfully submitted,

GREENBERG TRAURIG, LLP


  */s/ Carolyn F. McNiven*
Carolyn F. McNiven


Attorneys for Applicant JSC BTA Bank

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     Overview of 28 U.S.C. § 1782

Section 1782 authorizes a federal district court to order discovery of documents and testimony for use in a foreign proceeding from any person who resides or is found in the court's district:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made … upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a).

A successful application must meet three requirements: (1) the person(s) from whom discovery is sought must reside or be "found" in the district of the court issuing the discovery order; (2) the applicant must be a foreign tribunal or "interested person"; and (3) the discovery must be sought "for use in a proceeding in a foreign or international tribunal." *Govan Brown & Assocs. Ltd. v. Does 1 & 2*, No. C 10-02704 PVT, 2010 WL 3076295, *2 (N.D. Cal. Aug. 6, 2010). Because all three requirements are met here, this Application should be granted.

### II.    Factual Background

#### A.     Theft of Funds and Other Crimes

JSC BTA Bank ("Applicant," "BTA," or "BTA Bank") is a bank based in the city of Almaty in the Republic of Kazakhstan. Declaration of Jason Kislin in support of JSC BTA Bank's Ex Parte Application for Discovery Order Pursuant to 28 U.S.C. § 1782 In Aid of Foreign Proceeding ("Kislin Decl.") ¶ 5. Between May 2005 and February 2009, BTA was controlled by its Chairman and primary shareholder, Mukhtar Ablyazov ("Ablyazov"). Kislin Decl. ¶ 6. In 2008, during the global credit crunch, the Kazakh financial regulator (the "AFN") began investigating BTA's loan portfolio, identifying a number of issues with its risk management and requiring it to make an additional provision of $3.58 billion. *Id.*, ¶

6

7.  On January 30, 2009, BTA informed the AFN that it could not meet its liabilities.  *Id.*, ¶ 8.  In February 2009, BTA was effectively nationalized via the Kazakh sovereign wealth fund (Samruk-Kazyna).  *Id.*, ¶ 9.  During this time period, Ablyazov was dismissed and subsequently fled to London, England.  *Id.*, ¶ 10.

Thereafter, investigations by BTA Bank's new management revealed an enormous hole in its balance sheet.  *Id.*, ¶ 11.  As part of its investigation, BTA Bank's new management engaged KPMG, which advised that BTA Bank should provision for $16.5 billion.  *Id.*, ¶ 12.  BTA also found evidence leading it to believe that its former management, in particular Ablyazov, had embezzled vast amounts of its funds, including by directing and authorizing unsecured loans from BTA to companies that Ablyazov controlled and which had no assets.  *Id.*, ¶ 13. In essence, it was discovered that Ablyazov had used BTA as his own personal piggy bank, illegally syphoning off between approximately $6 Billion and $7.5 Billion of BTA assets through a combination of withdrawals, phony loans, and other mechanisms.  *Id.*, ¶ 14.  Thereafter, as described further below, Ablyazov attempted to conceal the fruits of his crimes by engaging in acts with co-conspirators to conceal the location of the proceeds of his crimes and launder those funds and proceeds.  *Id.*, ¶ 15.  As might be expected, numerous criminal and civil investigations and proceedings were initiated to attempt to gather evidence of Ablyazov's crimes, identify his co-conspirators, and locate and freeze the stolen BTA Assets.  *Id.*, ¶ 16.

## B.    The Ablyazov Proceedings, His Arrest, and $5 Billion Judgment

In August 2009, BTA commenced proceedings in England and Wales against Ablyazov and others and eventually procured a worldwide freezing order against the assets of Ablyazov and six alleged associates.  *Id.*, ¶ 21.  Thereafter, BTA commenced additional proceedings in the UK, commencing in total 13 sets of proceedings in the High Court of England and Wales between 2009 and 2010 against Ablyazov and various alleged associates and related parties.  *Id.*, ¶ 22.  BTA's claims against Ablyazov and his associates were for fraud and embezzlement on an unprecedented scale.  *Id.*, ¶ 23.  Essentially, BTA alleged that Ablyazov helped himself to huge amounts of BTA's cash resources by causing BTA to

1    make substantial transfers of funds to (or for the benefit of) a considerable number of
2    overseas companies that Ablyazov secretly owned.  *Id.* , ¶ 24.

3           Ablyazov failed to provide full disclosures of his assets and answer certain other
4    queries as he was required to do in these proceedings.  *Id.*, ¶ 25.  The English High Court
5    found that Ablyazov knowingly gave false evidence during the course of his cross-
6    examinations in October and November 2009, with the intention of interfering with the
7    administration of justice.  *Id.*, ¶ 26.

8           In August 2010, BTA successfully applied to the English High Court for receivers to
9    be appointed over Ablyazov's assets, in view of Ablyazov's persistent non-disclosure and
10   breaches of Court orders (the "Receivership Order").  *Id.*, ¶ 27.  The Receivership Order
11   has been varied from time to time to cover over 1000 companies and other assets believed
12   to be owned or beneficially owned by Ablyazov.  *Id.*, ¶ 28.

13          In February 2012, following a committal hearing, Ablyazov was found to have lied
14   in his asset disclosure and cross-examination at the hearing, and to have dealt with certain
15   assets in breach of a world-wide freeze order issued by the Court, as well as to have relied
16   on backdated and fabricated documentation and suborned the giving of evidence.  *Id.*, ¶ 29.

17          Ablyazov subsequently fled to France before judgment could be handed down.  *Id.*,
18   ¶ 30.  In his absence, Ablyazov was sentenced by the UK Court to three concurrent 22-
19   month terms of imprisonment.  *Id.*, ¶ 31.  The UK Court subsequently ordered that
20   Ablyazov's defenses to BTA's civil claims in the English Commercial Court be struck out.
21   *Id.*, ¶32.  Three of BTA's claims against Ablyazov were then selected to proceed to trial.
22   *Id.*, ¶ 33.  In each of the subsequent proceedings, judgment was entered in favor of BTA.
23   *Id.*, ¶ 34.

24          BTA ultimately obtained judgements against Ablyazov in England for over $5
25   Billion.  *Id.*, ¶ 35.  Ablyazov has not voluntarily paid any part of these judgments and BTA
26   has recovered only a relatively small amount through enforcement, including against some
27   properties in the UK belonging to Ablyazov, totaling approximately $45 million arising

28

from the various English proceedings.  Additionally, BTA has also taken control of other assets (mainly in the CIS), resulting in total recoveries of less than $1 Billion.  *Id.*, ¶ 37.

Since obtaining the judgements, BTA has been aggressively moving in multiple jurisdictions (mainly consisting of judgment recognition proceedings) including Switzerland, Lichtenstein, Luxembourg and the United States to locate, and freeze Ablyazov's assets so that they may be recovered and restored to BTA.  *Id.*, ¶ 38.  Unfortunately, BTA's extensive asset recovery and enforcement efforts have been frustrated by Ablyazov and his co-conspirators' use of a web of companies, many of which are offshore and held via straw or nominee owners, to conceal their assets and as such, the proceeds of their crimes.  *Id.*, ¶ 39.  Through the myriad of shell companies used by Ablyazov and his associates, the co-conspirators have managed to effect hundreds of financial transfers between countries and institutions, in order to put their assets beyond BTA's reach.  *Id.*, ¶ 40.

To date, despite its aggressive efforts, BTA Bank has recovered only a fraction of what Ablyazov and his co-conspirators stole.  *Id.*, ¶ 41.

### C.    The UK Case and Elvira Kudryashova (a/k/a Elvira Kud)

During the course of its investigation, BTA discovered that one of Ablyazov's key co-conspirators was Ilyas Khrapunov ("Khrapunov"), his son-in-law and "right hand man" and the step-son of  the former mayor of Almaty, Victor Khrapunov.  *Id.*, ¶ 42.  In July 2015, BTA issued a further set of proceedings against Ablyazov and Khrapunov — *JSC BTA Bank [versus] Mukhtar Ablyazov and Ilyas Khrapunov*, Claim No. CL-2015-000549 (the "UK Case") — in the English High Court of Justice, Business and Property Courts of England and Wales, Commercial Court.  *Id.*, ¶ 43.  BTA alleged in the UK Case that Khrapunov had been, since December 2009 at the latest, involved in a conspiracy with Ablyazov that involved concealing, dealing with, disposing of, and/or diminishing the value of the money stolen by Ablyazov from BTA (hereinafter "the Ablyazov-Khrapunov scheme").  *Id.*, ¶ 44.  Indeed, the facts uncovered by BTA and other victims of Ablyazov's crimes reads like an international thriller.  *Id.*, ¶ 45, Ex. A (Stephen M. Bland, *The Case of*

*the Khrapunovs*, THE DIPLOMAT, (Jul 18, 2018), http://www.thediplomat.com/2018/07/the-case-of-the-khrapunovs).

In June 2018 BTA eventually obtained a partial judgment for $500 Million against Khrapunov in the UK Case. In September 2018, the English High Court stayed the UK Case. Kislin Decl., ¶ 47. That stay was lifted on November 13, 2020. *Id. Id.*, ¶ 46. It is the UK Case, which BTA recently re-activated, that is relevant to this application.

In addition to its attempts to locate assets, BTA Bank has attempted to identify and gather evidence against Ablyazov's co-conspirators in the original crimes against BTA and in laundering the proceeds of those crimes. *Id.*, ¶ 48. One of the newly added defendants in the amended and re-activated UK Case is Khrapunov's sister, Elvira Kudryashova (a/k/a Elvira Kud, Elvira Belmandani, Elvira Khrapunov) ("Elvira Kud"), who resides in this district and has done so since in or about 2010.[1] *Id.*, ¶¶ 53, 63. BTA has obtained evidence indicating that Elvira Kud acted as a nominee for her brother Khrapunov in the money laundering scheme, that she received payments from shell companies into which tainted proceeds of the crimes were transferred, and that she owns property and has financial accounts in this district, including at Respondent, Wells Fargo Bank, NA. *Id.*, ¶ 49.

Based on what it uncovered through its investigation, BTA moved to have the stay lifted in the UK Case and amended its complaint to add multiple new defendants, including Elvira Kud. *Id.*, ¶ 50. BTA's case in the UK against Elvira Kud is currently in the pre-trial discovery state and BTA is continuing to amass evidence of Elvira Kud's involvement in money laundering, to attempt to locate her assets and those of her co-defendants, and apply for freeze orders to ensure that assets, once located, do not disappear before judgment is rendered in the UK Case as to Elvira Kud and the remaining defendants. *Id.*, ¶ 51.

\\

\\

---

[1] Ilyas Khrapunov and his sister Elvira left Kazakhstan for Switzerland with their mother and father in about 2007 after their father, Victor Khrapunov, the former mayor of Almaty, came under investigation for corruption and self-dealing. Kislin Decl. ¶ 61. According to a federal lawsuit filed by the city of Almaty, Victor Khrapunov sold off city real property to his daughter Elvira Kud for drastically below market prices and through means of shell companies. Kislin Decl. ¶ 54; *see also City of Almaty v. Khrapunov,* 956 F.3d 1129 (9th Cir. 2020).

APPLICATION FOR DISCOVERY UNDER 28 U.S.C. § 1782

### D.    Background on Elvira Kud and Her Relatives

According to numerous sources including media reports and pleadings in a case filed in the Central District of California by the City of Almaty, Kazakhstan — *City of Almaty v. Khrapunov, et al*. (Case No. CV14-3650-FMO-CW) (the "City of Almaty Case") — the Ablyazov and Khrapunov families are tied together by marriage and a common course of criminal conduct.  *Id.*, ¶ 52.  Elvira Kud's brother, Ilyas Khrapunov, is married to Ablyazov's daughter, Madina, and Elvira Kud has allegedly laundered money for both her father and brother as well as for Ablyazov.  *Id.*, ¶ 53.  Victor Khrapunov, Elvira Kud, and her husband Dmitry Kud (a/k/a Dmitry Kudryashova), and other family members have been separately accused by the City of Almaty in the City of Almaty Case of corruptly and fraudulently converting municipal assets to their own personal use and thereafter laundering hundreds of millions of dollars of that scheme in this district and elsewhere.  *Id.*, ¶¶ 54, 56, Ex. B.  The money laundering allegations and use of shell companies set out in the City of Almaty's amended complaint mirror closely the type of conduct uncovered by BTA with regard to the laundering of stolen BTA money — namely, that Elvira Kud was actively involved in setting up shell companies, including shell companies in California, purchasing assets, and moving money to launder criminal proceeds.  *Id.*, ¶ 57.

Elvira Kud is also referred to in a complaint brought in March 2019 in the United States District Court Southern District of New York by the City of Almaty and BTA against others (the "SDNY Proceedings").  *Id.*, ¶ 58.  The SDNY Proceedings go into significant detail as to Elvira Kud's role in concealing and dissipating monies on behalf of Khrapunov including using monies received from the bank accounts of companies controlled by Khrapunov to purchase US real property in knowing violation of freezing orders issued by UK courts.  *Id.*, ¶ 59.

BTA is endeavoring to learn as much as possible about the entities that Elvira Kud and her co-conspirators used to launder money to determine how and when such entities may have been used to launder proceeds of the crime against BTA Bank.  *Id.*, ¶ 60.  Based upon the City of Almaty's amended complaint as well as numerous press reports, it appears

that Victor Khrapunov fled Kazakhstan for Switzerland with his wife and step-children in about 2007 after news of his crimes broke.  *Id.*, ¶ 61.  According to those same sources, Elvira Kud is married to Russian national Dmitry Kud, who is also a defendant in the City of Almaty Case and is being investigated by BTA Bank to determine if he assisted in the money laundering scheme.  *Id.*, ¶ 63.

In or around 2010, Elvira Kud moved to Beverly Hills, California, with Dmitry Kud, where she ostensibly operated a Beverly Hills-based interior design firm called Style Life Décor.  *Id.*, ¶ 63, Exs. B, C.  Additionally, according to California Secretary of State ("CA SOS") filings, numerous press reports, interviews with Elvira Kud and her websites and postings, Elvira Kud also owns and operates two retail businesses in Costa Mesa, "Anthill Shopnplay" (a/k/a Anthill Fashion Market, Anthill Shopnplay LLC, Kud Vintage) (anthillshop.com) and "Edward Hill Bakery party N beyond."  *Id.*, ¶ 64.  Both businesses are located at 1800 Newport Blvd, Costa Mesa, CA.  *Id.*  The Edward Hill Bakery business may currently be closed due to the COVID-19 pandemic.  *Id.*, ¶ 65.

Although Elvira Kud operates two ostensibly legitimate retail establishments in Costa Mesa and a design business out of her home, her assets, which in 2020 have amounted at points to in excess of €197 Million (which approximates to over $235 Million), greatly exceed the amount that could be realistically attributable to the operation of such small-scale enterprises.  *Id.*, ¶ 66.

### E.   Shell Companies Relating to Elvira Kud

In addition to the businesses identified above, which apparently actually operate, filings in the City of Almaty Case and records filed with the CA SOS show that Elvira Kud established and/or controlled multiple shell companies in the United States, including in California, MaRo Design LLC, 628 Holdings LLC, Haute Hue LLC, MaRo Enterprises, LLC, and Thirtyeight Enterprises, LLC.  *Id.*, ¶ 68.  On information and belief, these entities are merely shell companies, used by Elvira Kud and her co-conspirators to conceal their ownership of and source of assets for real and personal property.  *Id.*, ¶ 69.

The City of Almaty also identified the following companies as involved in laundering for Elvira Kud and her money laundering co-conspirators:

    (a.)    RMU USA, LLC, a New York Corporation;

    (b.)    RPM-MARO LLC, a New York Corporation;

    (c.)    Canadian International Ltd., a British Virgin Islands corporation;

    (d.)    Crownway, Ltd., a Belize corporation;

    (e.)    Vilder Company, S.A., a Panama Corporation;

    (f.)    World Health Networks Inc. (f/k/a Health Station Networks Inc. a Delaware company;

    (g.)    SDG Capital, SA, a Swiss Company;

    (h.)    Swiss Promotion Group SA ("SPG"), a Swiss Company;

    (i.)    Adlux Sarl, SA, a subsidiary of SPG;

    (j.)    Soho 3203 LLC;

    (k.)    Soho 3310 LLC;

    (l.)    Soho 3311 LLC.

*Id.*, ¶ 70. Of the companies identified in this section, two — Vilder Company SA and Crownway LTD — are also named defendants in the UK Case for which proceedings are pending just as described for Elvira Kud. *Id.*, ¶ 71.

### F.    Shell Companies Relating to Elvira Kud

In addition to running her businesses, Elvira Kud has owned and flipped several luxury properties in the area over the past ten years. *Id.*, ¶ 72.

According to press and social media reports and the City of Almaty's Amended Complaint, on or about July 13, 2013, Elvira Kud purchased a house in Fryman Canyon with the street address of 11986 Lockridge Rd, Studio City, for around $5 Million and then, seven months later, put it on the market for considerably more, eventually selling it in 2014 to famed musician Bruno Mars for $6.5 Million. *Id.*, ¶ 88. The house was held in the name of The Kasan Family Trust, of which Elvira Kud was allegedly a trustee. *Id.*, 89.

According to the City of Almaty's Amended Complaint, Elvira and Dmitry Kud purchased a home at 2578 Hutton Drive, Beverly Hills, CA for approximately $3.65 Million. *Id.*, ¶ 73, Ex. B. This purchase was funded with two transfers, on October 20 and December 2, 2010, totaling over $3.6 Million from their Swiss bank accounts (into which tainted proceeds had been deposited) to Escrow of the West, an escrow company based in Los Angeles. *Id.*, ¶ 74. According to the website Realtor.com, the closing for the Hutton Drive house occurred on or about December 7, 2010, and the house was then listed for sale on May 10, 2013 for $5.37 Million. *Id.*, 77. The house was eventually sold on July 19, 2013 for $4.97 Million. *Id.*, ¶ 78, Ex. B.

In March 2012, Ilyas Khrapunov and his wife purchased a house at 606 North Alta Drive, Beverly Hills, for $5.45 Million through two transfers from shell company Canadian International LTD to Granite Escrow Services in Beverly Hills. *Id.*, ¶ 79, Ex. B. This house was sold on or about July 30, 2013 for approximately $6.975 Million. *Id.*, ¶ 80. BTA Bank is presently investigating whether there is a basis to add Ilyas' wife Madina and the shell company Canadian International Ltd. to the UK Case and is therefore seeking information concerning them and in particular their connection to this real estate transaction. *Id.*, ¶ 81.

According to the City of Almaty's amended complaint, less than a year after purchasing the house at 606 North Alta, Ilyas and his wife purchased another house on North Alta Drive. *Id.*, ¶ 82. Specifically, in January 2013, they purchased a house located at 628 North Alta Drive for $6.2 Million using a shell company called 628 Holdings LLC. *Id.*, ¶ 83. This purchase was allegedly paid for via two transfers of over $6.1 Million from an account held in the name of Vilder Company SA, at an FBME account in Cypres to Granite Escrow in Beverly Hills, California. *Id.*, ¶ 84. Notably, Vilder Company SA is also a defendant in BTA Bank's UK Case. *Id.*, ¶ 85. According to CA SOS records and the City of Almaty's amended complaint, Elvira Kud was the sole officer of 628 Holdings LLC. *Id.*, ¶ 86. The house was listed for sale in April 2014 for $7.995 Million and eventually sold for $7.2 Million in July 2016. *Id.*, ¶ 87.

On or about September 8, 2014, Elvira and Dmitry Kud purchased a property located at 2 Narbonne, Newport Beach, for $4.1 Million. *Id.*, ¶ 90. This house was also held in the name of The Kasan Family Trust. *Id.*, ¶ 91. Over the next two years, Elvira Kud oversaw a dramatic gut renovation of that property, and in 2016, she listed her 7500+ square foot home, which had been featured in several national interior design publications, for $7.395 Million, eventually selling it in October 2016 for a reported $6.375 Million. *Id.*, ¶ 92. Respondent Jason Bradshaw of Bradshaw Residential Group was Elvira Kud's listing agent for this property and listed himself as the Owner's Authorized Agent in connection with a Newport Beach building permit filing on or about August 30, 2016. *Id.*, ¶ 93.

Also in 2016, Elvira Kud purchased a property at 310 38th Street also in Newport Beach for $3,420,000, redecorated it and then sold it in 2018 for $3.987 Million. *Id.*, ¶ 94. It appears that title to this property was held in the name of Thirtyeight Enterprises LLC, a company that according to CA SOS records was established in 2016 and dissolved by Elvira Kud in 2019. *Id.*, ¶ 95. The business address of Thirtyeight Enterprises LLC is listed in the CA SOS filings as 15335 Morrison Street, Suite 115, Sherman Oaks, CA 91403. *Id.*, ¶ 96. Respondent Jason Bradshaw of Bradshaw Residential Group also served as Elvira Kud's listing agent for the sale of this property. *Id.*, ¶ 97.

BTA's investigation to date suggests that several of the closings and escrows relating to these real property transactions were handled by Granite Escrow and Settlement Services.

## G. UK Case: Current Status

As noted above, Elvira Kud is a defendant in the UK Case brought by BTA Bank. Although BTA Bank has secured judgements against her brother and Ablyazov, the case against Elvira Kud is currently in the pre-trial discovery stage. *Id.*, ¶ 51. In addition, BTA Bank is a complaining witness in an investigation currently being pursued by Kazakhstan law enforcement authorities and is cooperating with those authorities by sharing information with them. *Id.*, ¶ 19.

On November 13th, 2020, BTA Bank submitted an ex parte application before the High Court of Justice of England and Wales in the UK Case for the following orders (the

15

"2020 Claim") each of which were granted: (i) lifting the stay of proceedings in respect of the Khrapunov Proceedings; (ii) permission to add ten additional parties to the Khrapunov Proceedings, including Elvira Kud; (iii) a world-wide freeze order ("WFO") directed against eight of twelve defendants, including Elvira Kud; (iv) permission to file an amended particulars of claim; (v) orders for service out of the jurisdiction; and (vi) permission to serve the documents by alternate means. *Id.*, ¶ 98, Exs. E-H. By way of background, the Khrapunov WFO was also amended pursuant to the 2020 Claim, however, this order is not relevant for the purposes of this application. *Id.*

BTA's November 13 *ex parte* application to the UK Court summarized its evidence that Elvira Kud (Defendant #4) participated in laundering money obtained in the aforementioned Ablyazov-Khrapunov scheme against BTA Bank, including holding assets in her name and shell companies controlled by her for the co-conspirators. *Id.*, ¶ 99. Among other things, these filings demonstrated that 14 payments were made to Elvira Kud between May 2017 and June 2020 totaling € 194.65 Million and CHF 3.8 Million. *Id.*, ¶ 100. These payments were made to Elvira Kud's bank accounts by: (i) Khrapunov totaling €3.2 Million; (ii) Crownway Limited (a Belize entity with company number: RA000693_116029) owned or ultimately controlled by Khrapunov (totaling €40 Million); and (iii) companies owned by or ultimately controlled by another co-conspirator in the 2020 Claim, Bulat Utemuratov, including, (a) Pantech SARL (a Luxembourg entity with universal entity code: 2626-7152-1025-6451) totaling €29.6 Million; (b) Crowell Investments Limited (a Cypriot entity with company number: OE 115669) totaling €97 Million; (c) Cannana Limited (a Cypriot entity with company number: HE365622) totaling €21 Million; (d) Thala SA (a Swiss entity with company number: CH-660.5.840.008-5); and (e) Panolos Limited (a St. Vincent and Grenadines entity) totaling CHF3.8 Million. *Id.* Mr. Utemruatov is alleged by BTA to have played a key role in the conspiracy and the concealment of Ablyazov's assets and dealing with them in breach of various of the English High Court Orders. *Id.*, ¶ 101. As of the date of the filing, Elvira Kud had €197 Million in a bank account in Monaco with EFG International, which is purported to have been transferred to an account with another

Monaco Bank, Compagnie Monegasque de Banque. *Id.*, ¶ 102. Based on asset tracing — and simple common sense given her known employment — it appears that all or a large share of the funds transferred to Elvira Kud were proceeds of the Ablyazov-Khrapunov scheme. *Id.*, ¶ 103. Indeed, there is simply no evidence supporting an alternate theory or to explain why Elvira Kud was personally in receipt of such substantial sums, from entities to which she otherwise she has no connection, unless she was and is a co-conspirator in the Ablyazov-Khrapunov scheme. *Id.*

At the hearing on November 13, 2020, the High Court of Justice, by Mr. Justice Calver, determined that BTA had established a good and arguable case that Elvira Kud, and others, conspired with Ablyazov and Khrapunov to launder the proceeds of Ablyazov's theft from BTA with the purpose of evading enforcement of the previously issued English Court judgments and orders against Ablyazov and Khrapunov. *Id.*, ¶ 104. On that basis, Mr. Justice Calver issued that world-wide freeze order entitled "Worldwide Freezing Injunction and Disclosure Order" ("WFO"). *Id.*, ¶ 104, Ex. I.

BTA is now tasked with prosecuting its claims against Elvira Kud in the UK Case and to that end is gathering evidence of her money laundering, locating additional assets that it may apply to the UK court to freeze, and seeking to enforce the WFO. *Id.*, ¶ 105. One of its first steps is to locate evidence of her money laundering and proceeds of the scheme transferred to her, and to discover if any other proceeds were transferred to her or businesses or entities controlled by her in this district and thereafter used to purchase assets in this district or elsewhere in the United States. *Id.*, ¶ 106.

The Court in the UK Case has already considered evidence of Elvira Kud's assets in connection with entry of the WFO and thus likely will do so again if further evidence is obtained pursuant to the requested subpoenas, thus negating any concern that the UK is or will be unreceptive to this Court's assistance. *Id.*, ¶ 108. Likewise, the Kazak law enforcement authorities have previously accepted evidence and information supplied to them by BTA Bank in connection with their investigation of the Ablyazov-Khrapunov scheme, and likely will do so again if further evidence is obtained pursuant to the requested

subpoenas, thus negating any concern that these authorities are or will be unreceptive to this Court's assistance. *Id.*, ¶ 109.

### H. Respondents

#### (i) The Wells Fargo Respondents

BTA has learned that Elvira Kud currently maintains accounts at Wells Fargo Bank, NA, which is a subsidiary of Wells Fargo & Company, in one of that bank's branch locations in either Costa Mesa or Newport Beach, California. *Id.*, ¶ 110. BTA has also learned that Elvira Kud has at least three bank accounts at Wells Fark Bank at this branch. *Id.*, ¶ 111. Additionally, a *Financial Times* investigation uncovered information indicating that, in or around April 2013, more than $3.1 Million was transferred out of one of Elvira Kud's Wells Fargo accounts to facilitate the purchase of three apartments in the Trump Soho, a 46-story luxury hotel-condominium in New York City. *Id.*, ¶ 115, Ex. J.

According to publicly available information, in addition to operating Wells Fargo Bank, N.A., Wells Fargo & Company also operates affiliates, Wells Fargo Clearing Services, LLC and Wells Fargo Financial Advisors Network LLC (collectively with Wells Fargo Bank, NA, "Wells Fargo Respondents"). *Id.*, ¶ 112. Because Wells Fargo Bank, NA, is operated by Wells Fargo & Company which also offers brokerage and clearing services to their bank clients via the two other Respondent entities, BTA wishes to serve all of them with the subpoenas attached hereto so that it can obtain information that will help it investigate and prosecute its claims against Elvira Kud in the UK and effectuate the WFO issued in the UK Case. *Id.*, ¶ 114.

The Wells Fargo Respondents operate their businesses in this district and maintain records in this district, most particularly at their branch locations in Costa Mesa and Newport Beach. *Id.*, ¶ 113. Therefore, each of these respondents can be "found" in this district. Further, Respondent Wells Fargo Bank, NA, certainly has information and evidence regarding Elvira Kud's assets and financial transactions in this district insofar as it is a depository institution where she maintains accounts. The Wells Fargo Bank accounts

listed in the proposed subpoenas are all listed in the WFO issued in the UK Case.  *Id.*, ¶ 116.

(ii)   <strong>Respondent Yvgeny Bukrinsky</strong>

According to publicly available information, Yvgeny Bukrinsky ("Bukrinsky" and "Respondent Bukrinsky") is an accountant  who lists his business address at 8325 Skyline Drive in Los Angeles California.  *Id.*, ¶ 117.  This address is a residence and it is also where he operates his d/b/a business, Omega Enterprises.  *Id.*

On August 27, 2018, Yevgeny Bukrinsky, filed a "Statement of No Change" with the California SOS on behalf of MaRo Design, LLC, of which Elvira Kud was listed as the sole member.   *Id.*, ¶ 118.  Respondent Bukrinsky also appears to have used or shared a mailing address with Elvira Kud's shell company Thirtyeight Enterprises LLC, namely, 15335 Morrison Street, Suite 115, Sherman Oaks, California 91403.  *Id.*, ¶ 119.

On or about May 26, 2016, Respondent Bukrinsky submitted registration to the CA SOS for an entity named 824 La Jolla LLC, with the same address as Thirtyeight Enterprises LLC: 15335 Morrison Street, Suite 115, Sherman Oaks, California 91403.  *Id.*, ¶ 120.  According to Realtor.com, a home at 824 La Jolla Avenue, Los Angeles, was purchased less than a month later, on or about June 16, 2016, for $3.295 Million.  *Id.*, ¶ 121.  That house was sold on February 2, 2018 for $3.3 Million, and six days later (on February 8, 2018), Respondent Bukrinsky filed a certificate of cancellation and other paperwork with the CA SOS for 824 La Jolla LLC.  *Id.*, ¶ 122. This flipping of high end properties by 824 La Jolla LLC mirrors almost exactly Elvira Kud's activity with her other shell companies such as Thirtyeight Enterprises LLC, with which it shares an address.  *Id.*

On or about January 12, 2020, Respondent Bukrinsky registered a new corporation, Omega Tax Services Inc., with the CA SOS, and listed the business address as 15335 Morrison Street, Suite 115, Sherman Oaks, CA 91403 (the same address used by Thirtyeight Enterprises LLC and 824 La Jolla LLC); himself as an officer; and his address as 8325 Skyline Drive in Los Angeles, California.  *Id.*, ¶ 123.  This suggests that he offers tax services in addition to accounting services.

BTA Bank wishes to obtain records from Respondent Bukrinsky relating to MaRo, Elvira Kud, and any other entity associated with Elvira Kud and/or her co-defendants in the UK Case; and to depose him to ask (among other things) about the instructions that he received relating to MaRo Design LLC, and any other asset or control information he has relative as to Elvira Kud, and whether any of the remaining defendants in the UK Case have or had an interest or involvement in 824 La Jolla LLC. *Id.*, ¶ 124.

(iii)   **Respondent Escrow of the West**

As noted above, Escrow of the West handled the escrow for Elvira Kud's 2010 purchase of 2758 Hutton Drive in Beverly Hills, California. *Id.*, ¶125. Escrow of the West has offices in Beverly Hills, Woodland Hills and Westlake Village, and boasts that it is "Southern California's Leading Escrow Company." *Id.*, ¶ 126. Its Beverly Hills office is located at 9440 S Santa Monica Blvd., Suite 310, Beverly Hills, CA 90210. *Id.*, ¶ 127.

(iv)   **Respondent Granite Escrow and Settlement Services**

Respondent Granite Escrow and Settlement Services ("Granite Escrow") handled the escrow on Elvira Kud's purchase and sale of various properties mentioned above, including the property at 2 Narbonne in Newport Beach. *Id.*, ¶ 128. According to publicly available information, Granite Escrow's office is located at 450 Newport Center Drive, Newport Beach, CA. *Id.*, ¶ 129.

(v)   **Respondents Jason Bradshaw and Bradshaw Residential Group (n/k/a Coldwell Banker)**

As noted above, Jason Bradshaw of Bradshaw Residential Group was Elvira Kud's listing agent for the 2 Narbonne and 310 38th Street properties in Newport Beach. *Id.*, ¶ 130. His office is located at 4 Corporate Plaza, Suite 100, Newport Beach, California. *Id.*, ¶ 131. In or about December 2017 Bradshaw Residential Group was acquired by Coldwell Banker. *Id.*, ¶ 132. Out of an abundance of caution, BTA wishes to serve both Jason Bradshaw d/b/a Bradshaw Residential Group and Coldwell Banker, both of which can be found in this district.

\\

(vi)   **Respondents Anthill Shopnplay and Edward Hill Bakery**

Respondents Anthill Shopnplay and Edward Hill Bakery party N beyond are businesses that are currently owned and operated by Elvira Kud.  *Id.*,  ¶ 133.   They are located at 1800 Newport Blvd, Costa Mesa, California.  *Id.*  BTA Bank wishes to determine the source of funds Elvira Kud used to establish these businesses, pay rents and/or purchase the property at 1800 Newport Blvd and any other location(s) where they may operate, pay employees, make purchases of stock, and, among other things, to determine whether tainted funds were used in any way relating to these businesses, whether the businesses have any assets that BTA can attempt to freeze in the UK Case, and whether the operation of these businesses is involved in the money laundering scheme.  *Id.*, ¶ 134.

The purpose of all of this discovery is to gather evidence of Elvira Kud's involvement in and participation in the Ablyazov-Khrapunov scheme, which is the subject of the UK Case (and of course the criminal proceeding mentioned above), and the involvement in that scheme of the other named defendants.  *Id.*, ¶ 136.

## III.   ARGUMENT

Congress enacted Section 1782 to "facilitate the conduct of litigation in foreign tribunals, improve international cooperation in litigation, and put the United States into the leadership position among world nations in this respect."  *In re Application Pursuant to 28 U.S.C. § 1782 for an Order Permitting Bayer AG to Take Discovery (In re Bayer AG)*, 146 F.3d 188, 191-92 (3d Cir. 1998).  Liberal application of Section 1782 in appropriate cases furthers the statute's twin aims of "provid[ing] efficient means of assistance to participants in international litigation in our federal courts and encourag[ing] foreign countries by example to provide similar means of assistance to our courts."  *Schmitz v. Bernstein, Liebhard & Lifshitz*, 376 F.3d 79, 84 (2d Cir. 2004).

This Application presents a paradigmatic case for judicial assistance.  BTA Bank has spent over ten years tracing the stolen $6 Billion through an intricate web of shell companies, straw owners, and other nominees.  Because the scale of the money laundering in this case is huge and international — as it had to be given the sums involved — attempts

by BTA to trace the tainted funds stolen in the Ablyazov-Khrapunov scheme have been challenging to say the least. *Id.*, ¶ 139. Their quest really has been akin to finding a needle in a very, very large haystack.

Now that BTA has identified millions of euros in tainted funds transferred to Elvira Kud's bank accounts in Monaco within the past 12 months and that significant sums were thereafter transferred out of those accounts or used to purchase assets, the race quite literally is on to see where those funds and/or assets currently are so that they can be frozen. In addition to locating assets to freeze pursuant to the WFO, BTA must ultimately marshal sufficient evidence to prove their claims against her and obtain a judgment. By issuing these subpoenas to Respondents, BTA wishes to ascertain if any of these transfers ended up in Elvira Kud's accounts with Respondent Wells Fargo Bank N.A. and gather information about her financial dealings since she entered this district in 2010, as the recent transfers to her are more than likely not the first assets sent to her (or an entity controlled by her) to launder. The need for discovery is particularly acute because neither Ablyazov nor Khrapunov have cooperated with authorities, indeed Ablyazov fled the UK for France so as not to have to testify about the location of his assets and the location of the proceeds of his crimes. *Id.*, ¶ 139. And, as explained below, the three threshold requirements for granting a Section 1782 application are readily met.

## A.  Respondents are "found" in this district.

Based on evidence obtained by BTA's legal team, it appears that Elvira Kud maintains accounts at Wells Fargo Bank NA in either Costa Mesa or Newport Beach, California ("Costa Mesa Wells Fargo"). *Id.*, ¶¶ 110-111. Because Costa Mesa Wells Fargo "resides" in this district, it is subject to this Court's authority under Section 1782. Likewise, the Costa Mesa Wells Fargo's parent company, Wells Fargo & Company, maintains its corporate headquarters in California and has such extensive business operations throughout Orange County and Los Angeles Counties that it, and its affiliated investment service firms, are essentially at home and thus reside in this district. *See Goodyear Dunlop Tires*

*Operations, S.A. v. Brown*, 564 US 915, 924 (2011) (corporation will be deemed "domiciled" in its state of incorporation and where it has its principal place of business).

Yvgeny Bukrinsky d/b/a Omega Enterprises "resides" in this district as his business is located at 8325 Skyline Dr. in Los Angeles, CA. *Id.*, ¶ 117. Likewise, Granite Escrow and Settlement Services resides in this district insofar as its office is located at 450 Newport Center Drive, Newport Beach, CA, and according to its website:

> **Granite Escrow & Settlement Services** is one of California's largest independent escrow companies. Our corporate office is located in Newport Beach and we have branches in Newport Beach, Beverly Hills, Santa Monica, La Jolla, Irvine, Laguna Woods, San Clemente and San Diego.

*Id.*, ¶ 129. Respondent Escrow of the West also resides in this district because its offices are located in Beverly Hills, Woodland Hills, and Westlake Village, including at 9440 S Santa Monica Blvd., Suite 310, Beverly Hills, California, 90210. *Id.*, ¶¶ 126-127.

Respondents Anthill Shopnplay and Edward Hill Bakery party N beyond both reside in this district as they are both located at 1800 Newport Blvd, Costa Mesa, California. *Id.*, ¶ 133.

Finally, Respondent Jason Bradshaw of Bradshaw Residential Group resides in this district because he maintains his offices at 4 Corporate Plaza, Suite 100, Newport Beach, California. *Id.*, ¶ 131. In or around December 2017, Bradshaw Residential was acquired by Respondent Coldwell Banker, which also can be found in this district. *Id.*, ¶ 132, Ex. K.

## B. Petitioners are "interested persons" under the statute.

BTA Bank without doubt qualifies as an interested person under Section 1782. The Supreme Court has held that the term "interested person" in the statute is broad, encompassing any individual who "possesses a reasonable interest in obtaining judicial assistance." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256-57 (2004) (citation and alteration omitted). This includes a complainant before a foreign court. *See id.* at 256 ("a complainant 'possess[es] a reasonable interest in obtaining [judicial] assistance,' and therefore qualifies as an 'interested person' within any fair construction of that term.").

Here, BTA Bank is the complaining victim in the UK Case.  It has recently amended its claims in the UK Case, where it already has obtained judgements from that court, to assert claims against Elvira Kud.  BTA is tasked with prosecuting its claims in the UK and seeking to enforce the WFO it has obtained.   Any evidence obtained pursuant to the requested subpoenas directed to Respondents will be used for the purposes of prosecuting the claims against Elvira Kud in the UK Case.  *Id.*, ¶ 135. To the extent that  it obtains information relevant to the pending criminal investigation, it will pass that along to government authorities.   In short, Petitioner is precisely the type of interested person contemplated in the statute and in the Supreme Court's *Intel* opinion.

### C.     <u>The requested discovery is for use before a foreign tribunal</u>

BTA proposes to use the discovery requested in the UK Case and possibly pass it along to law enforcement authorities for their parallel criminal investigation.  "Proceedings" qualifying for issuance of a discovery order under Section 1782  include cases pending before an international tribunal, such as the UK court here, and "criminal investigations conducted before formal accusation." 28 U.S.C. § 1782(a).  Adjudicatory proceedings need not be imminent or pending "for an applicant to invoke § 1782(a) successfully." *Intel*, 542 U.S. at 253.   Indeed, as the legislative history shows, "[T]he [district] court[s] have discretion to grant assistance when proceedings are pending before investigation magistrates in foreign countries." S. Rep. No. 1580, at 7, U.S. Code Cong. & Admin. News 1964, pp. 3782, 9788.  Here, the UK Case is a formal court proceeding before a foreign tribunal, namely the UK High Court.   There is also a pending criminal investigation in Kazakhstan.  Both the UK Case and the criminal investigation qualify as "proceedings" under the statute.

Further, the discovery requested in this Application falls squarely within the statute's purview in so far as it will be used in those proceedings.  It is sought in furtherance of the UK Case as part of BTA's ongoing investigation and pursuant to the orders of that court.  The scope of that investigation extends to all participants in the Ablyazov-Khrapunov

scheme including those such as defendant Elvira Kud, who appear to have held assets for their co-schemers and/or laundered money for them. *Id.*, ¶¶ 135-139.

The requested discovery, which is related to Elvira Kud's financial transactions and assets, can be used as evidence of Elvira Kud's participation in the money-laundering scheme or to locate other such evidence. Further, it can be used to determine whether her accounts at the Wells Fargo Respondents hold tainted assets and/or identify other assets and accounts for which an additional freeze or other court order can be obtained in the UK Case. *Id.*, ¶ 105. The information in Respondents' possession would not only be relevant but may be essential to the progress of BTA's investigation against Elvira Kud and her co-conspirators.

**D.  The Application should be granted in the exercise of the Court's discretion.**

Where, as here, Section 1782's threshold requirements are met, the decision whether to grant the application rests within the district court's discretion. The Supreme Court has articulated several factors for a court to consider in determining whether to grant an application, including (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal and proceedings, and the receptivity of the foreign government, court, or agency to the assistance of the U.S. federal courts; (3) whether the application conceals an attempt to circumvent foreign proof-gathering restrictions or other public policies; and (4) whether the discovery would be unduly intrusive or burdensome. *Intel*, 542 U.S. at 264-66. All of these factors weigh in favor of granting this Application.

First, Respondents are not participants in the underlying foreign proceeding, and BTA has no independent means of securing their cooperation absence issuance of the requested subpoenas.

Second, the court in the UK Case has already considered evidence of Elvira Kud's activities and assets in connection with entry of the WFO and thus likely will do so again if

further evidence is obtained pursuant to these subpoenas, thus negating any concern that the UK is or will be unreceptive to the Court's assistance. *Id.*, ¶ 108.

Third, the Application does not seek to circumvent proof-gathering restrictions, but rather to fill a gap in foreign discovery devices — a goal firmly in line with the statute's overarching purpose of "providing efficient means of assistance to participants in international litigation in our federal courts." *Application of Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992).

Finally, the discovery sought here is exactly the sort of discovery financial institutions and other businesses routinely receive from litigants in civil cases trying to locate evidence of assets and/or financial transactions and from law enforcement authorities investigating money laundering. Because it is routine and restricted to Respondents' business documents, the request is not unduly intrusive or burdensome. This is especially so in light of the potential benefit to Applicant from the requested discovery. The relatively *de minimis* burden on Respondents' resources and time is an insufficient basis for declining to aid the investigation's critical truth-seeking mission.

## IV.   CONCLUSION

WHEREFORE, Applicant respectfully requests the Court grant Applicant leave to serve Respondents Wells Fargo Bank, NA, Wells Fargo & Company, Wells Fargo Clearing Services, LLC., Wells Fargo Financial Advisors Network LLC, and related entities; Anthill Shopnplay and Edward Hill Bakery party N beyond, accountant/tax preparer Yvgeny Bukrinsky (d/b/a Omega Enterprises); Granite Escrow and Settlement Services and Escrow of the West; Jason Bradshaw d/b/a Bradshaw Residential Group; and Coldwell Banker with the subpoenas attached to this Application.

\\

\\

\\

\\

\\

DATED:  December 2, 2020      GREENBERG TRAURIG, LLP


By: _____*/s/ Carolyn F. McNiven*_____
Carolyn F. McNiven


Attorneys for Applicant JSC BTA Bank

APPLICATION FOR DISCOVERY UNDER 28 U.S.C. § 1782