CAROLYN F. McNIVEN (SBN 163639)
GREENBERG TRAURIG, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111
Telephone: (415) 655-1270
Facsimile: (415) 707-2010
mcnivenc@gtlaw.com

Attorneys for Applicant
JSC BTA BANK

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| In the Matter of the Application of JSC BTA Bank for an Order Seeking Discovery Under 28 U.S.C. § 1782 | Case No. 8:20-MC-00126 <br><br> **DECLARATION OF JASON KISLIN IN SUPPORT OF JSC BTA BANK'S EX PARTE APPLICATION FOR DISCOVERY ORDER PURSUANT TO 28 U.S.C. § 1782 IN AID OF FOREIGN PROCEEDING** <br><br> CTRM: TBD <br> JUDGE: TBD <br> DATE FILED: December 2, 2020 |
|---|---|

# DECLARATION OF JASON KISLIN IN SUPPORT OF JSC BTA BANK'S EX PARTE APPLICATION FOR DISCOVERY ORDER PURSUANT TO 28 U.S.C. § 1782 IN AID OF FOREIGN PROCEEDING

I, Jason Kislin, hereby declare as follows:

1. I am an attorney who practices in and is licensed in New Jersey, and I am a shareholder with Greenberg Traurig, LLP ("**GT**"), counsel for Applicant JSC BTA Bank ("**Applicant**," "**BTA**," or "**BTA Bank**").

2. I have personal knowledge of the status of the on-going civil case pending in the United Kingdom ("**UK**") against Elvira Kudryashova ("**Elvira Kud**") and co-defendants entitled *JSC BTA Bank [versus] Mukhtar Ablyazov, et al.,* Claim No. CL-2015-000549, In the High Court of Justice, Business and Property Courts of England and Wales, Commercial Court (the "**UK Case**"), which case is being handled by my GT London colleagues. I have personally reviewed the pleadings and orders in that case referenced herein.

3. I can attest to the fact that the UK Case is currently pending against (among others) Elvira Kud and Vilder Company SA; that this case is active and pending before a foreign tribunal, namely the High Court of Justice in the UK; that BTA Bank is investigating whether any other individuals and/or entities (including Medina Khrapunov and Dmitry Kudryashova (a/k/a Dmitry Kud)) should be added to its complaint in the UK Case; and that I and my UK GT colleagues who are handling the UK Case intend to use the records and testimony being sought via this petition pursuant to 28 U.S.C. §1782 for use in the UK Case.

4. With respect to facts described herein that are not based upon my own personal knowledge, my testimony is based upon a review of information received by BTA bank as well as publicly available materials, including the amended complaint and other pleadings in *City of Almaty v Viktor Khrapunov et al.*, 14 CV 03650 (USDC CDCA ("**City of Almaty Case**"); related proceedings in that matter before the 9th Circuit court of appeals, case number 18-56451, including the published opinion at 956 F. 3d 1129 (9th Cir. 2020);

California Secretary of State records; media reports and other information referenced herein. As such, I am testifying as a summary witness based upon facts known to and/or reported by others as well as facts know to me personally.

**The Bank, The Crime, and the UK Case**

5. BTA is a bank based in the city of Almaty in the Republic of Kazakhstan.

6. Between May 2005 and February 2009, BTA was controlled by its Chairman and primary shareholder, Mukhtar Ablyazov ("**Ablyazov**").

7. In 2008, during the global credit crunch, the Kazakh financial regulator (the "**AFN**") began investigating BTA's loan portfolio, identifying a number of issues with its risk management and requiring it to make an additional provision of $3.58 billion.

8. On 30 January 2009, BTA informed the AFN it could not meet its liabilities.

9. In February 2009, BTA was effectively nationalized, via the Kazakh sovereign wealth fund (Samruk-Kazyna).

10. Ablyazov was dismissed and subsequently fled to London, England.

11. Subsequent investigations by BTA revealed an enormous hole in its balance sheet.

12. KPMG was engaged by BTA's new management and advised that BTA should provision for $16.5 billion as a result.

13. BTA also found evidence leading it to believe that its former management, in particular Ablyazov, had embezzled vast amounts of its funds, including by directing and authorizing unsecured loans from BTA to companies that Ablyazov controlled and which had no assets.

14. Ablyazov effectively used BTA as his own personal piggy bank, illegally syphoning off between approximately $6 Billion and $7.5 Billion of BTA assets through a combination of withdrawals, phony loans, and other mechanisms.

15. Thereafter, as described further below, Ablyazov attempted to conceal the fruits of his crimes by engaging in acts with co-conspirators to conceal the location of the proceeds of his crimes and launder those funds and proceeds.

16. On information and belief, law enforcement authorities in France, Kazakhstan, and Switzerland have active investigations into Ablyasov's crimes against BTA Bank, and there are other open criminal investigations in several jurisdictions concerning related crimes by the same individuals.

17. Elvira Kud is reportedly one of the targets of these investigations.

18. BTA Bank is the complaining victim in the Kazakhstan investigation into the BTA theft and is cooperating with Kazak law enforcement authorities.

19. BTA has, since the beginning of 2020, received information and documents from the Anti-Corruption Service and the General Prosecutor's Office of Kazakhstan and is in an ongoing dialogue with them in relation to their investigation.

20. The information provided to BTA by the law enforcement authorities forms the basis of BTA's claims in its various civil suits.

**ABLYAZOV PROCEEDINGS**

21. In August 2009, BTA commenced proceedings in England and Wales against Ablyazov pursuant to which a worldwide freezing order was granted against Ablyazov and six alleged associates.

22. In total BTA commenced 13 sets of proceedings in the High Court of England and Wales between 2009 and 2010 against Ablyazov and various alleged associates and related parties.

23. BTA's claims against Ablyazov and his associates were for fraud and embezzlement on an unprecedented scale.

24. Essentially, BTA alleged that Ablyazov had helped himself to huge amounts of BTA's cash resources by causing BTA to make substantial transfers of funds to (or for the benefit of) a considerable number of overseas companies that Ablyazov secretly owned and/or controlled.

25. In the course of these cases, Ablyazov failed to provide full disclosure of his assets and answer certain other queries as he was required to do.

DECLARATION OF JASON KISLIN IN SUPPORT OF APPLICATION PURSUANT TO 28 U.S.C. § 1782

ACTIVE 53970877v11

26. The English High Court found that Ablyazov knowingly gave false evidence during the course of his cross-examinations in October and November 2009, with the intention of interfering with the administration of justice.

27. In August 2010, BTA successfully applied to the English High Court for receivers to be appointed over Ablyazov's assets in view of Ablyazov's persistent non-disclosure and breaches of Court orders ("**Receivership Order**").

28. The Receivership Order has been varied from time to time to cover over 1000 companies and other assets believed to be owned or beneficially owned by Ablyazov.

29. In February 2012, following a committal hearing, Ablyazov was found to have lied in his asset disclosure and cross-examination at the hearing, to have dealt with certain assets in breach of a world-wide freeze order issued by the Court, and to have relied on backdated and fabricated documentation and suborned the giving of evidence.

30. Ablyazov subsequently fled to France before judgment could be handed down.

31. In his absence Ablyazov was sentenced by the UK Court to three concurrent 22-month terms of imprisonment.

32. It was subsequently ordered that Ablyazov's defenses to BTA's civil claims in the English Commercial Court be struck out.

33. Three of BTA's claims against Ablyazov were then selected to proceed to trial.

34. In each of the subsequent proceedings, judgment was entered into in favor of BTA.

35. As a result, judgement was entered into against Ablyazov and his associates in the sum of $5 Billion.

36. No part of these judgments has been paid voluntarily by Ablyazov and BTA has recovered only a relatively small amount by enforcement, including against some properties in the UK belonging to Ablyazov – totaling approximately $45 million arising from the various English proceedings.

37. BTA has also taken control of other assets (mainly in the CIS), resulting in total recoveries of less than $1 Billion.

38. Since obtaining judgments in cases pending in the UK, BTA has been aggressively moving in multiple jurisdictions (mainly consisting of judgment recognition proceedings) including Switzerland, Lichtenstein, Luxembourg and the USA to locate, and freeze Ablayzov's assets so that it will be able (eventually) to recover the proceeds of Ablyazov's crimes.

39. BTA's extensive asset recovery and enforcement efforts have been frustrated by Ablyazov and his co-conspirators' use of a web of companies, many offshore and held via straw or nominee owners, to conceal their assets and as such, the proceeds of their crimes.

40. Through the myriad of shell companies, Ablyazov and his co-schemers have managed to effect hundreds of financial transfers between countries and institutions to put their assets beyond BTA's reach.

41. As stated above, BTA has only managed to recover a fraction of its total losses.

**The UK Case**

42. During the course of its investigation, BTA discovered that one of Ablyazov's key co-conspirators was Ilyas Khrapunov ("**Khrapunov**"), his son-in-law and "right hand man," who is also the step-son of the former mayor of Almaty, Victor Khrapunov.

43. In July 2015, BTA issued a further set of proceedings in the English High Court against Ablyazov and Khrapunov, namely the UK Case.

44. BTA alleged in the UK Case that Khrapunov had been, since December 2009 at the latest, involved in a conspiracy with Ablyazov that involved concealing, dealing with, disposing of, and/or diminishing the value of the money stolen by Ablyazov from BTA (hereinafter "**the Ablyazov-Khrapunov scheme**").

45. The facts uncovered by BTA and other victims of Ablyazov's crimes concerning this scheme reads like an international thriller. *See e.g.* Stephen M. Bland, *The Case of the Khrapunovs*, THE DIPLOMAT, (Jul. 18, 2018), http://www.thediplomat.com/2018/07/the-case-of-the-khrapunovs, attached hereto as **Exhibit A**.

46. In June 2018 BTA eventually obtained a partial judgment for $500 Million against Khrapunov in the English Courts (following his breach of Court orders relating to disclosure of his and Mr. Ablyazov's assets).

47. In September 2018, the English High Court stayed the UK Case. That stay was lifted on November 13, 2020.

48. In addition, to locating assets, BTA Bank has attempted to identify and gather evidence against Ablyazov's co-conspirators in the original crimes against BTA and in laundering the proceeds of those crimes.

49. BTA has obtained evidence indicating that Elvira Kud acted as a nominee for her brother Khrapunov in the money laundering scheme relating to the BTA Bank theft, that she received payments from shell companies into which tainted proceeds of the crimes were transferred, and that she owns property and has financial accounts in this district, including at Respondent, Wells Fargo Bank, NA.

50. Based upon what it uncovered in its investigation, BTA moved to have the stay lifted in the UK Case and amended its complaint to add multiple new defendants, including Elvira Kud.

51. BTA's case in the UK against Elvira Kud is currently in the pre-trial discovery state and BTA is continuing to amass evidence of Elvira Kud's involvement in money laundering, to attempt to locate her assets and those of her co-defendants, and apply for freeze orders to ensure that assets, once located, do not disappear before judgment is rendered in the UK Case as to Elvira Kud and the remaining defendants.

**Background on Elvira Kud, her Husband Dmitry Kud, and her brother Ilyas**

52. According to numerous sources including media reports and filings in the City of Almaty Case, the Ablyazov and Khrapunov families are tied together by marriage and a common course of criminal conduct.

53. Elvira Kud's brother Ilyas Khrapunov is married to Ablyazov's daughter Madina, and Elvira Kud has allegedly laundered money for both her father and brother as well as Ablyazov.

7
DECLARATION OF JASON KISLIN IN SUPPORT OF APPLICATION PURSUANT TO 28 U.S.C. § 1782
ACTIVE 53970877v11

54. Victor Khrapunov, Elvira Kud and her husband Dmitry Kud (a/k/a Dmitry Kudryashova), and other family members have been separately accused by the City of Almaty in the City of Almaty Case of corruptly and fraudulently converting municipal assets to their own personal use and thereafter laundering hundreds of millions of dollars of the proceeds of that scheme in this district and elsewhere.

55. The City of Almaty has alleged that Victor Khrapunov sold off real property owned by that city to his step-daughter Elvira Kud for drastically below market prices and through means of shell companies, and that Elvira Kud laundered the proceeds with her brother Ilyas and other family members including via shell companies and real estate transactions in this district.

56. A true and correct copy of the city's "Consolidated Amended Complaint For Damages, Injunctive Relief, And Other Equitable Relief," filed in the City of Almaty case is attached hereto as **Exhibit B**.

57. The money laundering allegations and use of shell companies set out in the City of Almaty's amended complaint mirror closely the type of conduct uncovered by BTA with regard to the laundering of stolen BTA money – namely, that Elvira Kud was actively involved in setting up shell companies, including shell companies in California, purchasing assets, and moving money to launder criminal proceeds.

58. Elvira Kud is also referred to in complaint proceedings brought in March 2019 in the United States District Court Southern District of New York by City of Almaty and BTA against others ("**SDNY Proceedings**").

59. The SDNY Proceedings go into significant detail as to Elvira Kud's role in concealing and dissipating monies on behalf of Khrapunov including using monies received from the bank accounts of companies controlled by Khrapunov to purchase US real property in knowing violation of freezing orders issued by UK courts.

60. BTA is endeavoring to learn as much as possible about the entities that Elvira Kud and her co-conspirators used to launder money to determine how and when such entities may have been used to launder proceeds of the crime against BTA Bank.

61. Based upon the City of Almaty's amended complaint as well as numerous press reports, it appears that Victor Khrapunov fled Kazakhstan for Switzerland with his wife and step-children in about 2007 after news of his crimes broke.

62. According to those same sources, Elvira Kud is married to Russian national Dmitry Kud (a/k/a Dmitry Kudryashova), who is also a defendant in the City of Almaty Case and is being investigated by BTA Bank to determine if he assisted in the money laundering scheme.

63. In or about 2010, Elvira Kud moved to Beverly Hills, CA, with Dmitry Kud, where she ostensibly started an interior design business, Style Life Décor. See Exhibit B; *see also* https://www.houzz.com/professionals/interior-designers-and-decorators/style-life-decor-pfvwus-pf~310895062; McDonough, Lauren Smith, "This California Manor Has a Thing for Abstract Art, House Beautiful, Apr. 25, 2016, https://www.housebeautiful.com/design-inspiration/house-tours/a6087/california-mansion-abstract-art/, attached hereto as **Exhibit C.**

64. According to California Secretary of State ("**CA SOS**") filings, numerous press reports, interviews with Elvira Kud and her websites and postings, Elvira Kud owns and operates two retail businesses in Costa Mesa: "Anthill Shopnplay" (a/k/a Anthill Fashion Market, Anthill Shopnplay LLC, Kud Vintage) (anthillshop.com) and "Edward Hill Bakery party N beyond," at 1800 Newport Blvd, Costa Mesa, CA.

65. Based on recent online searches, it appears that the bakery business may be closed.

66. Although Elvira Kud operated two ostensibly legitimate retail establishments in Costa Mesa and a design business out of her home, her assets, which in 2020 have amounted at points to in excess of €197 Million (which approximates to over $235 Million), greatly exceed the amount that could be realistically attributable to the operation of such small-scale enterprises.

\\

67. Further, I am aware of no reports – in the press or otherwise – that suggest that there is a legitimate source for her wealth such as inheritance, winning the lottery or equivalent legal source.

**Shell Companies Relating to Elvira Kud**

68. According to filings in the City of Almaty Case and records filed with the CA SOS, Elvira Kud established and/or controlled multiple companies in the United States, including, in California, MaRo Design LLC, 628 Holdings, LLC, Haute Hue LLC, MaRo Enterprises, LLC, and Thirtyeight Enterprises, LLC, and those listed on the subpoenas attached hereto.

69. On information and belief, and as described in the City of Almaty case, Elvira Kud and her co-conspirators us shell companies such as these to conceal their ownership of and source of assets for real and personal property.

70. The City of Almaty also identified the following companies and involved in laundering for Elvira Kud and her money laundering co-conspirators:

    (a.) RPM USA, LLC, a New York Corporation;

    (b.) RPM-MARO LLC, a New York Corporation;

    (c.) Canadian International Ltd., a British Virgin Islands corporation;

    (d.) Crownway, Ltd., a Belize corporation;

    (e.) Vilder Company, S.A., a Panama corporation;

    (f.) World Health Networks Inc. (f/k/a Health Station Networks Inc. a Delaware company:

    (g.) SDG Capital, SA, a Swiss Company;

    (h.) Swiss Promotion Group SA ("**SPG**"), a Swiss Company;

    (i.) Adlux Sarl, SA, a subsidiary of SPG;

    (j.) Soho 3203 LLC;

    (k.) Soho 3310 LLC;

    (l.) Soho 3311 LLC.

71. Of the companies listed in the prior paragraphs, two -- Vilder Company SA and Crownway LTD -- are also named defendants in the UK Case for which proceedings are pending as just as described for Elvira Kud.

**Elvira Kud's Real Property Transactions in this District**

72. Elvira Kud has also owned and flipped several luxury properties within the district over the past ten years.

73. **2578 Hutton Drive, Beverly Hills:** According to the City of Almaty's Amended Complaint, Elvira and Dmitry Kud purchased a house at 2578 Hutton Drive, Beverly Hills, CA, for approximately $3.65 Million. Ex. B, ¶111.

74. This purchase was funded with two transfers in 2010 (October 20 and December 2) totaling over $3.6 Million from their Swiss bank accounts (into which tainted proceeds had been deposited) to Escrow of the West, an escrow company based in Los Angeles. *Id.*

75. Escrow of the West has offices in Beverly Hills, Woodland Hills and Westlake Village, and boasts that it is "Southern California's Leading Escrow Company." https://escrowofthewest.com/.

76. Its Beverly Hills office is located at 9440 S Santa Monica Blvd., Suite 310 Beverly Hills, CA 90210. *Id.*

77. According to the website Realtor.com, the closing for the Hutton Drive house occurred on or about December 7, 2010; and the house was listed for sale on May 10, 2013 for $5.37 Million. https://www.realtor.com/realestateandhomes-detail/2578-Hutton-Dr_Beverly-Hills_CA_90210_M24339-28510.

78. The house was eventually sold on July 19, 2013 for $4.97 Million. *Id.* and Ex. B at ¶133.

79. **606 North Alta Drive, Beverly Hills**: According to the City of Almaty's amended complaint, Ilyas and his wife purchased a house for $5.45 Million in March 2012 at 606 North Alta Drive, Beverly Hills, through two transfers from shell company Canadian International LTD to Granite Escrow Services in Beverly Hills. Ex. B at ¶116.

80. This house was sold on or about July 30, 2013 for approximately $6.975 Million. *Id.* 139.

81. BTA Bank is presently investigating whether there is a basis to add Ilyas wife Medina and the shell company Canadian International Ltd. to the UK Case; therefore, it is seeking information concerning them and in particular their connection to this real estate transaction.

82. **628 North Alta Drive, Beverly Hills**: According to the City of Almaty's amended complaint, less than a year after purchasing the house at 606 North Alta, Ilyas and his wife purchased another house on North Alta Drive.

83. Specifically, in January 2013, they (utilizing a shell company called 628 Holdings LLC) purchased a house located at 628 North Alta Drive, for $6.2 Million. Ex. B at ¶¶123, 124.

84. This purchase was allegedly paid for via two transfers of over $6.1 million from an account held in the name of Vilder Company SA, at an FBME account in Cyprus to Granite Escrow in Beverly Hills, CA. *Id.*

85. Notably, Vilder Company SA is also a defendant in BTA Bank's UK Case.

86. According to CA SOS records and the amended complaint, Elvira Kud was the sole officer of 628 Holdings LLC.

87. The house was listed for sale the next year (April 2014) for $7.995 Million and eventually sold for $7.2 Million in July 2016. *See,* https://www.realtor.com/realestateandhomes-detail/628-N-Alta-Dr_Beverly-Hills_CA_90210_M21529-82038

88. **11986 Lockridge Rd, Studio City:** According to press and social media reports and the City of Almaty's Amended Complaint, on or about July 19, 2013, Elvira Kud purchased a home in Fryman Canyon with the street address of 11986 Lockridge Rd, Studio City for around $5 Million, and then, seven months later, put it on the market for considerably more, eventually selling it in 2014 to famed musician Bruno Mars for approximately $6.5 Million. *See* Mark David, *Bruno Mars Buys Big Studio City Estate*,

Variety (Dec. 12, 2014, 11:00 AM), http://www.variety.com/2014/dirt/real-estalker/bruno-mars-buys-studio-city-estate-1201388860/, attached hereto as **Exhibit D**; *See also* Ex. B at ¶¶ 134, 142.

89. The house was held in the name of The Kasan Family Trust; Elvira Kud was allegedly trustee of that trust. Ex. B at ¶ 142.

90. **2 Narbonne, Newport Beach:** On or about September 8, 2014, Elvira and Dmitry Kud purchased a property located at 2 Narbonne, Newport Beach, for $4.1 Million. Ex. B at ¶ 144.

91. The house was held in the name of The Kasan Family Trust. *Id*.

92. Elvira Kud oversaw a dramatic gut renovation of that property, and in 2016, she listed the 7500+ square foot home, which was been featured in several national interior design publications, for $7.395 Million, eventually selling it in October 2016 for a reported $6.395 Million. That property is located at 2 Narbonne, Newport Beach, CA. *See* Exhibit B at ¶ 151.

93. Realtor Jason Bradshaw of Bradshaw Residential Group was Elvira Kud's listing agent for this property and listed himself as the Owner's Authorized Agent in connection with a Newport Beach building permit filing on or about August 30, 2016. *See* https://www.realtor.com/realestateandhomes-detail/2-Narbonne_Newport-Beach_CA_92660_M22173-35246.

94. **310 38th Street, Newport Beach:** Also in 2016, Elvira Kud purchased a property at 310 38th Street in Newport Beach for $3,420,000, redecorated it, and then sold it in 2018 for $3,987,000. *See* https://www.realtor.com/realestateandhomes-detail/310-38th-St_Newport-Beach_CA_92663_M26728-66177.

95. It appears that title to this property was held in the name of Thirtyeight Enterprises LLC, a company that according to CA SOS records was established in 2016 and dissolved by Elvira Kud in 2019.

96. The business address of Thirtyeight Enterprises LLC is listed in the CA SOS filings as 15335 Morrison Street, Suite 115, Sherman Oaks, CA 91403.

97. The listing agent for the property was Jason Bradshaw of Bradshaw Residential Group.

**Current Status of UK Case**

98. On the 13th November, 2020, BTA made an ex parte application (a true and correct copy of the Ex Parte Application is attached hereto at **Exhibit E**) in the High Court of Justice of England and Wales for the following orders (the "**2020 Claim**") each of which were granted: (i) lifting the stay of proceedings in respect of the Khrapunov Proceedings as referred to in paragraph 17 above; (ii) permission to add ten additional parties to the Khrapunov Proceedings, including Elvira Kud; (iii) a world-wide-freeze order ("**WWFO**") directed against eight of 12 defendants; (iv) permission to file an amended particulars of claim (a true and correct copy of the amended claim is attached hereto as **Exhibit F**); (v) orders for service out of the jurisdiction (a true and correct copy of the Service Order is attached hereto at **Exhibit G**); and (vi) permission to serve the documents by alternate means (a true and correct copy of the Alternative Service Order is attached at **Exhibit H**). By way of background the Khrapunov WWFO was also amended pursuant to the 2020 Claim, however, this order is not relevant for the purposes of this application.

99. BTA's application summarized its evidence that Elvira Kud (Defendant # 4) participated in laundering money obtained in the Ablyazov-Khrapunov scheme, including holding assets in her name and shell companies controlled by her for the co-conspirators.

100. Among other things, BTA's application evidenced 14 payments made to Elvira Kud between May 2017 and June 2020 totaling € 194.65 Million and CHF 3.8 Million. These payments were made to Elvira Kud's bank accounts by: (i) Khrapunov totaling €3.2 Million; (ii) Crownway Limited (a Belize entity with company number: RA000693_116029) owned or ultimately controlled by Khrapunov (totaling €40 Million); and (iii) companies owned by or ultimately controlled by another co-conspirator in the 2020 Claim, Bulat Utemuratov (including, (a) Pantech SARL (a Luxembourg entity with universal entity code: 2626-7152-1025-6451) totaling €29.6 Million; (b) Crowell Investments Limited (a Cypriot entity with company number: OE 115669) totaling €97

Million; (c) Cannana Limited (a Cypriot entity with company number: HE365622) totaling €21 Million; (d) Thala SA (a Swiss entity with company number: CH-660.5.840.008-5); and (e) Panolos Limited (a St. Vincent and Grenadines entity) totaling CHF3.8 Million.

101. Mr. Utemruatov is alleged by BTA to have played a key role in the conspiracy and the concealment of Ablyazov's assets and dealing with them in breach of various the English High Court Orders.

102. As of the date of this filing, Elvira Kud had €197 Million in a bank account in Monaco with EFG International, which is purported to have been transferred to an account with another Monaco Bank, Compagnie Monegasque de Banque.

103. Based on asset tracing – and common sense -- it appears that all or a large share of the funds transferred to Elvira Kud were the proceeds of the Ablyazov-Khrapunov scheme. This begs the question why Elvira Kud was personally in receipt of such substantial sums, from entities which otherwise she has no connection to, unless she was involved in the Ablyazov-Khrapunov scheme.

104. At the hearing on November 13, 2020, Mr. Justice Calver, determined (at a hearing without notice to Elvira Kud and the other respondents) that BTA had established a good and arguable case that Elvira Kud, and others, conspired with Ablyazov and Khrapunov to launder the proceeds of Ablyazov's theft from BTA with the purpose of evading the enforcement of the previously issued English Court judgments and orders against Ablyazov and Khrapunov. On that basis, Mr. Justice Calver issued the **WFO** as referred to in paragraph 30 (iii) above. A true and correct copy of the WWFO is attached hereto as **Exhibit I**.

105. BTA is now tasked with prosecuting its claims against Elvira Kud in the UK Case and to that end is gathering evidence of her money laundering, locating additional assets that it may apply to the UK court to freeze, and seeking to enforce the WFO.

106. One of its first steps is to locate evidence of her money laundering and proceeds of the scheme transferred to her, and to discover if any other proceeds were

transferred to her or businesses or entities controlled by her in this district and thereafter used to purchase assets in this district or elsewhere in the United States.

107.   The purpose of the discovery sought by this application is to obtain evidence and develop leads to other evidence to support BTA Bank's case against Elvira Kud and her co-defendants in the UK Case, specifically to prove that Elvira Kud has in fact received the sums alleged by BTA, and then to establish the reasons for such receipt and what has become of the funds received.

108.   The court in the UK Case has already considered evidence of Elvira Kud's assets in connection with entry of the WFO and thus likely will do so again if further evidence is obtained pursuant to the requested subpoenas, thus negating any concern that the UK is or will be unreceptive to this Court's assistance.

109.   Likewise, Kazak law enforcement authorities have previously accepted evidence and information supplied them by BTA Bank in connection with their investigation of the Ablyazov-Khrapunov scheme, and likely will do so again if further evidence is obtained pursuant to the requested subpoenas, thus negating any concern that these authorities are or will be unreceptive to this Court's assistance.

**Wells Fargo Respondents**

110.   BTA has learned that Elvira Kud currently maintains accounts at Wells Fargo Bank, NA, which is a subsidiary of Wells Fargo & Company, in one of that bank's branch locations in either Costa Mesa or Newport Beach.

111.   BTA has learned that Elvira Kud has at least three bank accounts at Wells Fargo Ban at this branch.

112.   According to publicly available information including that available on the Wells Fargo website, Wells Fargo & Company also operates affiliates, Wells Fargo Clearing Services, LLC and Wells Fargo Financial Advisors Network LLC (collectively with Wells Fargo Bank, NA, the "Wells Fargo Respondents").

\\

113. The Wells Fargo Respondents operate their businesses in this district and maintain records in this district, most particularly at their branch locations in Costa Mesa and Newport Beach.

114. Because Wells Fargo Bank, NA, is operated by Wells Fargo & Company, which also offers brokerage and clearing services to their bank clients via the two other Respondent entities, BTA wishes to serve them with the subpoenas attached hereto for financial records so that it can obtain information that will help it prosecute its claims against Elvira Kud in the UK and effectuate the WFO issued in the UK Case.

115. Notably, a Financial Times investigation uncovered information indicating that, in or around April 2013, more than $3.1 Million was transferred out of Elvira Kud's Wells Fargo account in order to facilitate the purchase of three apartments in the Trump Soho, a 46-story luxury hotel-condominium in New York City. *See* Burgis, Tom, *Dirty Money: Trump and the Kazakh Connection*, Financial Times (Oct. 19, 2016), *ft.com/content/33285dra-9231-11e6-8df8-d3778b55a923*, attached hereto as **Exhibit J**.

116. The Wells Fargo Bank accounts listed in the proposed subpoenas are all listed in the WFO issued in the UK Case.

**Respondent Yevgeny Bukrinsky**

117. According to publicly available information, Bukrinsky ("**Bukrinsky**" and "**Respondent Bukrinsky**") is an accountant who lists his business address as 8325 Skyline Drive in Los Angeles, California, which is a residence and where he also operates a d/b/a business, Omega Enterprises.

118. On August 27, 2018, Yevgeny Bukrinsky signed and filed a "Statement of No Change" with the California Secretary of State on behalf of MaRo Design, LLC, of which Elvira Kud was listed as the sole member.

119. Respondent Bukrinsky also appears to have used or shared a mailing address with Elvira Kud's Thirtyeight Enterprises LLC, namely, 15335 Morrison Street, Suite 115, Sherman Oaks, CA 91403.

120. On or about May 26, 2016, Respondent Bukrinsky submitted registration to the CA SOS for an entity 824 La Jolla LLC, with the same address as Thirtyeight Enterprises LLC: 15335 Morrison Street, Suite 115, Sherman Oaks, CA 91403.

121. According to Realtor.com, a home at 824 La Jolla Ave., Los Angeles, was purchased less than a month later, on or about June 16, 2016, for $3.295 Million.

122. That house was sold on February 2, 2018 for $3.3 Million, and six days later (on February 8, 2018), Respondent Bukrinsky filed a certificate of cancellation and other paperwork with the CA SOS for 824 La Jolla LLC, closely mirroring the Elvira Kud's practice and pattern.

123. On or about January 12, 2020, Respondent Bukrinsky registered a new corporation, Omega Tax Services Inc., with the CA SOS, and listed the business address as 15335 Morrison Street, Suite 115, Sherman Oaks, CA 91403 (the same address used by Thirtyeight Enterprises LLC and 824 La Jolla LLC); himself as an officer; and his address as 8325 Skyline Drive in Los Angeles, California.

124. BTA Bank wishes to obtain records from Respondent Bukrinsky relating to MaRo, Elvira Kud, and any other entity associated with Elvira Kud and/or her co-defendants in the UK Case; and to depose him to ask (among other things) about the instructions that he received relating to MaRo Design LLC, and any other asset or control information he has relative as to Elvira Kud, and whether any of the remaining defendants in the UK case have or had an interest or involvement in 824 La Jolla LLC.

**Respondent Escrow of the West**

125. As noted above, Escrow of the West handled the escrow for the 2010 purchase of 2578 Hutton Drive in Beverly Hills, CA. Ex. B at ¶111.

126. Escrow of the West has offices in Beverly Hills, Woodland Hills and Westlake Village, and boasts that it is "Southern California's Leading Escrow Company." *See* https://escrowofthewest.com/.

127. Its office Beverly Hills is located at 9440 S Santa Monica Blvd., Suite 310, Beverly Hills, CA 90210. *Id.*

**Respondent Granite Escrow and Settlement Services**

128. Respondent Granite Escrow and Settlement Services (**"Granite Escrow"**) handled the escrow on Elvira Kud's purchase and sale of various properties mentioned above, including the property at 2 Narbonne in Newport Beach.

129. According to publicly available information, Granite Escrow' office is located at 450 Newport Center Drive, Newport Beach, CA. According to its website:

> Granite Escrow & Settlement Services is one of California's largest independent escrow companies. Our corporate office is located in Newport Beach and we have branches in Newport Beach, Beverly Hills, Santa Monica, La Jolla, Irvine, Laguna Woods, San Clemente, and San Diego.

**Respondents Jason Bradshaw and Bradshaw Residential Group**

130. As noted above, Jason Bradshaw of Bradshaw Residential Group was Elvira Kud's listing agent for the 2 Narbonne and 310 38th Street, in Newport Beach.

131. His office is located at 4 Corporate Plaza, Suite 100, Newport Beach, CA.

132. In or about December 2017 Bradshaw Residential Group was acquired by Coldwell Banker. *See* https://www.cbinsideout.com/agent/bradshaw-residential-group-newport-beach/, attached hereto as **Exhibit K**.

**Respondent Anthill shopNplay and Edwards Bakery**

133. As noted above, Elvira Kud owns and operates Anthill Shopnplay (a/k/a Anthill Fashion Market, Anthill Shopnplay LLC, Kud Vintage) (anthillshop.com) and "Edward Hill Bakery party N beyond," at 1800 Newport Blvd, Costa Mesa, CA.

134. BTA Bank wishes to determine the source of funds Elvira Kud used to establish these businesses, fund the lease and/or property acquisition at 1800 Newport Blvd. and any other location(s) where they may operate, pay employees and make purchases of stock, among other things to determine whether tainted funds were used in any way relating to these businesses, whether the businesses have any assets that BTA can attempt to freeze, and whether the operation of these businesses is involved in the money laundering scheme.

\\

\\

**Use and Purpose for Requested Discovery**

135. The purpose of all of the discovery sought via BTA's Application is to gather evidence of Elvira Kud's involvement in and participation in "the Ablyazov-Khrapunov scheme," which is the subject of the UK Case (and of course the criminal proceeding mentioned above); and the involvement in that scheme of the other named defendants.

136. It is also to determine whether there are additional individuals and/or entities that should be added to the UK Case and/or assets that ought to be frozen pursuant to further court order.

137. If it is successful in obtaining information and/or evidence pursuant the proposed subpoenas, BTA Bank has every expectation that it will be able to use this evidence (or some portion thereof) in the UK Case.

138. BTA Bank is also willing to provide evidence of crimes that it uncovers to appropriate law enforcement authorities including those in Kazakhstan noted above.

139. BTA Bank has spent over ten years tracing the stolen $6 Billion through an intricate web of shell companies, straw owners, and other nominees. Because the scale of the money laundering in this case is both huge and international, BTA's attempts to trace the tainted funds stolen in the Ablyazov-Khrapunov scheme have been challenging to say the least. The need for discovery in this case is particularly acute because neither Ablyazov nor Khrapunov have cooperated with authorities, indeed Ablyazov fled the UK for France so as not to have to testify about the location of his assets and the location of the proceeds of his crimes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of December 2020, at Florham Park, New Jersey.

            /s/ Jason Kislin
            Jason Kislin

DECLARATION OF JASON KISLIN IN SUPPORT OF APPLICATION PURSUANT TO 28 U.S.C. § 1782
ACTIVE 53970877v11