1  CAROLYN F. McNIVEN (SBN 163639)
   GREENBERG TRAURIG, LLP
2  4 Embarcadero Center, Suite 3000
   San Francisco, CA 94111
3  Telephone: (415) 655-1270
   Facsimile: (415) 707-2010
4  mcnivenc@gtlaw.com

5  Attorneys for
   Applicant JSC BTA
6  BANK

7

8

9              **UNITED STATES DISTRICT COURT**

10        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11

12  | In the Matter of the Application of JSC BTA Bank for an Order Seeking Discovery Under 28 U.S.C. § 1782 | Case No. 8:20-MC-00126 |
|---|---|
| | **EXHIBITS TO DECLARATION OF JASON KISLIN IN SUPPORT OF JSC BTA BANK'S EX PARTE APPLICATION FOR DISCOVERY ORDER PURSUANT TO 28 U.S.C. § 1782 IN AID OF FOREIGN PROCEEDING** |
| | CTRM:              TBD |
| | JUDGE:             TBD |
| | DATE FILED:    December 2, 2020 |

19

20

21

22

23

24

25

26

27

28

# Exhibit A

# THE|DIPLOMAT

**FEATURES** | POLITICS | CENTRAL ASIA

# The Case of the Khrapunovs

## International institutions fail to measure up to the task of tackling globalized financial crime.

By **Stephen M. Bland**

July 18, 2018



Credit: Wikimedia Commons / Stefan Krasowski

The subject of lawsuits in the United Kingdom and the United States, former Mayor of Almaty Viktor Khrapunov, his TV-anchorwoman wife Leila, and their son Ilyas stand accused of embezzlement schemes amounting to at least $300 million. Resident in Switzerland since August 2008 when they fled their native Kazakhstan to join their son — loading up a chartered plane with an alleged 18 tonnes of art, antiquities and assorted booty — the family is now the subject of ongoing proceedings by the Public Prosecutor's Office of Geneva. With a network of connections that span the globe, though, is the Khrapunov house of cards about to come crashing down, or will their friends in high places save them?

**Simple, Yet Audacious Schemes**

Born to a family of bureaucrats in northern Kazakhstan in 1948, Viktor Khrapunov moved to Almaty — then the country's capital — after completing training at a college of industry and technology. Working as a mechanic while he continued with his studies, he decided to join the Komsomol (the All-Union Leninist Young Communist League), a move which marked the beginning of his political ascent. Khrapunov served as minister of energy and natural resources before being appointed mayor of Almaty, a position he held from 1997 to 2004. He went on to hold a governorship and another ministerial post, before retiring from all public positions in 2007, purportedly for "health reasons." It is his tenure as mayor, however, from which allegations of corruption stem.

In August 2008, with local investigators closing in, Viktor Khrapunov and his wife hightailed it out of Almaty to the safe haven of Geneva, where their son was already resident. An investigation by the Kazakh authorities subsequently uncovered 83 shell entities that bore the family's fingerprints.

"The theft was committed through the alienation of properties in Almaty and land in protected environmental areas," Sergey Perov, Kazakhstan's chief of Anti-Corruption Investigations and head of the inquiry into the Khrapunovs, told *The Diplomat*. "He also demanded bribes from entrepreneurs for issuing decrees of privatization, which were paid in the form of cash and real estate. We've uncovered 28 separate episodes of criminal activity.

**Enjoying this article?** Click here to subscribe for full access. Just $5 a month.

"The schemes used by the Khrapunovs were simple, yet audacious," Perov said. "The most common went like this: Mayor Khrapunov instructed his subordinates to conduct a fictitious tender for the sale of an asset to a predetermined company, the ultimate owner of which was his wife, Leila. After that, the Khrapunovs resold the object at its real value to a third party. For example, one piece of government land was bought and resold a day later at 45 times the price it was acquired for. He's not a moral man; he even privatized a kindergarten and a hospital for veterans of the Second World War."

As laid out by the plaintiffs in a California court case, Kindergarten No. 186 serves as an example of how the Khrapunovs allegedly conducted their business:

> On or about April 16, 2001, Viktor used his position as mayor to cause public land and a building in Almaty known as Kindergarten No. 186 to be auctioned and ultimately sold to Leila's company, KRI, for approximately $347,000... Under the laws of Kazakhstan, potential buyers of state-owned property are obligated to state how they intend to invest in and develop the property. In an attempt to make KRI's bid appear legitimate and to ensure they won, KRI fraudulently represented that they would invest more money than their competitors (based on inside information about the competitors' bids) in Kindergarten No. 186 and build a health center... Instead, Leila caused KRI to sell Kindergarten No. 186 to Karasha [a shell company] and three days later, Leila caused Karasha to sell Kindergarten No. 186 directly to her. The investment promise KRI used to win the bid was not passed on in the subsequent purchase agreements... [The asset] was then sold to an unrelated third party in a transaction that valued Kindergarten No. 186 at approximately $4.1 million.

### It's Good to be Swiss

Founded at the time the family fled from Kazakhstan, the Swiss Development Group (SDG) — company slogan: "It's Good to be Swiss" — was established as a hub of financial operations for the Khrapunovs in Geneva. Among SDG's projects were a high-end beach resort on the shores of Lake Geneva, a mall in the city center, and a luxury ski resort, while the family also snapped up a string of other properties in Switzerland and elsewhere. As

early as 2010, *La Tribune de Genève* ran a story raising suspicions that $10 million in capital raised for these ventures had been illegally funneled out of Almaty.

"Currently Switzerland isn't at the top when it comes to the fight against money laundering," Martin Hilti, executive director of Transparency International Switzerland told *The Diplomat*. "We have several loopholes, one being the scope of our anti-money laundering act, which is limited to financial intermediaries and doesn't take into account other risky activities, such as the buying and selling of real estate."

Hilti continued: "We published a report last autumn looking at the risk of money laundering in the Swiss real estate sector. It's pretty easy to buy Swiss real estate with dirty money because of the loopholes. The main actors, such as notaries and estate agents normally don't have any duty of due diligence or reporting. The banks have these duties, but are too far away from the business to detect money laundering."

In 2010, the Swiss business magazine *Bilan* published an article naming the Khrapunovs among the wealthiest families in the country. By early 2012, however, with Viktor Khrapunov's name added to the Interpol Red List, Swiss authorities began to take tentative steps toward freezing the family's assets.

Meanwhile, in the Netherlands — where Kazakh authorities identified 15 entities that allegedly bear the hallmarks of Khrapunov shells — in May 2017, Ilyas Khrapunov's lawyers sought an injunction against the broadcaster Zembla, which was preparing to air a documentary examining the ties between kleptocrats and U.S. President Donald Trump.

"We approached Ilyas Khrapunov, and as soon as we told him the scope of the research and the issues we'd like to discuss with him, we got an email from his PR guy in Geneva," Sander Rietveld, an investigative journalist and the creator of the documentary, *The Dubious Friends of Donald Trump*, told *The Diplomat*. "They warned us not to cross legal lines, but we were very transparent with him. We didn't hear from them for a couple of weeks, and then days before the documentary was set to air, we were served with an injunction. It was Ilyas suing us.

**Enjoying this article?** Click here to subscribe for full access. Just $5 a month.

"His main argument," Rietveld said, "was that the research was sloppy and we were accusing him of money laundering without any grounds. The judge basically said that the research had been conducted in the correct manner, so there was no reason to block the program. It gave the documentary more publicity; it definitely backfired on them.

"It's hard to search for the ultimate beneficial owners of entities in the Netherlands," Rietveld said. "It's not information that the government or the Chamber of Commerce provides in a transparent way. For example, Leila Khrapunova used to have this Dutch shell company, Helvetic Capital B.V., which was 50 percent owner of Kazbay B.V. and the other owner was Bayrock B.V. which was a shell company of Felix Sater and Tevfik Arif, the owners of Bayrock in New York."

### From Europe to the White House via Kazakhstan

It was SDG's search for partners that led them across the Atlantic to Trump's business partners, connecting the Khrapunovs to the

inner sanctum of the current U.S. administration. In 2008, the Bayrock Group announced that it was partnering with SDG to convert the Hotel Du Parc in Montreux into "ultra-luxury" private residences. The chief operating officer of Bayrock at the time, Felix Sater, would later become the dominant force behind the company, whose offices were situated in Manhattan's Trump Tower. Paying the Trump Organization a licence fee for the use of its name, Bayrock repeatedly partnered with the Trump Organization in trying to engineer a deal for a [Trump Tower in Moscow](#). In 2006, Sater personally showed two of Donald Trump's children, Ivanka Trump and Donald Trump Jr., around the city, introducing them to movers and shakers. Daniel Ridloff also worked for Bayrock before briefly joining the Trump Organization's acquisitions and finance arm in 2010. [Articles](#) list him as the vice president of the Swiss Development Group Investment Fund — a thinly-veiled SDG offshoot — information which he has since deleted from his LinkedIn profile.

Bayrock subsequently partnered with the Trump Organization in a failed project in Arizona financed by the FL Group of Iceland. Despite the undertaking going nowhere, Ernest Mennes, the owner of Camelback Plaza Development, who had entered into an arrangement with them, [sued Bayrock](#) in 2007, accusing Sater of threatening to "electrically shock [his] testicles, cut off [his] legs, and leave [him] dead in the trunk of his car." The case was settled and Mennes barred from making any further comment.

The son of a Russian syndicate crime boss linked to Semyon Mogilevich, a long-term resident of the [FBI's top 10 most wanted list](#), Felix Sater served time in the early 1990s for

stabbing a man in the face and neck with the stub of a margarita glass in a bar brawl. Upon his release, he turned to fraud, artificially inflating share prices with false information. Striking a deal to turn informant on the Russian mob, he is also said to have turned evidence on Osama Bin Laden's network.

After leaving Bayrock in 2008, Sater was brought into the Trump Organization as a senior adviser to Donald Trump. "If he was sitting in the room right now, I really wouldn't know what he looked like," Trump said of Sater in a Florida court video deposition in 2013.

"Our boy can become President of the USA and we can engineer it," Sater enthused in emails to Trump's personal lawyer at the time, Michael Cohen. "I will get all of Putin's team to buy in on this... we will get Donald elected."

Sater allegedly acted as the Khrapunovs' U.S. intermediary on $40 million of real estate and investment deals. Court documents state that he received SWIFT codes for bank transfers, $5 million of which was transferred from a now sanctioned Cyprus-based LLC to California-based Elvira Kudryashova, the Khrapunovs' daughter, to purchase three condos in Trump SoHo, a project developed by Bayrock in partnership with the Trump Organization. The units were purchased by three shell companies established in April 2013 and dissolved shortly after they were sold. Financing to the tune of $50 million for Trump SoHo and three other Bayrock projects flowed from the FL Group, an Icelandic private equity company named in the Panama Papers with significant ties to dirty money from the CIS.

The law firm Bracewell and Giuliani was hired by Bayrock to create offshore companies to

minimize taxes. Now attorney to Donald Trump, former New York Mayor Rudolph Giuliani's firm had an office in Kazakhstan, with Giuliani raising funds there for his failed 2008 presidential bid. It was on the advice of Bracewell and Giuliani regarding tax structures that in 2007, the Khrapunovs together with the Bayrock Group set up KazBay B.V. in the Netherlands.

In 2016, Nicolas Bourg, former director of Triadou SPV S. A. testified that the Khrapunovs had ordered him to move money out of the United States after a California lawsuit was filed against them. "Triadou is a shell entity for SDG and has no corporate presence separate from SDG," he said in the New York Southern District Court. "Monthly meetings occurred in Geneva between myself, Ilyas Khrapunov, Peter Sztyk (an advisor of Ilyas), and, at times, my longtime business partner, Laurent Foucher. The agenda at each meeting was to discuss the investments of the Ablyazov-Khrapunov family money (i.e., not only money invested through SDG or Triadou.) At these meetings, I frequently received directions from Ilyas regarding various business ventures, including Triadou and others that the Ablyazov-Khrapunov family money was involved in."

Bourg went on to testify that the Khrapunovs commingled funds in their U.S. dealings with Mukhtar Ablyazov, a kleptocrat and former energy minister of Kazakhstan. Subject to asset-freezing orders amounting to $4.9 billion in the British courts alone, Ablyazov stands accused of having embezzled up to $10 billion, largely from BTA, the Kazakh bank he once chaired. Ilyas Khrapunov is married to Ablyazov's daughter, Madina, and court judgments hold him

responsible for a swathe of his father-in-law's financial affairs.

One of multiple Bayrock projects partly financed by the FL Group was a Florida development which ended in ignominy with condo buyers suing for $7.8 million. Former Bayrock partner Jody Kriss filed a suit which named Sater, alleging that Bayrock was "substantially and covertly mob-owned and operated." After eight years in the U.S. courts, in February 2018 the case was the subject of a sealed settlement.

"Felix Sater was involved in laundering money for the Khrapunovs," James S. Henry, an investigative reporter, lawyer, and expert on tax evasion told *The Diplomat*. "That started roughly when Viktor Khrapunov left Almaty and fled to Geneva and continued on probably even as late as 2015. Sater is up to his eyeballs in financial chicanery. The fact that they cut him all these deals," Henry says "allowed him to move onto a life of financial fraud and to raise money from banks and regular investors as well as from people like the FL Group without letting anyone know that he was a twice-convicted felon.

"The FL Group had a $2 billion plan that they'd talked about [with Bayrock]. A lot of this never got funded, but Bayrock received about $50 million in equity. It's hard to account for why they were investing there," Henry contends. "I spent a lot of time in Iceland working on the Panama Papers. The question was, who was the FL Group and why were they investing in Bayrock? The FL Group was this private equity firm with upstream ties to people who had interests in Russia. The Iceland Central Bank never really audited the connections, so when the banks failed in 2008, there was no information available on who had accounts in

the private banking arms of key banks. There were several of them which had big investments in the FL Group. There was also this strange moment in fall of 2008 when Putin showed up just as Iceland was going into financial crisis and offered a very generous loan to Iceland to bail them out. They actually dispatched a whole team to Moscow to check this out. For about six weeks, they were negotiating an alternative to the IMF. Why was Putin bailing out Iceland? Well, there were some big Russians who had money in the banks and I think we still don't know much about what their names were.

**Enjoying this article?** Click here to subscribe for full access. Just $5 a month.

"There were stories about Alfabank being an investor, as well as Alisher Usmanov, whose wife introduced Putin to his girlfriend. Usmanov is an oligarch who in September 2008 was on the verge of getting a huge loan from one of the Icelandic banks," Henry says. "It was a very odd transaction for this oligarch to be getting. I think in terms of conspiracies, the FL Group is a smoldering fire that just can't be put out. Overall, though, given what's happened in court cases in Europe and the U.S., it's hard to make any of these jurisdictions look like a winner when it comes to prosecutions. It's an example of how weak the international instruments are when it comes to tracking down these kinds of financial crimes."

As of January 2018, Triadou's lawyers have issued a motion to stay with regards to Sater, indicating that he is now ready to cooperate with discovery requests. In March 2018, Viktor and Ilyas lost a New York court case for violating a confidentiality order. "The court noted that Ilyas Khrapunov has played games with the court in the past and cited, as one

example, the fact that the Khrapunovs requested to appear at the evidentiary hearing by phone but later retracted that offer, claiming that it would violate Swiss law to testify at the hearing while residing in Switzerland," wrote U.S. Magistrate Katharine Parker. The court ordered the Khrapunovs to pay BTA Bank and the City of Almaty's legal fees, noting that their defense that they had not leaked evidence was "not credible."

**Aristocratic Acquaintances**

Meanwhile, in the U.K., a story about how this all ties to the British aristocracy continues to fly under the radar. Formed as a private company in 2010, New World Oil and Gas (NWOG) went public in 2011 using the exchange unregulated fund regime, part of Jersey's race to the bottom in terms of regulation. The founding director of NWOG, Ilyas Khrapunov's advisor Peter Sztyk, was married to Mukhtar Ablyazov's alleged mistress, Bota Jardemalie, at the time of the company's incorporation. Jardemalie is wanted by Kazakhstan for her part in embezzlement from BTA Bank.

In August 2013, after NWOG had disappointing drilling results, a company called Niel Petroleum, whose director and largest shareholder were the Khrapunovs' erstwhile business partners Nicolas Bourg and Laurent Foucher, offered to buy out NWOG. The driving force behind numerous dubious projects across Central Africa, the Niel Group is named as an "Ablyazov-Khrapunov controlled entity" on legal documents. Sztyk was eventually forced off the board of NWOG after being outed as a money launderer by Bourg in 2016.

Control over the regulation of NWOG on the London Stock Exchange was delegated to

Beaumont Cornish, meaning that the compliance officer for NWOG, until it was effectively thrown off the stock exchange in late 2016, was Felicity Geidt. The sister of the Queen's former personal secretary, Felicity Geidt has been FCA regulated for a series of oversights since 2001.

Having been first appointed to the royal household when the Duke of York left the Royal Navy, Christopher Geidt rose through the private office to become the Queen's private secretary before being ousted in July 2017. This is the same Duke of York, of course, that Mukhtar Ablyazov once threatened to call as a witness in his defense. For his loyal service, Geidt has since been elevated to the House of Lords, becoming part of the legislature.

Another piece in this series of opaque connections saw Robert Hankes appointed to work as a project manager for NWOG in 2011. His brother, Sir Claude Hankes — the man brought in by the Iraqi government to conduct an investigation into the UN oil-for-food scandal — is an extremely close friend of the Duke of Edinburgh. Sir Claude Hankes is the only honorary fellow and life member of the St. George's House Council at the House of Windsor.

### The Wheels of Justice

So, is time running out for the Khrapunovs or will their connections save them? In the latest legal episode under British jurisdiction, on March 21, 2018, the U.K. Supreme Court dismissed Ilyas' appeal against a previous ruling with regards to breaches of freezing orders on his father-in-law's assets and contempt of court. Finding that his actions constituted "the tort of conspiracy," the judges also dismissed Ilyas'

argument that the British courts lacked jurisdiction over him.

That Ilyas Khrapunov acted as an accomplice to Ablyazov's embezzlement schemes, the ongoing U.K. lawsuit has left "no grounds for doubt," according to a representative of BTA Bank. "[...T]he Commercial Court of England and Wales issued a decision obliging Ilyas Khrapunov to provide all data under a previously imposed disclosure order... information about his assets and the assets that he manages on behalf of Mukhtar Ablyazov, but he refused to do so," the representative told *The Diplomat*.

Back in Switzerland, Ilyas and his wife hold diplomatic posts representing the Central African Republic at the U.N. Mission in Geneva as a means to travel freely, but the mission, located in an otherwise residential block on the outskirts, appears rarely if ever to be staffed. At 3 Mont Blanc, a prestigious property in the city center, once a key Khrapunov asset, with the SDG long since having been sold off and in liquidation as of January 2018, the company's plaque has been removed. Similarly, another shell, Swiss TV S.A., has disappeared from Rue Philippe-Plantamour.

Henri Della Casa, spokesman at the Public Prosecutor's Office of Geneva, would only confirm that "Proceedings against the Khrapunovs by the Prosecutor's Office in Geneva on suspicion of money laundering are still ongoing. Due to the investigation, the Public Ministry will not comment further at this stage." At the time of writing, the Federal Office of Justice in Switzerland had yet to respond to a request for an update as regards an extradition request made by Ukraine for Ilyas Khrapunov, although a source who spoke on condition of

anonymity told *The Diplomat* it had been "kicked into the long grass."

For the Kazakh authorities, though, having failed with this route in the past, it's no longer about extradition. "Currently, we're not desperately looking to [extradite them]," Perov, the head of the Kazakh inquiry into the Khrapunovs, told *The Diplomat*. "We have solid proof that they funneled stolen funds abroad, mainly to Switzerland and then began to launder it. All the evidence we've collected was transmitted to the Swiss authorities and the City of Almaty has initiated civil proceedings against the Khrapunovs in the U.S. We're ready to pass our evidence to any country which might decide to prosecute them."

The Khrapunovs continue to claim that cases against them are the result of political persecution. At the time of going to press, Khrapunov family lawyers had not responded to requests for comment.

**Enjoying this article?** Click here to subscribe for full access. Just $5 a month.

*Stephen M. Bland is a freelance journalist and author specializing on Central Asia and the Caucasus.*

## TAGS

Features    Politics    Central Asia    Kazakhstan

corruption in Kazakhstan    Donald Trump    Felix Sater

Ilyas Khrapunov    Kazakhstan    Nursultan Nazarbayev

Viktor Khrapunov

# **Exhibit B**

LATHAM & WATKINS LLP
  David J. Schindler (Bar No. 130490)
    *david.schindler@lw.com*
  Julie R. F. Gerchik (Bar No. 237764)
    *julie.gerchik@lw.com*
  Kendall M. Howes (Bar No. 294285)
    *kendall.howes@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

Attorneys for Plaintiff the City of Almaty

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF ALMATY, a foreign state,<br><br>Plaintiff,<br><br>v.<br><br>VIKTOR KHRAPUNOV, an individual; LEILA KHRAPUNOVA, an individual; ILIYAS KHRAPUNOV a/k/a ILYAS KHRAPUNOV, an individual; MADINA ABLYAZOVA a/k/a MADINA KHRAPUNOVA, an individual; ELVIRA KHRAPUNOVA a/k/a/ ELVIRA KUDRYASHOVA a/k/a ELVIRA BALMADANI, an individual; DMITRY KUDRYASHOV a/k/a DMITRI KUDRYASHOV, an individual; RPM USA, LLC, a New York corporation; RPM-MARO LLC, a New York corporation; MARO DESIGN LLC, a California corporation; HAUTE HUE LLC, a California corporation; 628 HOLDINGS LLC, a California Corporation; CANDIAN INTERNATIONAL LTD., a British Virgin Islands corporation; ELVIRA KUDRYASHOVA AS TRUSTEE FOR THE KASAN FAMILY TRUST; DMITRY KUDRYASHOV AS TRUSTEE FOR THE KASAN FAMILY TRUST; CROWNWAY LTD, a Belize corporation; VILDER COMPANY S.A., a Panama corporation; WORLD HEALTH NETWORKS, INC. f/k/a HEALTH STATION NETWORKS INC., a Delaware corporation, and DOES 1 through 10,<br><br>Consolidated Defendants. | Case No. CV14-3650-FMO-CW<br><br>Assigned To: Hon. Fernando M. Olguin<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND OTHER EQUITABLE RELIEF FOR:**<br><br>1) **Violations of RICO (18 U.S.C. §§ 1962(c), 1962(d), 1964);**<br>2) **Breach of Fiduciary Duty;**<br>3) **Conversion and Conspiracy to Commit Conversion;**<br>4) **Fraud and Deceit and Conspiracy to Defraud; and**<br>5) **An Accounting, and Imposition of a Constructive Trust and Equitable Lien.**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

US-DOCS\91976251.11

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Plaintiff the City of Almaty ("Almaty") hereby alleges the following claims for relief against defendants Viktor Khrapunov ("Viktor"), Leila Khrapunova ("Leila"), Iliyas Khrapunov a/k/a Ilyas Khrapunov ("Iliyas"), Madina Ablyazova a/k/a Madina Khrapunova ("Madina"), Elvira Khrapunova a/k/a Elvira Kudryashova a/k/a Elvira Balmadani ("Elvira"), Dmitry Kudryashov a/k/a Dmitri Kudryashov ("Dmitry"), RPM USA, LLC ("RPM USA"), RPM-Maro LLC ("RPM-Maro"), Maro Design LLC ("Maro Design"), Haute Hue LLC ("Haute Hue"), 628 Holdings LLC ("628 Holdings"), Candian International Ltd. ("Candian"), Elvira Kudryashova as Trustee of The Kasan Family Trust, Dmitry Kudryashov as Trustee of The Kasan Family Trust, Crownway Ltd. ("Crownway"), Vilder Company S.A. ("Vilder"), and World Health Networks, Inc. f/k/a Health Station Networks Inc. ("World Health Networks"), and Does 1 through 10 (collectively, "Defendants").

## I.   NATURE OF THE ACTION

1.     This is an action on behalf of the City of Almaty, the largest city in the Republic of Kazakhstan, to recover funds that were stolen by its corrupt former mayor, Viktor, and his co-conspirators – his wife Leila, their children Iliyas and Elvira, and their children's spouses Madina and Dmitry (collectively, the "Individual Defendants"). The Individual Defendants employed a scheme that involved two related objectives: (a) first to steal money from Almaty; and then (b) to transfer, launder, and hide that stolen money in the United States where they believed it would be out of reach of Kazakh and other governmental authorities (the "Khrapunov Racketeering Enterprise").

2.     From 1997 to 2004, Viktor, Leila, Iliyas, Elvira, and their co-conspirators systematically stole money from Almaty through Viktor's corrupt use of his political power and a series of fraudulent real estate transactions that allowed the Khrapunovs to convert public assets to their personal use. In 2007, fearing discovery of their fraud, Viktor and Leila fled to Switzerland, where Iliyas and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
US-DOCS\91976251.11

1

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Elvira resided at the time, and attempted to launder and hide the stolen money in Switzerland.  The Kazakh authorities continued to investigate Viktor, Leila, Iliyas, and Elvira, and sought the assistance of the Swiss authorities.  In May 2011, the Kazakh authorities began bringing formal criminal charges against Viktor, Leila, and Elvira, and in mid-2012 the Swiss authorities initiated an investigation of Viktor and Leila on suspicion of money laundering.  In November 2012, the Swiss authorities began freezing assets in Switzerland belonging to Viktor, Leila, Iliyas, and Elvira.

3.     In or around 2010, understanding that they risked losing the proceeds of their fraudulent scheme if they kept the stolen money in Switzerland, the Individual Defendants and their co-conspirators engaged in racketeering activity to launder and hide the stolen money in and through the United States using various sham companies and disguised entities in the United States.  Upon information and belief, the Individual Defendants and their co-conspirators selected the United States to launder the stolen proceeds because they believed it was beyond the reach of the Kazakh authorities.  At that time, the United States did not have a mutual legal assistance treaty or extradition treaty with Kazakhstan.

4.     The Individual Defendants and their co-conspirators engaged in racketeering activities in the United States by engaging in money laundering with stolen funds in violation of 18 U.S.C. § 1956; transacting in property derived from unlawful activity in violation of 18 U.S.C. § 1957; transporting stolen property in violation of 18 U.S.C. § 2314; mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. §1343.  They orchestrated these racketeering activities by using the stolen funds to acquire property, including property in the Central District of California, and then engaging in business transactions in the names of Iliyas, Madina, Elvira, Dmitry, and/or sham companies and disguised entities, in order to hide the true identity of the source of the stolen funds and to avoid detection by Kazakh, Swiss, and U.S. authorities.  These activities in the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

2

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  United States were critical to the success of the criminal enterprise because without
2  a perceived safe haven for the stolen funds, the Individual Defendants and their co-
3  conspirators would not have been able to use Almaty's stolen funds for their
4  personal benefit.  Moreover, the Individual Defendants targeted their activity in the
5  United States with the mistaken belief that they could launder funds in the United
6  States without risk of detection, prosecution, or consequences.

7       5.    The Individual Defendants and their co-conspirators violated United
8  States law in order to achieve their end goal of securing and using their stolen
9  proceeds.  It was a two part scheme:  (1) steal (the Kazakh equivalent of) hundreds
10 of millions of dollars from the city of Almaty, and (2) avoid detection and/or
11 seizure of the stolen proceeds by using banks, sham entities, real estate
12 transactions, and the acquisition of other assets in the United States to hide and
13 "clean" the stolen funds with the ultimate goal of being able to lead a lavish
14 lifestyle in the United States and elsewhere.  In short, the Individual Defendants
15 and their co-conspirators undertook to use, and continue to use, the United States
16 as a safe haven for international money laundering.

17      6.    As set forth herein, Almaty seeks: (a) to hold Defendants, including
18 the Individual Defendants and their co-conspirators, liable for their laundering and
19 transportation of stolen funds to and within the United States; (b) the return of the
20 money stolen from Almaty and its people, or the return of substitute assets located
21 in the United States acquired with funds stolen from Almaty and its people; (c)
22 injunctive relief to prevent the Individual Defendants and their co-conspirators
23 from engaging in any further laundering or other transactions in the United States
24 in violation of federal law involving the proceeds of the looting scheme; (d)
25 imposition of a constructive trust over all monies and other assets located within
26 the United States that are traceable, either directly or indirectly, to Viktor and his
27 co-conspirators' systematic looting of Almaty's funds; and (e) treble and punitive
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

3

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Case 8:20-mc-00025-DOC-DFM   Document 41-4   Filed 12/02/20   Page 23 of 149   Page ID
#:168
Case 2:14-cv-03069-MCC-CW   Document 241-1   Filed 09/11/07   Page 5 of 34   Page ID #:6695

1    damages for Defendants' myriad violations of the federal anti-racketeering statute,

2    as well as state and federal common law.

3    **II.     THE PARTIES**

4         7.     Plaintiff Almaty is a foreign state within the meaning of 28 U.S.C. §

5    1332(a)(4).  Until 1997, Almaty was the capital of Kazakhstan, which is a

6    sovereign state recognized by the Government of the United States of America.

7    Almaty remains a major commercial and cultural center of Kazakhstan and is the

8    largest city in Kazakhstan by population.  Almaty has standing to bring this

9    Complaint and sues: (a) in its own right, as the victim of Defendants' unlawful

10   schemes, conspiracies, and acts of racketeering; and (b) in a *parens patriae*

11   capacity as the representative of the city and its people, who were the ultimate

12   victims of Defendants' conspiracies, fraudulent schemes, and acts of racketeering

13   and who are the rightful owners of funds and assets unlawfully held by the

14   Defendants and their co-conspirators in the United States.

15        8.     Defendant Viktor was the mayor of Almaty from approximately June

16   16, 1997 until approximately December 2004.  In 2004, Viktor was nominated for

17   the position of governor of the Pavlodar province in northeast Kazakhstan, a

18   position he held until 2007, at which time he was appointed Minister of Emergency

19   Measures.  In late 2007, Viktor announced his retreat from all public functions and

20   his retirement, ostensibly for health reasons.

21        9.     Upon information and belief, in or about 1998, Viktor married

22   Defendant Leila.  Viktor and Leila are citizens of the Republic of Kazakhstan and,

23   upon information and belief, currently reside in Switzerland.

24        10.    Upon information and belief, Defendants Iliyas and Elvira are the son

25   and daughter, respectively, of Leila, and stepson and stepdaughter, respectively, of

26   Viktor.

27        11.    Upon information and belief, Iliyas is married to Defendant Madina,

28   while Elvira is married to Defendant Dmitry.  Upon information and belief, Iliyas

Case 8:20-mc-00025-DOC-DFM Document 11-1 Filed 12/02/20 Page 24 of 149 Page ID
#:169
Case 2:20-cv-03094-MWF-GJS Document 441 Filed 09/11/07 Page 6 of 34 Page ID #:696

1    and Madina are citizens of the Republic of Kazakhstan and currently reside in

2    Switzerland.  Upon information and belief, Elvira is a citizen of the Republic of

3    Kazakhstan and of Switzerland, and currently resides in Irvine, California.  Upon

4    information and belief, Dmitry is a citizen of the Russian Federation and currently

5    resides with Elvira in Irvine, California.

6          12.    Upon information and belief, Defendants Maro Design LLC, Haute

7    Hue LLC, and 628 Holdings LLC are corporations organized and existing under

8    the laws of the State of California.  Upon information and belief, Defendants RPM

9    USA LLC and RPM-Maro LLC are corporations organized and existing under the

10   laws of the State of New York.  Upon information and belief, World Health

11   Networks, formally known as Health Station Networks Inc. ("HSNI"), is a

12   corporation organized and existing under the laws of the State of Delaware.  Upon

13   information and belief, Defendant Candian is an offshore corporation organized

14   under the laws of the British Virgin Islands.  Upon information and belief,

15   Crownway is an offshore corporation organized under the laws of Belize.  Upon

16   information and belief, Vilder is an offshore company organized under the laws of

17   Panama.  Upon information and belief, Defendants Elvira Kudryashova as Trustee

18   of The Kasan Family Trust and Dmitry Kudryashov as Trustee of The Kasan

19   Family Trust have beneficial ownership and control over a property used by Iliyas

20   and/or Elvira in furtherance of the racketeering scheme described below.

21         13.    Upon information and belief, Maro Design, Haute Hue, 628 Holdings,

22   RPM USA, RPM-Maro, World Health Networks, Candian, Crownway, Vilder, and

23   The Kasan Family Trust (collectively, the "Entity Defendants") all are or were at

24   the relevant time owned or controlled by Iliyas, Elvira, and/or Dmitry and were

25   misused by them and the other Individual Defendants in order to carry out the

26   racketeering scheme described below.

27         14.    Almaty is ignorant of the true names of defendants Does 1 through 10

28   (the "Doe Defendants"), inclusive, and therefore sues those defendants by such

LATHAM&WATKINS LLP  US-DOCS\91976251.11
ATTORNEYS AT LAW
LOS ANGELES
5
CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Case 8:20-mc-00025-DOC-DFM Document 1-4 Filed 12/02/20 Page 25 of 149 Page ID
Case 2:14-cv-03090-MCO-CW Document 141-4 Filed 08/11/07 Page 96 of 54 Page ID #:697
#:170

1 fictitious names.  Almaty is informed and believes, and on that basis alleges, that

2 the Doe Defendants, inclusive, are responsible for the acts alleged in this

3 Complaint.  When the true names of such fictitious defendants are ascertained,

4 Almaty will seek leave of this Court to amend this Complaint to name those

5 individuals or entities.

6   15. Almaty is informed and believes, and thereon alleges, that the

7 Defendants were at all times relevant herein the agents, servants, and/or employees

8 of the Individual Defendants, and each of them, and in performing the deeds herein

9 alleged, were acting at least in part within the course and scope of their authority as

10 such agents, servants, and/or employees of Defendants and each of them.

11 **III. JURISDICTION AND VENUE**

12   16. This Court has subject matter jurisdiction under 28 U.S.C. § 1331(a)

13 and 18 U.S.C. § 1964(c) over the First and Second Claims for Relief of this

14 Complaint for violation of the federal Racketeer Influenced and Corrupt

15 Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* and for conspiracy to

16 violate RICO.  The Third through Seventh Claims for Relief allege violations of

17 state law and of federal common law.  This Court has pendent jurisdiction over

18 such claims pursuant to 28 U.S.C. § 1367(a) because those claims are joined with

19 substantially related claims under RICO and because those claims are so related to

20 the RICO claims in the action that they form part of the same case or controversy

21 under Article III of the United States Constitution and arise from a common

22 nucleus of operative facts.

23   17. Venue is proper in this District and before this Court pursuant to 28

24 U.S.C. § 1391(b)(2) because events giving rise to Almaty's claims occurred in this

25 District, including, among other things, Defendants' purchase, in violation of U.S.

26 law, of real estate and other assets located in Beverly Hills, Studio City, and

27 Orange County, California.

28

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

6

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Case 8:20-mc-00025-DOC-DFM Document 141-1 Filed 12/02/20 Page 26 of 149 Page ID
Case 2:14-cv-03069-MCW-CW Document 944-1 Filed 03/11/07 Page 8 of 64 Page ID #:6698
#:171

18.     This Court has personal jurisdiction over Defendants because each of them knowingly committed acts that form the basis of this Complaint in this District, directed or conspired with others to commit acts in this District, or purposely availed themselves of the privileges of doing business in this District, as fully set forth herein.

## IV.     FACTUAL ALLEGATIONS

### A.     Overview of the Khrapunov Racketeering Enterprise and Conspiracy

19.     In 1991, Kazakhstan declared its independence from the former Soviet Union and initiated the process of becoming a free society.  Rather than assist their country in embracing this move toward freedom, Viktor and his co-conspirators exploited Viktor's position of trust and authority to steal hundreds of millions of dollars from the people of Almaty and laundered, hid, and spent this money in the United States.

20.     The Khrapunov Racketeering Enterprise is comprised of two interrelated parts.  First, the Individual Defendants conspired together to have Viktor abuse his position as mayor of Almaty to convert and steal state-owned assets cumulatively valued at over $300 million.  Second, the Individual Defendants conspired to transport and to launder those stolen assets out of Kazakhstan and into the United States, among other places, in order to escape the reach of the authorities and to attempt to prevent Almaty from recovering monies that rightfully belong to it.  The transporting and laundering of the stolen assets to the United States was essential to the success of the enterprise because it enabled the Individual Defendants and their co-conspirators to use the stolen assets for their own personal benefit.

21.     Viktor became mayor of Almaty on or about June 16, 1997, and remained in that position until approximately December 2004.  Before Viktor assumed the office of the mayor of Almaty, he took an oath of office to strictly

LATHAM&WATKINS LLP US-DOCS\91976251.11
ATTORNEYS AT LAW
LOS ANGELES

7

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

obey the Constitution and laws of the Republic of Kazakhstan.  Among other things, Viktor expressly and impliedly promised and represented that he would fulfill his fiduciary duties to the people of Almaty, would honor his obligation to provide honest services, and would not convert money, property, or assets belonging to Almaty for his own use or that of his family, friends, or associates.

22.    In fact, over the span of more than six years, Viktor repeatedly and systematically violated those promises and abused his position of power and authority to steal millions of dollars of real property and assets from the city and people of Almaty and to launder and conceal that money in the United States and elsewhere in the hopes of escaping prosecution and seizure of funds that rightfully belong to the Almaty.  Aided and abetted by his wife, children, associates, accomplices, and other co-conspirators, Viktor plundered the city's wealth and industry to enrich himself, his family, and his co-conspirators at the expense of Almaty and its people, and the Individual Defendants and their co-conspirators now seek to conceal and enjoy their ill-gotten gains in the United States.

23.    Defendants and their co-conspirators carried out the scheme through various means, including: (a) secretly acquiring property owned by Almaty through fictitious sham entities for a fraction of what the property was worth, then selling the property for tens of millions of dollars in illicit profits; (b) acquiring property without payment through sham transactions; and (c) secretly acquiring property at a discount then using Viktor's position of power to take illegal government action that vastly increased the value of the property solely to benefit Viktor and his co-conspirators.

24.    As mayor, Viktor was entrusted with the right to cause state-owned real estate to be sold to private parties at auction pursuant to established legal procedures, the right to cause privately-owned real estate to be taken for purported state use, and the right to control who could do business in Almaty through the granting of licenses, concessions, and permits.  As mayor, Viktor did not have the

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

8

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1    authority to take these actions solely for his personal benefit or for the personal

2    benefit of his family members.

3         25.    In his capacity as mayor of Almaty, Viktor caused certain state-owned

4    real estate parcels to be made available for auction, ostensibly to generate revenue

5    for Almaty or to allow for the privatization of government assets.  However, in

6    violation of Kazakh law and his duty to the people of Almaty, Viktor – aided and

7    abetted by others involved in the Khrapunov Racketeering Enterprise – corrupted

8    those auctions by: (a) improperly influencing and directing the actions of the

9    individuals responsible for administering the auctions; and (b) improperly causing

10   confidential bid information to be disclosed to entities controlled by his co-

11   conspirator Leila, which allowed these entities to adjust their bids in order to win

12   the auction.

13        26.    Through these corrupt activities, Viktor and Leila succeeded in

14   purchasing real estate and other assets put up for auction by Almaty, often at

15   artificially suppressed prices.  In some instances, Viktor thereafter caused

16   development permits to be issued in connection with the purchased sites, vastly

17   increasing the market value of the real estate, which Viktor, Leila, and/or their co-

18   conspirators then re-sold at a significant profit.  In other instances, entities

19   controlled by Leila simply ignored restrictions placed on parcels sold at auction in

20   order to resell the parcels at a significant profit.  In addition, in some instances,

21   entities controlled directly or indirectly by Viktor and Leila simply failed to pay for

22   the assets they acquired and subsequently re-sold them.

23        27.    Viktor thus conspired with the other Individual Defendants and their

24   co-conspirators to use his position of power and authority to convert and cause to

25   be converted to his use and that of his family, friends and associates money, funds

26   and property rightfully belonging to Almaty and its people.

27        28.    After wrongfully appropriating assets belonging to the people of

28   Almaty, Viktor, Leila, Elvira, and Iliyas, along with their families, friends,

1    associates, and accomplices in the Khrapunov Racketeering Enterprise, devised

2    and executed schemes to systematically and secretly transfer their ill-gotten gains

3    out of Kazakhstan to escape the reach of the authorities and to prevent the seizure

4    and return of monies to Almaty.  To that end, the Individual Defendants and their

5    co-conspirators ultimately transferred millions of dollars of Almaty's stolen funds

6    into the United States in violation of U.S. law through accounts, sham companies,

7    and disguised entities owned or ultimately controlled by Elvira, Dmitry, Iliyas,

8    and/or Madina.

9         29.    The Individual Defendants and their co-conspirators first transferred

10   Almaty's funds to Switzerland, where Iliyas and Elvira were residing, and

11   elsewhere using accounts and sham entities owned or ultimately controlled by

12   Leila, Iliyas, Elvira, and/or their co-conspirators.  Leila, Iliyas, and Elvira

13   laundered hundreds of millions of dollars through various offshore holding

14   companies with the goal of making the funds appear legitimate.

15        30.    In an effort to further obscure the funneling of the stolen funds

16   through sham entities and bank accounts based in Switzerland, Cyprus, and

17   elsewhere, the Khrapunovs partnered with Madina's father (Iliyas' father-in-law)

18   Mukhtar Ablyazov ("Ablyazov").  Ablyazov served as the Chairman of BTA bank,

19   a Kazakh bank headquartered in Almaty, from 2005 to 2009.  During his tenure,

20   Ablyazov stole over $6 billion from BTA Bank through fraudulent loan schemes—

21   for example, Ablyazov would issue enormous loans to valueless entities

22   (ultimately owned by Ablyazov), which would then be obscured by transfers

23   among different shell corporations and never repaid.  BTA bank obtained a

24   worldwide freezing order and a $4 billion dollar judgment in the United Kingdom

25   against Ablyazov in 2012.  Upon information and belief, the Khrapunovs

26   comingled certain of their stolen assets with Ablyazov's, and then Iliyas hid these

27   funds in sham investments and entities through which he would move hundreds of

28   millions of dollars in illicit proceeds for both families.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

10

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Case 8:20-mc-00126-DOC-DFM   Document 14   Filed 12/02/20   Page 30 of 149   Page ID
Case 2:14-cv-09690-FMO-CW   Document 44-1   Filed 08/24/20   Page 12 of 54   Page ID #:702
#:175

31.     In or around 2010, Leila, Iliyas, and Elvira began transferring portions of the stolen funds out of bank accounts in Switzerland and Cyprus, through various offshore holding companies, and ultimately into the United States in violation of U.S. law via accounts and entities owned or ultimately controlled by Elvira, Dmitry, Iliyas, and/or Madina.  The Individual Defendants used an intricate web of individuals and offshore holding companies to transfer the funds stolen from Almaty into the United States, and caused further harm to Almaty by making it significantly more difficult and costly for Almaty to trace and recover its funds in the United States.

32.     Iliyas, Madina, Elvira, and Dmitry conspired with the other Individual Defendants to use Almaty's stolen funds in the United States to purchase real estate and other assets in California and New York, to fund U.S. holding companies owned or controlled by Leila, Iliyas, Madina, Elvira, and/or Dmitry, and to invest in United States businesses.  Each new purchase and business investment Defendants made in the United States using Almaty's money harmed Almaty in the United States by impeding Almaty's attempts in the United States to trace and recover the stolen funds.

33.     Upon information and belief, the Individual Defendants and their co-conspirators increased their efforts to transfer Almaty's funds to and within the United States following the initiation of investigation of Viktor and Leila by Swiss authorities in mid-2012, which led to the Swiss authorities freezing Swiss bank accounts held by the Individual Defendants and their co-conspirators in November 2012.

34.     For years, Viktor and Leila took numerous steps to conceal their looting from Almaty and the Kazakh authorities.  Among other things, Viktor and Leila each filed false annual tax returns with the Tax Committee of the Ministry of Finance of Kazakhstan, Kazakhstan's taxation authority, which concealed the millions of dollars in monies, properties, and assets acquired through the

Khrapunov Racketeering Enterprise. According to their 2007 tax returns, which required Viktor and Leila to list their entire net worth accumulated through all sources as of December 31, 2007, Viktor and Leila reported a combined net worth of approximately $113,298 (13,671,665 ₸), in addition to three vehicles, five modest pieces of real estate, and two parking stalls.

35.     Despite claiming to have a total net worth of less than $120,000, Viktor and Leila amassed a fortune that reportedly exceeds $300 million by systematically looting and plundering assets belonging to the people of Almaty. Indeed, according to public news reports, in 2009 Viktor was one of the richest people in Switzerland with a fortune of over $300 million. Similarly, in 2012 Viktor was among Switzerland's 300 richest people with a fortune of approximately $324 – $432 million (300 – 400 million Swiss francs).

**B.     Pending Investigations: The Kazakh and Swiss Authorities Are Proceeding Against the Individual Defendants and Their Co-Conspirators for Crimes Committed in Those Countries**

36.     In approximately late 2007, Viktor became aware that the Kazakh government had begun investigating him and his family, friends, and associates for criminal violations. On or about November 9, 2007, Viktor and Leila fled Kazakhstan via private jet to Switzerland, where Iliyas and Elvira resided at the time.

37.     On or about May 27, 2011, the Investigation Department of the Agency for Economic and Corruption-Related Crimes of Kazakhstan (the "Financial Police") filed two criminal cases against Viktor on suspicion of abuse of power and fraudulent acts. On or about July 21, 2011, the Financial Police obtained a court-ordered arrest warrant for Viktor. In 2011 and 2012, additional charges were brought in Kazakhstan against Viktor, Leila, Iliyas, and Elvira stemming from the theft of public property and the ultimate laundering of funds.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11                12                CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

38.     On or about February 20, 2012 and September 14, 2012, the Financial Police applied to the Federal Office of Justice in Switzerland for legal assistance in connection with the effort to prosecute Viktor, Leila, Iliyas, and Elvira for their crimes in Switzerland and Kazakhstan against Almaty and its people.  In or about mid-2012, the Public Prosecutor of Geneva opened an investigation into Viktor, Leila, Iliyas, and Elvira on suspicion of money laundering in violation of Swiss law.  In or about November 2012, the Public Prosecutor of Geneva ordered Swiss accounts and assets belonging to Viktor, Leila, Iliyas, and Elvira frozen, including accounts held at Swiss banks Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co.  The investigation by the Swiss authorities is ongoing.  The various Swiss investigations contributed to the Individual Defendants' attempts to direct their money laundering activities to the United States.

39.     There currently are 24 criminal cases pending against Viktor in Kazakhstan for embezzlement, fraud, money laundering, establishing and directing an organized criminal group for criminal purposes, abuse of power, and bribery. There currently are five criminal cases pending against Leila in Kazakhstan for money laundering and establishing and directing an organized criminal group for criminal purposes.  There also currently is a criminal case pending against Elvira in Kazakhstan for money laundering.

**C.     The Theft of Property:  The Individual Defendants and Their Co-Conspirators Unlawfully Converted Almaty's Property and Sold it to Third Parties at an Enormous Profit**

40.     Over the life of the Khrapunov Racketeering Enterprise, the Defendants and their co-conspirators carried out multiple acts all directed at the same goal: to convert property rightfully belonging to the people of Almaty, sell it for a profit, then launder the proceeds out of Kazakhstan in order to escape the reach of the authorities and get away with their crimes.  As a result, Viktor, Leila, Iliyas, Elvira, and their co-conspirators stole hundreds of millions of dollars from

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

13

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Almaty and laundered these stolen funds into and within the United States in violation of U.S. law.

41. Five examples of Defendants' illegal acquisition of property from Almaty are set forth below. Through the five transactions detailed below, Viktor, Leila, Iliyas, Elvira, their family and their co-conspirators generated millions in illicit profits resulting from the illegal conversion and re-sale of several pieces of property. In total, the Khrapunov Racketeering Enterprise is believed to have illegally acquired over 80 pieces of real estate, valued at approximately $300 million, from Almaty and its people. They have sought to further their wrongdoing by hiding stolen funds in the United States.

**Fraudulent Transaction Example 1**

42. In or about 2000, Viktor abused his position as Mayor of Almaty to cause a large tract of state-owned land near two rivers in Almaty located at 232 Gornaya Street (the "Gornaya Property") to be transferred to Leila for a total price of approximately $689,000 (101,886,477 ₸). The transfer was accomplished via a series of fraudulent transactions and front companies controlled by Leila and Iliyas. Through several more transfers designed to conceal the illegal conduct, Leila and Iliyas ultimately sold the Gornaya Property for a total of $15.57 million, yielding nearly $15 million in illicit profit as a result of this single transaction.

43. To carry out the illegal conversion of the Gornaya Property, Viktor, Leila, and Iliyas utilized at least six Kazakhstan entities controlled by Leila and Iliyas, including: (a) Almaty-Demalys; (b) Viled Establishment; (c) KazRealIncom LLP ("KRI"); (d) Karasha Plus LLP ("Karasha"); (e) Building Services Company ("BSC"); and (f) Asia Holding Development LLP ("Asia Holding").

44. In 2000, Viktor unlawfully ordered the Gornaya Property to be transferred to Almaty-Demalys, an entity ultimately controlled by Leila. Almaty-Demalys purchased the Gornaya Property on or about November 20, 2001.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

14

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

45.     Viktor's transfer of the Gornaya Property violated the Land Code of the Republic of Kazakhstan, which requires that public property be sold via auction.  Viktor's transfer also violated the Water Code, which mandates that land in water conservation zones may only be provided to private individuals and entities for temporary use.  The fraudulent transfer did not involve an auction nor was the property provided for temporary use only.

46.     On or about August 29, 2003, Leila caused Almaty-Demalys to transfer two small portions of land from the Gornaya Property directly to Leila.  Upon information and belief, although Leila purported to purchase these plots for approximately $72,000 (10,660,352 ₸), Leila never transferred money to Almaty-Demalys for these purchases.

47.      On or about September 30, 2003, Leila caused Almaty-Demalys to transfer a separate, large portion of land from the Gornaya Property to Karasha, an entity ultimately controlled by Leila.  Upon information and belief, Karasha purported to purchase the land for $613,000 (91,226,125 ₸).  Karasha never paid for this purchase.

48.     Days later, on or about October 3, 2003, Leila caused Karasha to transfer the land plot directly to Leila.  Upon information and belief, Leila similarly never paid for the acquisition of this property.

49.     On or about October 6, 2003, Leila contributed the same portion of the Gornaya Property to BSC, of which she was the sole owner.  Ten days later, Leila sold her interest in BSC to a third party in a transaction that valued that portion of the Gornaya Property at approximately $8 million (1,179,999,980 ₸).

50.     Leila transferred the proceeds to Elvira's bank accounts in Switzerland, including Deutsch Bank and American Express Ltd. NY, and Viled Establishment's bank accounts in Liechtenstein.

51.      Leila caused the smaller portions of the Gornaya Property to be conveyed directly to Iliyas.  Iliyas, in turn, contributed it to Asia Holding, and then

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

15

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  sold Asia Holding to a separate unrelated third party for approximately $7.57

2  million.  Of the $7.57 million, Iliyas transferred approximately $2.21 million to

3  Elvira's Swiss bank accounts, including accounts at Sarasin & Co. Ltd., Credit

4  Suisse, and Schroeder & Co., and retained the remainder for himself.

5      52.    Thus, Leila paid approximately $689,000 for the Gornaya Property,

6  which she and Iliyas later re-sold for a total of $15.57 million.

7      **Fraudulent Transaction Example  2**

8      53.    On or about April 16, 2001, Viktor used his position as mayor to

9  cause public land and a building in Almaty known as Kindergarten No. 186 to be

10  auctioned and ultimately sold to Leila's company, KRI, for approximately

11  $347,000 (52,155,100 ₸).  Viktor did so by manipulating a public auction, through

12  members of the Territorial Committee and Investment Tender Committee, to

13  ensure that KRI won the auction.

14      54.    Under the laws of Kazakhstan, potential buyers of state-owned

15  property are obligated to state how they intend to invest in and develop the

16  property.  In an attempt to make KRI's bid appear legitimate and to ensure KRI

17  won the bid, Leila caused KRI to fraudulently represent that KRI would invest

18  more money than its competitors (based off inside information about the

19  competitors' bids) in Kindergarten No. 186 to build a health center for the benefit

20  of the people of Almaty.  That representation was false at the time it was made

21  and, in fact, KRI never intended to and never did build any such health center.  Leila

22      55.    Instead, on or about September 30, 2003, Leila caused KRI to sell

23  Kindergarten No. 186 to Karasha and, three days later, Leila caused Karasha to sell

24  Kindergarten No. 186 directly to her.  The investment promise KRI used to win the

25  bid was not passed on to Karasha or Leila in the subsequent purchase agreements.

26  On or about October 6, 2003, Leila contributed Kindergarten No. 186 to BSC,

27  which she then sold to an unrelated third party ten days later in a transaction that

28  valued Kindergarten No. 186 at approximately $4.1 million (611,445,206 ₸).  Leila

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

16

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

and Viktor thus obtained illegal profit of over \$3.7 million as a result of their illicit acquisition and re-sale of Kindergarten No. 186.

### Fraudulent Transaction Example 3

56.      In addition to manufacturing the sale of state-owned assets to Leila and other family members and co-conspirators, Viktor also abused his authority as mayor to seize privately-owned land and transfer it to Leila and others for re-sale.

57.      On or about April 3, 2001, Viktor caused Almaty to seize land owned by certain private unrelated individuals.  On or about August 25, 2003, Viktor caused Almaty to seize land owned by a private third party, Shadid Engineering LLP.  On or about September 16, 2003, Viktor caused Almaty to seize land owned by various private entities, including Kazkommertsbank, Arman Garage, Bulat Enterprise, and Argymak LLP.

58.      On or about September 23, 2003, Viktor combined all properties with an additional property into a single plot (the "Seized Property") and caused the Seized Property to be sold to Leila's company Karasha for approximately \$105,000 (15,637,100 ₸).  Leila then caused Karasha to sell the Seized Property directly to her on or about October 4, 2003.  Two days later, Leila contributed the Seized Property to BSC, and sold BSC to an unrelated third party in a transaction that valued the Seized Property at approximately \$2 million.  As a result, Leila obtained nearly \$1.9 million in illicit profit at the expense of Almaty and its people.

### Fraudulent Transaction Example 4

59.      In or about November 2004, Viktor caused Almaty to sell two plots of land to two additional Kazakh companies owned and controlled by Leila, Ademytau-KMK LLP and Viktoriya-KMK LLP (the plot transferred to Ademytau-KMK LLP, the "Ademytau Property," and the plot transferred to Viktoriya-KMK LLP, the "Viktoriya Property").  Both plots were located in a water conservation zone and, therefore, under Kazakh law (Part 1 of Article 119 of the Water Code of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

17

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

the Republic of Kazakhstan), could be provided to private persons or entities only for temporary use. Nevertheless, in violation of the law and his obligations as mayor of Almaty, Viktor caused both the Ademytau Property and the Viktoriya Property to be sold to Leila's companies for 16,640,900 ₸ and 2,229,200 ₸, respectively – approximately $1.3 million total (18,870,100 ₸).

60.     On or about April 12, 2005, Leila caused Ademytau-KMK LLP to transfer the Ademytau Property to Elvira.

61.     On the same day, April 12, 2005, Leila caused Viktoriya-KMK LLP to transfer the Viktoriya Property to Phoenix, VL., LLP, another entity that she owned and controlled. Two months after Leila transferred the property to Phoenix, VL., LLP, Phoenix, VL., LLP (previously known as Phenix-Kh Company LLP) proceeded to change its name a second time to Swiss Kazakh Phoenix Holding, LLP ("Swiss Kazakh").

62.     On or about December 23, 2005, Elvira transferred the Ademytau Property to a co-conspirator, Armen Sanasarovich Khachatryan ("Khachatryan") for 16,640,900 ₸.

63.     About one month later, on or about January 25, 2006, Leila caused Swiss Kazakh to transfer the Viktoriya Property to Khachatryan for 3,237,860 ₸. From December 2006 through May 2007, Khachatryan made payments, labeled as the return of temporary financial aid, totaling approximately $8.6 million (1,223,950,000 ₸) to Leila for the Ademytau and Viktoriya Properties and six additional properties. On information and belief, these illicit proceeds were transferred from Leila's Kazakh bank accounts to Elvira's Swiss bank accounts as "financial aid."

### Fraudulent Transaction Example 5

64.     Between 2002 and 2005, Viktor sold more than 55 plots of public land to private companies for billboards to be used for outdoor advertisements. Viktor violated Kazakh law by privatizing these public lands, including Article 18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

18

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

of the Law "On Land," which provided that public land could not be in private ownership. As part of this billboard scheme, Viktor ordered the privatization and sale of public land to companies owned by or affiliated with himself and Leila.

65.     Viktor's and Leila's companies subsequently leased the land at inflated prices to secure profits. Generally, the land would be sold to one company in particular, GeFest LLP ("GeFest"), for a nominal price. GeFest was founded by Leila and Viktor's brother-in-law, Aijar Kadyrovich Ilyasov, who served as GeFest's Executive Director.

66.     GeFest sold the land to Swiss Kazakh. Swiss Kazakh also was founded by Leila.

67.     Swiss Kazakh then sold the land to Vostochny Media Ekspress, LLC ("Vostochny"). Vostochny was founded by Aijar Ilyasov, Viktor's brother-in-law.

68.     Vostochny then leased the billboard space to third parties and collected profits.

69.     As a specific example, on November 7, 2002, Viktor signed a "decision" to sell GeFest the public land described as south of Baitursynov St., south of Satpaev St., in Bostandyk District. On January 15, 2004, Viktor and GeFest entered into a purchase agreement for this state-owned land plot. The purchase price was $11,472 ₸ (approximately $35.22 USD).

70.     On July 18, 2005, GeFest entered into a purchase agreement to sell the land to Swiss Kazakh. Swiss Kazakh purchased the land for the same nominal price, $11,472 ₸ (approximately $35.22 USD).

71.     On November 27, 2006, Swiss Kazakh entered into a purchase agreement to sell the land to Vostochny for $19,600 ₸ (approximately $60.00 USD).

72.     Vostochny then leased the outdoor advertising space for a profit. For example, on January 1, 2009, Vostochny entered into an agreement with F.I.R.S.T. Agency LLP to lease the billboard space for one month for $210,600 ₸

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

19

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

(approximately $646.55 USD) and an installation fee of $27,000 ₸ (approximately
$83.00 USD). Additional lease agreements were entered into and resulted in
increased profits over an extended period of time.

73. As a result of this billboard scheme, Khrapunov-related companies
leased out billboard space for more than 55 plots of land for approximately 6 years.
Almaty alleges on information and belief that the Khrapunov family earned
millions of dollars in ill-gotten gains through their illegal billboard scheme.

74. Together, the illegal conversion of properties described in Fraudulent
Transactions 1-5 and the ultimate sale of those properties to third parties, resulted
in tens of millions in profits to Viktor, Leila, Iliyas, Elvira, their family members,
and their co-conspirators. These are merely five examples of Viktor and his family
and co-conspirators' wrongdoing. In total, approximately 80 parcels of real estate
rightfully belonging to Almaty and its people were illegally alienated by the
Individual Defendants and their co-conspirators for their own personal gain. On
information and belief, the Individual Defendants and their co-conspirators
profited by over $300 million from these illegal transactions, all at the expense of
the people of Almaty, and now are seeking to use the United States as a haven in
which to enjoy their ill-gotten gains.

**D.    The Laundering of Stolen Funds: The Individual Defendants and
Their Co-Conspirators Laundered Illegally Obtained Funds in
Switzerland and the United States**

75. The Individual Defendants and their co-conspirators laundered the
proceeds of their crimes in Switzerland and the United States in order to hide the
assets from authorities and reap the rewards of their wrongdoing. Once the Swiss
authorities began to investigate the Individual Defendants and their co-conspirators
and to freeze their assets, the Individual Defendants and their co-conspirators
increased their illegal laundering activities in and through the United States to
further conceal the proceeds and attempt to prevent their recovery by Almaty.

76.     These funds rightfully belonged to, and still belong to, Almaty. Defendants continue to hold funds belonging to Almaty without permission and via constructive trust, and Defendants are obligated, by law, to return funds transferred into and laundered in the United States in furtherance of the Khrapunov Racketeering Enterprise.  The continued movement of Almaty's funds within the United States has hindered and continues to hinder Almaty's ability to trace and recover its funds, thereby causing Almaty ongoing harm and damage in the United States.  Upon information and belief, the Individual Defendants and their co-conspirators selected the United States as a jurisdiction in which to hide the stolen funds because they thought they would be immune from redress for their crimes here.  At the time the laundering began, the United States did not have a mutual legal assistance treaty or extradition treaty with Kazakhstan.

77.     The Individual Defendants and their co-conspirators have used and continue to use numerous holding companies in order to hide and to launder the illicit funds they siphoned out of Kazakhstan through Switzerland and other intermediary countries, and ultimately into and within the United States.  Iliyas and Elvira owned and/or controlled a number of these companies, including Defendants Vilder, Crownway, and at least two Swiss companies, SDG Capital SA ("SDG") and Swiss Promotion Group SA ("SPG").  In total, Iliyas, Elvira, and Leila have already transferred at least $125 million into these two Swiss companies alone.

78.     Between 2008 and 2012, Iliyas, Elvira, Leila, and sham companies they control injected over $115 million into SDG.  SDG was formed in or about July 2008 and, until approximately May 2009, was owned and controlled by Harlem Securities, a British Virgin Islands corporation that was, in turn, owned by Iliyas.  In or about May 2009, Elvira purchased SDG from Harlem Securities for approximately $99,000.  Following that purchase, Iliyas continued to exert full control over SDG.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

21

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

79.     Iliyas, Elvira, Leila, and sham companies they control also have contributed substantial assets, believed to be in excess of $10 million, to SPG. Iliyas is the ultimate beneficial owner of SPG via a variety of offshore holding companies.

80.     Upon information and belief, Iliyas, Elvira, Leila, and the sham companies they control have contributed substantial funds to Vilder, including millions of dollars to Vilder's account at FBME Bank ("FBME").[1]

81.     Upon information and belief, Iliyas, Elvira, Leila, and the sham companies they control have contributed substantial funds to Crownway, including millions of dollars to Crownway's account at FBME.

82.     All of the funds contributed to SDG, SPG, Vilder, Crownway, and other front companies controlled by Iliyas, Elvira, and Leila are traceable to the ill-gotten proceeds of Viktor's and his co-conspirators' looting of real estate and other assets.

**Funds Transferred to Defendants in the United States**

83.     In an ongoing effort to launder and conceal the source of the funds they stole from the people of Almaty, after moving the funds to various accounts and holding companies in Switzerland and elsewhere, Defendants and their co-conspirators began transferring the stolen funds into the United States by using an intricate web of individuals and offshore holding companies to launder Almaty's funds.

84.     Defendants harmed Almaty by concealing those funds from Almaty, and thereby causing Almaty to have to devote substantial monies and time and use

---

[1] The U.S. Treasury's Financial Crimes Enforcement Network ("FinCEN") has alleged that FBME engaged in large-scale money laundering. FinCEN first reported concerns regarding FBME's role in money laundering in July of 2014. In March 2016, FinCEN imposed the "fifth special measure" against FBME, aimed at blocking FBME from doing business in the United States or using U.S. currency. On or around May 8, 2017, Tanzania's central bank revoked FBME Bank's business license.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

22

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  extraordinary means in the United States to trace and recover their funds in the

2  United States.  The ongoing detention in the United States of funds belonging to

3  Almaty causes ongoing harm and damage to Almaty.

4        85.     For example, on or about July 20, 2012, Individual Defendants and

5  their co-conspirators caused over $3 million to be transferred from Defendant

6  Crownway's FBME account into Defendant RPM-Maro LLC's United States bank

7  account.  Upon information and belief, this bank account was owned or controlled

8  by Elvira, and at all times all Individual Defendants and their co-conspirators knew

9  that was stolen money.

10        86.     On the date of this transfer, RPM-Maro was owned and controlled by

11  Elvira and Iliyas.  Indeed, from June through August 2012, RPM-Maro was jointly

12  owned by Defendant RPM USA – which was controlled by Iliyas through RPM

13  USA's sole member, SPG, and Defendant Maro Enterprises – which was wholly

14  owned and controlled by Elvira.  Upon information and belief, before transferring

15  these funds into the United States, the Individual Defendants and their co-

16  conspirators caused the funds to be moved through various offshore bank accounts,

17  including accounts held by sham holding companies, for the sole purpose of

18  illicitly concealing the source of the stolen funds to make the stolen funds appear

19  legitimate.  Upon information and belief, this $3 million transferred into the United

20  States by the Individual Defendants is traceable to the funds they looted from

21  Almaty.

22        87.     The Individual Defendants made use of the United States wires and

23  United States mail in furtherance of this illegal $3 million transaction.  The

24  Individual Defendants harmed Almaty by transferring Almaty's stolen funds into

25  the United States, concealing the illegitimate source of the funds, and impeding

26  and seeking to prevent Almaty from recovering the stolen funds in furtherance of

27  the goals of the Khrapunov Racketeering Enterprise.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

23

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

88.     As another example, on or about November 7, 2012, Individual Defendants and their co-conspirators caused approximately $1.27 million to be transferred from Defendant Vilder's offshore account, into a United States bank account owned by Defendant RPM USA and controlled by Iliyas through RPM USA's sole member, SPG.  At all times, all Individual Defendants and their co-conspirators knew that money to have been stolen from the people of the City of Almaty.

89.     Upon information and belief, before transferring the $1.27 million into the United States, Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.  Upon information and belief, this $1.27 million transferred into the United States by the Individual Defendants and their co-conspirators is traceable to the funds they looted from Almaty.

90.     The Individual Defendants and their co-conspirators made use of the United States wires and United States mail in furtherance of this illegal $1.27 million transaction.  The Individual Defendants harmed Almaty by transferring Almaty's stolen funds into the United States, concealing the illegitimate source of the funds, and impeding and seeking to prevent Almaty from recovering the stolen funds in furtherance of the goals of the Khrapunov Racketeering Enterprise.

91.     Six days after the transfer of $1.27 million from Vilder to RPM-USA, RPM-USA transferred $1.2 million to RPM-USA's New York-based attorney to be held in escrow.  Upon information and belief, Defendants regularly used this attorney, who also served as attorney for RPM-Maro and World Health Networks, to assist in laundering money between various sham entities and into sham investments.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

24

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

92.     As a third example, on or about January 9, 2013, Individual Defendants and their co-conspirators caused Defendant Vilder to transfer $1 million from an offshore bank account into Defendant RPM-Maro's United States bank account, which was owned or controlled by Elvira.  At all times all Individual Defendants and their co-conspirators knew that money to have been stolen from the people of the City of Almaty.

93.     Elvira officially owned 100% interest in RPM-Maro, but Iliyas exerted informal control over the company.  Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.  Upon information and belief, this $1 million transferred into the United States by the Individual Defendants is traceable to the funds they looted from Almaty.

94.     The Individual Defendants made use of the United States wires and United States mail in furtherance of this illegal transaction.  The Individual Defendants harmed Almaty by transferring Almaty's funds into the United States, concealing the illegitimate source of the funds, and impeding and seeking to prevent Almaty from recovering the stolen funds in furtherance of the goals of the Khrapunov Racketeering Enterprise.

95.     As a fourth example, on or about February 28 and March 1, 2013, Individual Defendants and their co-conspirators caused Vilder to transfer a total of $1 million from an offshore bank account to a United States bank account owned by RPM-USA and controlled by Iliyas.  At all times, all Individual Defendants and their co-conspirators knew that money to have been stolen from the people of the City of Almaty.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

25

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

96.     Upon information and belief, before transferring the $1 million into the United States, Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts – including accounts held by their sham holding companies – for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.  Upon information and belief, this $1 million transferred into the United States by the Individual Defendants and their co-conspirators is traceable to the funds they stole from Almaty.

97.     The Individual Defendants made use of the United States wires and United States mail in furtherance of this illegal transaction.  The Individual Defendants harmed and continue to harm Almaty by transferring Almaty's funds into the United States, concealing the illegitimate source of the funds, and impeding and seeking to prevent Almaty from recovering the stolen funds in furtherance of the goals of the Khrapunov Racketeering Enterprise.

98.     As a fifth example, on or about August 5, 2013 Individual Defendants and their co-conspirators caused Vilder to transfer $1 million from its FBME bank account to Elvira's United States bank account.  Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.  Upon information and belief, this $1 million transferred into the United States by the Individual Defendants is traceable to the funds they looted from Almaty.

99.     The Individual Defendants made use of the United States wires and United States mail in furtherance of this illegal $1 million transaction.  The Individual Defendants harmed Almaty by transferring Almaty's funds into the United States, concealing the illegitimate source of the funds, and impeding and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

26

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Case 8:20-mc-00126-DOC-DFM Document 1-4 Filed 12/02/20 Page 46 of 149 Page ID
Case 2:19-cv-03660-FMO-CW Document 141 Filed 08/24/20 Page 28 of 54 Page ID
#:191

seeking to prevent Almaty from recovering the stolen funds in furtherance of the
goals of the Khrapunov Racketeering Enterprise.

100.   As a sixth example, upon information and belief, throughout the
course of 2014, Individual Defendants and their co-conspirators caused a total of
over $1 million to be transferred from offshore companies – including Vilder, SDG
Capital, and another sham company Adlux Sarl SA, a subsidiary of SPG – directly
to United States bank accounts owned by Elvira.

101.   Upon information and belief, before transferring these funds into the
United States, Individual Defendants and their co-conspirators caused the funds to
be moved through various offshore bank accounts, including accounts held by their
sham holding companies, for the sole purpose of illicitly concealing the source of
the stolen funds to make the stolen funds appear legitimate.  Upon information and
belief, these funds transferred into the United States by the Individual Defendants
and their co-conspirators is traceable to the funds they stole from Almaty.

102.   The Individual Defendants made use of the United States wires and
United States mail in furtherance of this illegal transaction.  The Individual
Defendants harmed, and continue to harm, Almaty by transferring Almaty's funds
into the United States, concealing the illegitimate source of the funds, and
impeding and seeking to prevent Almaty from recovering the stolen funds in
furtherance of the goals of the Khrapunov Racketeering Enterprise.

103.   The funds identified in the above six examples, in addition to all other
funds stolen from Almaty and transferred into the United States in furtherance of
the Khrapunov Racketeering Enterprise, rightfully belonged and still belong to
Almaty, and Defendants hold these funds without permission and through a
constructive trust or otherwise.  The continued movement of Almaty's funds
within the United States continues to cause Almaty harm and damage by hindering
Almaty's ability to trace and recover its funds and forcing Almaty to expend
substantial assets and time in its efforts to do so.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

27

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

104. Elvira, Dmitry, Iliyas, and Madina have laundered the funds transferred into the United States by making investments in multiple U.S. companies, including World Health Networks. Upon information and belief, between July 2012 and October 2014, Defendants invested approximately $6.3 million in a World Health Networks, a medical device company registered to do business in New York and California. The funds are traceable to the money the Individual Defendants and their co-conspirators stole from Almaty and laundered through various offshore bank accounts, before Defendants transferred the funds into the United States. Approximately $1.9 million of the $6.3 million investment was provided by Defendant RPM USA – which is owned or controlled by Iliyas and is a wholly owned subsidiary of SPG – on RPM-Maro's behalf. The remainder of the funds came from RPM-Maro, and directly from Elvira and Dmitry. All of these funds had been transferred into the United States from offshore companies controlled by Individual Defendants, as described in the six examples above. The individual defendants, along with Defendants RPM-Maro and RPM USA, used those funds to invest in the medical device company with the intent to conceal further the illicit source of those funds.

105. Upon information and belief, Individual Defendants used this sham investment into World Health Networks as a front for obtaining United States visas for Elvira and Dmitry.

106. Furthermore, upon information and belief, Elvira, Dmitry, Iliyas, and Madina made use of the United States mail and wires, as well as United States financial institutions, to engage in these investments. As a result, Elvira, Dmitry, Iliyas, and Madina again acted in violation of 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

107. They at all times acted with the agreement and knowledge of Viktor and Leila, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

28

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Case 8:20-mc-00126-DOC-DFM Document 1-4 Filed 12/02/20 Page 48 of 149 Page ID
#:193
Case 2:14-cv-09690-FMO-CW Document 114 Filed 03/24/20 Page 30 of 54 Page ID #:6720

108.   In or about October 2014 – months after Almaty first filed its initial complaint against the Khrapunovs in this action in May 2014 – Elvira caused RPM-Maro to sell its interest in World Health Networks to Techvest S.A, an entity based in Luxembourg.  Upon information and belief, Elvira sold its interest in World Health Networks in a further attempt to launder and conceal the source of the funds, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

**Funds Laundered Into Real Estate and Other Assets**

109.   As part of their ongoing effort to launder and conceal the source of the funds they stole from Almaty, after moving funds to various offshore accounts and holding companies, Defendants and their co-conspirators injected funds directly into real estate located in the United States.

110.   Defendants harmed Almaty by concealing those funds from Almaty, and thereby causing Almaty to have to devote substantial monies and time, and to use extraordinary means in the United States to trace and recover their stolen funds hidden in the United States.  The ongoing detention in the United States of funds belonging to Almaty causes ongoing harm and damage to Almaty.

111.   On or about October 20, 2010 and December 2, 2010, Elvira and Dmitry caused $365 thousand and $3.3 million, respectively, to be transferred from their Swiss bank accounts at Schroder & Co. Bank AG and Bank Sarasin and Co. Ltd., respectively, directly to Escrow of the West, an escrow company based in Los Angeles, California.  Elvira and Dmitry used these laundered funds to purchase a luxurious single-family home located at 2578 Hutton Drive in Beverly Hills, California, for approximately $3.65 million.

112.   Elvira and Dmitry knew that the money they used to engage in this transaction was stolen from Almaty and illegally laundered to appear legitimate. Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

29

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Case 8:20-mc-00126-DOC-DFM Document 1-4 Filed 12/02/20 Page 49 of 149 Page ID
Case 2:14-cv-09930-FMO-CW Document 41 Filed 08/24/15 Page 31 of 54 Page ID #:6721
#:194

through various offshore bank accounts, including accounts held by sham holding

companies, for the sole purpose of illicitly concealing the source of the stolen

funds to make the stolen funds appear legitimate. They purchased this property

with the intent to use the transaction to further conceal the illegitimate source of

the funds, which are traceable to the funds the Individual Defendants and their co-

conspirators embezzled from Almaty.

113. Because the funds used to purchase this property were wrongfully

detained from Almaty, Elvira and Dmitry held this real property as constructive

trustees for the benefit of Almaty. The unlawful purchase of this property caused

additional harm to Almaty in the United States by preventing Almaty access to its

property and made it more difficult and costly for Almaty to trace and recover its

U.S.-based assets.

114. Furthermore, Elvira and Dmitry made use of the United States mail

and wires, as well as United States financial institutions, to engage in this

transaction. As a result of the foregoing, Elvira and Dmitry violated, among other

U.S. laws, 18 U.S.C. §§ 1956 (money laundering and conspiracy to commit money

laundering), 1957 (transactions in property derived from unlawful activity), 2314

(transport of stolen money), 1341 (mail fraud), and 1343 (wire fraud).

115. Elvira and Dmitry acted with the agreement and knowledge of Viktor,

Leila, Iliyas, and Madina, and as a result, all Individual Defendants also violated

18 U.S.C. § 371 (conspiracy).

116. On or about December 30, 2011 and March 15, 2012, Iliyas and

Madina caused Defendant Candian to transfer $163 thousand and $5.366 million,

respectively, directly to Granite Escrow Services ("Granite Escrow") in Beverly

Hills, California from its Swiss bank account. Iliyas and Madina used these funds

to purchase a lavish single-family home located at 606 North Alta Drive in Beverly

Hills, California, for approximately $5.45 million.

LATHAM&WATKINS LLP  US-DOCS\91976251.11
ATTORNEYS AT LAW
LOS ANGELES
30

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Case 2:20-mc-00126-DOC-DFM Document 14 Filed 12/02/20 Page 50 of 149 Page ID
Case 8:20-cv-03080-FMO-CW Document 14 Filed 08/24/10 Page 32 of 54 Page ID #:722
#:195

117.   Iliyas and Madina knew that the money they used to engage in this transaction was stolen from the people of Almaty, and illegally laundered to appear legitimate.  Indeed, Iliyas and Madina attempted to further conceal the source of the stolen funds used to make this purchase by using Defendant Candian to complete the purchase, and they purchased this property with the intent to use the transaction to further conceal the illegitimate source of the funds, which are traceable to the funds the Individual Defendants and their co-conspirators embezzled from the people of Almaty.  Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.

118.   Because the funds used to purchase this property were wrongfully detained from Almaty, Iliyas, Madina, and/or Candian International Ltd. held this real property as constructive trustees for the benefit of Almaty.  The unlawful purchase of this property caused additional harm to Almaty in the United States by preventing Almaty access to its property and making it more difficult and costly for Almaty to trace and recover its U.S.-based assets.

119.   Furthermore, Iliyas and Madina made use of the United States mail and wires, as well as United States financial institutions, to engage in this transaction.  As a result of the foregoing, Iliyas and Madina violated, among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

120.   Iliyas and Madina acted with the agreement and knowledge of Viktor, Leila, Elvira, and Dmitry, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

121.   In or about mid-2012, the Public Prosecutor of Geneva opened an investigation into Viktor, Leila, Iliyas, and Elvira on suspicion of money

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

31

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  laundering in violation of Swiss law.  In or about November 2012, the Public

2  Prosecutor of Geneva ordered frozen certain Swiss accounts and assets belonging

3  to Viktor, Leila, Iliyas, and Elvira.  After this action by Swiss government

4  authorities, the Individual Defendants and their co-conspirators continued and

5  increased their laundering activities in the United States.

6      122.   For example, Iliyas moved significant amounts of money into New

7  York real estate investments.  On or around November 2012, Iliyas began

8  investing tens of millions (of the equivalent) of dollars stolen from the people of

9  Almaty and others to purchase a partial interest in a luxury hotel in New York.

10  Additionally, in order to conceal the source of the funds used to make this

11  investment, Iliyas used Luxembourg shell entity Triadou SPV S.A. ("Triadou"),

12  together with a series of at least four Delaware holding companies, all of which

13  were ultimately owned by SDG and controlled by Iliyas.  Iliyas invested additional

14  funds in the Cabrini Medical Center in New York.

15      123.   Individual Defendants also increased their laundering of the stolen

16  funds into California at this time as well.  On or about November 30, 2012 and

17  January 18, 2013, Individual Defendants caused Defendant Vilder to transfer $186

18  thousand and $6 million, respectively, from its FBME bank account located in

19  Cyprus directly to Granite Escrow in Beverly Hills, California.  Iliyas and Madina

20  used these funds to purchase a second mansion in Beverly Hills using Almaty's

21  funds illegally obtained through the Khrapunov Racketeering Enterprise's criminal

22  activity and laundered through various offshore bank accounts and entities into the

23  U.S.  Iliyas and Madina knew that the money they used to engage in this

24  transaction was stolen from the people of Almaty and illegally laundered to appear

25  legitimate.

26      124.   Indeed, Iliyas and Madina, with Elvira's assistance, used another

27  sham holding company, Defendant 628 Holdings LLC, to launder and conceal the

28  source of the illicit funds.  To that end, Iliyas and Madina caused 628 Holdings

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

32

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  LLC to purchase with Almaty's money a $6.2 million five-bedroom single-family

2  home located at 628 North Alta Drive in Beverly Hills, California for the benefit

3  and use of Iliyas and Madina.  Elvira is listed in public records as an officer of

4  Defendant 628 Holdings LLC.

5    125.  Iliyas and Madina purchased this property with the intent to use the

6  transaction to further conceal the illegitimate source of the funds, which are

7  traceable to the funds the Individual Defendants and their co-conspirators

8  embezzled from the people of Almaty.  Because the funds used to purchase this

9  property were wrongfully detained from Almaty, Iliyas, Madina, and/or 628

10 Holdings LLC held this real property as constructive trustees for the benefit of

11 Almaty.  The unlawful purchase of this property caused additional harm to Almaty

12 in the United States by preventing Almaty access to its property and making it

13 more costly and difficult for Almaty to trace and recover its U.S.-based assets.

14   126.  Furthermore, Iliyas and Madina made use of the United States mail

15 and wires, as well as United States financial institutions, to engage in this

16 transaction.  As a result of the foregoing, Iliyas, Madina, and Elvira violated,

17 among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

18   127.  Iliyas, Madina, and Elvira acted with the agreement and knowledge of

19 Viktor, Leila, and Dmitry, and as a result, all Individual Defendants also violated

20 18 U.S.C. § 371.

21   128.  On or about April 5, 2013 and April 28, 2013, Elvira, with the full

22 knowledge and assistance of the other Individual Defendants and their co-

23 conspirators, caused Defendant Crownway to transfer over $5 million and $250

24 thousand, respectively, from its FBME bank account into Elvira's United States

25 bank account.  Upon information and belief, before transferring these funds into

26 the United States, the Individual Defendants and their co-conspirators caused the

27 funds to be moved through various offshore bank accounts, including accounts

28 held by sham holding companies, for the sole purpose of illicitly concealing the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

33

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  source of the stolen funds to make the stolen funds appear legitimate.  Upon

2  information and belief, this $5 million transferred into the United States by the

3  Individual Defendants is traceable to the funds they stole from Almaty.

4  129.  On or about April 16, April 25, and April 29, 2013, Elvira transferred

5  a total of approximately $3.2 million of the funds moved into the U.S. by

6  Crownway to a New York-based real estate attorney, Martin Jajan, for the

7  purchase of three condominiums – units 3203, 3310, and 3311 – in the Trump

8  Soho tower located at 246 Spring Street, New York, New York.  All three units

9  were purchased on or about April 30, 2013 for $879,833, $1,407,321 and $829,351

10  respectively.  Elvira knew that the funds they used to engage in this transaction

11  were stolen from the people of Almaty, and illegally laundered to appear

12  legitimate.  Indeed, in a further attempt to conceal their wrongful possession and

13  use of Almaty's funds, Elvira used three separate LLCs – Soho 3203 LLC, Soho

14  3310 LLC, and Soho 3311 LLC – to make these purchases.

15  130.  Elvira purchased these properties with the intent to use the transaction

16  to further conceal the illegitimate source of the funds, which are traceable to the

17  funds the Individual Defendants and their co-conspirators embezzled from the

18  people of Almaty.  Because the funds used to purchase these properties were

19  wrongfully detained from Almaty, Elvira held these real properties as constructive

20  trustees for the benefit of Almaty.  The unlawful purchase of these properties

21  caused additional harm to Almaty in the United States by preventing Almaty

22  access to its property and making it more costly and difficult for Almaty to trace

23  and recover its U.S.-based assets.

24  131.  Furthermore, Elvira made use of the United States mail and wires, as

25  well as United States financial institutions, to engage in this transaction.  As a

26  result of the foregoing, Elvira violated, among other U.S. laws, 18 U.S.C. §§ 1956,

27  1957, 2314, 1341, and 1343.

28

LATHAM&WATKINS LLP  US-DOCS\91976251.11
ATTORNEYS AT LAW
LOS ANGELES

34

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1      132.   Elvira acted with the agreement and knowledge of Iliyas, Madina,

2    Viktor, Leila, and Dmitry, and as a result, all Individual Defendants also violated

3    18 U.S.C. § 371.

4      133.   In attempts to bury Almaty's money deeper in California, on or about

5    July 19, 2013, Elvira and Dmitry sold the house at 2578 Hutton Drive for

6    approximately $4.97 million.  Upon information and belief, Elvira and Dmitry sold

7    this property in furtherance of the Khrapunov Racketeering Enterprise, causing

8    additional harm to Almaty by making it more costly and difficult for Almaty to

9    trace and recover its U.S.-based assets.

10      134.   That same day, Elvira and Dmitry purchased an expansive, two-acre

11    estate located at 11986 Lockridge Road in Studio City, California for

12    approximately $5.7 million.  Upon information and belief, nearly $1 million of the

13    funds used to effectuate this purchase were derived from Crownway's $5.25

14    million transfer in April 2013.  The remainder was funded by the proceeds from

15    the sale of 2578 Hutton Drive.

16      135.   Elvira and Dmitry knew that the money they used to engage in this

17    transaction was stolen from the people of Almaty, and illegally laundered to appear

18    legitimate.  Indeed, shortly after they purchased this property, in a further attempt

19    to conceal their wrongful possession and use of Almaty's funds, Elvira and Dmitry

20    transferred it to The Kasan Family Trust, a trust for which they serve as trustees.

21      136.   Elvira and Dmitry purchased this property with the intent to use the

22    transaction to further conceal the illegitimate source of the funds, which are

23    traceable to the funds the Individual Defendants and their co-conspirators

24    embezzled from the people of Almaty.  Because the funds used to purchase this

25    property were wrongfully detained from Almaty, Elvira, Dmitry, and/or The Kasan

26    Family Trust held this real property as constructive trustees for the benefit of

27    Almaty.  The unlawful purchase of this property caused additional harm to Almaty

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

35

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

in the United States by preventing Almaty access to its property and making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

137. Furthermore, Elvira and Dmitry made use of the United States mail and wires, as well as United States financial institutions, to engage in this transaction. As a result of the foregoing, Elvira and Dmitry violated, among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

138. Elvira and Dmitry acted with the agreement and knowledge of Viktor, Leila, Iliyas, and Madina, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

139. On or about July 30, 2013, Iliyas and Madina sold the house at 606 North Alta Drive for approximately $6.975 million. Upon information and belief, Iliyas and Madina sold this property less than 18 months after they purchased it in a further attempt to launder and conceal the source of the funds, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

140. Almaty filed its initial complaint in this present action on or about May 13, 2014. Elvira was served that same day, and Dmitry was served the day after.

141. On or about May 27, 2014, the Elvira caused Soho 3310 LLC to sell the Soho 3310 property for $1.4 million. Upon information and belief, Elvira sold this property a little more than a year after she purchased it in a further attempt to launder and conceal the source of the funds, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

142. On or about August 4, 2014, Elvira and Dmitry as trustees of the Kasan Family Trust caused the Kasan Family Trust to sell the house at 11986 Lockridge Rd. for approximately $6.5 million. As Almaty already had filed the present action at this time, the parties entered into a stipulation agreement to ensure

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

36

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   that the proceeds from the sale were not transferred outside of the Central District

2   of California. In accordance with that stipulation, the proceeds were placed in an

3   escrow account.

4       143.   That same day, without Almaty's knowledge, Triadou assigned its

5   partial interest in the New York luxury hotel to the developers of the hotel for a

6   fraction of the initial investment. Upon information and belief, Iliyas caused

7   Triadou to make this assignment in an attempt to move millions of Almaty's

8   money out of the United States and further conceal it from Almaty.

9       144.   On or about September 8, 2014, Elvira and Dmitry purchased a

10  property located at 2 Narbonne in Newport Beach, California for approximately

11  $4.1 million, using a portion of the proceeds from the sale of 11986 Lockridge Rd.

12  property. These funds were derived from the funds stolen from Almaty and

13  laundered through various offshore bank accounts and entities into the U.S. Elvira

14  and Dmitry knew that the money they used to engage in this transaction was stolen

15  from the people of Almaty, and illegally laundered to appear legitimate. Elvira and

16  Dmitry named The Kasan Family Trust as owner, a trust for which they serve as

17  trustees.

18      145.   Because the funds used to purchase this property were wrongfully

19  detained from Almaty, Elvira, Dmitry, and/or The Kasan Family Trust held this

20  real property as constructive trustees for the benefit of Almaty. The unlawful

21  purchase of this property caused additional harm to Almaty in the United States by

22  preventing Almaty access to its property and making it more costly and difficult

23  for Almaty to trace and recover its U.S.-based assets.

24      146.   Furthermore, Elvira and Dmitry made use of the United States mail

25  and wires, as well as United States financial institutions, to engage in this

26  transaction. As a result of the foregoing, Elvira and Dmitry violated, among other

27  U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

28

LATHAM&WATKINS LLP   US-DOCS\91976251.11

ATTORNEYS AT LAW
LOS ANGELES

37

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1    147.   Elvira and Dmitry acted with the agreement and knowledge of Viktor,

2   Leila, Iliyas, and Madina, and as a result, all Individual Defendants also violated

3   18 U.S.C. § 371.

4    148.   On or about September 24, 2014 – a little over four months after

5   Almaty initially brought this action – Elvira caused Soho 3203 LLC to sell the

6   Soho 3203 property for $840 thousand.  Upon information and belief, Elvira sold

7   this property less than 18 months after she purchased it in a further attempt to

8   launder and conceal the source of the funds, causing additional harm to Almaty by

9   making it more costly and difficult for Almaty to trace and recover its U.S.-based

10  assets.

11   149.   On or about October 16, 2015, Elvira caused Soho 3311 LLC to sell

12  the Soho 3311 property for $777,000.  Upon information and belief, Elvira sold

13  this property it in a further attempt to launder and conceal the source of the funds,

14  causing additional harm to Almaty by making it more costly and difficult for

15  Almaty to trace and recover its U.S.-based assets.

16   150.   On or about March 29, 2016, Iliyas and Madina caused 628 Holdings

17  to sell the house at 628 N. Alta for approximately $7.2 million.  Upon information

18  and belief, Iliyas and Madina sold this property in furtherance of the Khrapunov

19  Racketeering Enterprise, causing additional harm to Almaty by making it more

20  costly and difficult for Almaty to trace and recover its U.S.-based assets.

21   151.   On or about August 26, 2016, Elvira and Dmitry as trustees of the

22  Kasan Family Trust caused the Kasan Family Trust to sell the house at 2 Narbonne

23  for approximately $6.375 million.  Upon information and belief, Elvira and Dmitry

24  sold this property in furtherance of the Khrapunov Racketeering Enterprise,

25  causing additional harm to Almaty by making it more costly difficult for Almaty to

26  trace and recover its U.S.-based assets.

27   152.   The Individual Defendants' luxurious lifestyles in the United States

28  were not limited to the purchase of Beverly Hills mansions.  In or about April

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

38

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

2013, Elvira leased a 2013 Rolls Royce sedan valued at approximately $302,000. In addition to the Rolls Royce, Elvira leased a 2013 Bentley sedan valued at approximately $320,000. Elvira is also the registered owner of a 2013 Mercedes Benz sport utility vehicle valued at approximately $114,000 and a 2011 Cadillac sport utility vehicle valued at approximately $75,000. Upon information and belief, Individual Defendants also purchased numerous pieces of valuable art and home furnishings.

153. Elvira used funds stolen from Almaty and laundered through various offshore bank accounts and entities to acquire these vehicles and other personal assets, and appear legitimate, while knowing those funds were stolen.

154. Upon information and belief, the funds used to purchase or lease these vehicles, artwork, and other property are traceable to the funds stolen from Almaty. Because the funds used to purchase and lease these assets were wrongfully detained from Almaty, Elvira held and continues to hold these assets as constructive trustee for the benefit of Almaty. The unlawful purchase of this property caused additional harm to Almaty in the United States by preventing Almaty access to its property and making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

155. Furthermore, upon information and belief, Elvira made use of the United States mail and wires, as well as United States financial institutions, to engage in these purchase and lease transactions. As a result of the foregoing, Elvira violated, among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

156. Elvira engaged in these transactions with the agreement and knowledge of Viktor, Leila, Dmitry, Iliyas, and Madina, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

39

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Case 8:20-nc-00126-DOC-DFM Document 1-4 Filed 12/02/20 Page 59 of 149 Page ID
Case 2:14-cv-09063-FMO-CW Document 124 Filed 08/24/17 Page 40 of 54 Page ID #:6731
#:204

157.   Each U.S. investment and transaction made in furtherance of the Khrapunov Racketeering Enterprise harmed Almaty by making it significantly more difficult and costly for Almaty to trace and recover its U.S.-based assets.

158.   By this lawsuit, Almaty seeks to hold Defendants responsible for their illegal conduct in the United States in violation of U.S. law.  Almaty further seeks to hold Defendants liable for the ongoing harm they have caused Almaty in the United States and continue to cause Almaty in the United States.

## **FIRST CLAIM FOR RELIEF**

(For Violations of RICO, 18 U.S.C. §§ 1962(c), 1962(d), 1964(c), against all Defendants)

159.   Almaty hereby incorporates by reference the allegations in paragraphs 1 through 158, as though fully set forth herein.

160.   From in or about 1997 and continuing to the present, by reason of its organization, structure, and activities, the Khrapunov Racketeering Enterprise constituted a RICO enterprise within the meaning of 18 U.S.C. § 1961(4).  The Khrapunov Racketeering Enterprise was comprised of myriad individuals and entities, all associated in fact as part of the Khrapunov Racketeering Enterprise, including but not limited to the Individual Defendants and Entity Defendants named herein.  The Khrapunov Racketeering Enterprise was engaged in, and the activities of the Khrapunov Racketeering Enterprise affected, interstate and foreign commerce.

161.   As alleged herein, the Khrapunov Racketeering Enterprise participants, including Defendants and each of them, engaged and conspired to engage in acts in the United States to further the goals of their criminal enterprise, in violation of U.S. law.

162.   Defendants engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting numerous financial transactions using illegally obtained funds laundered through various off-shore accounts and entities

LATHAM&WATKINS LLP   US-DOCS\91976251.11
ATTORNEYS AT LAW
LOS ANGELES
40
CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

to, among other things, purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, including the Entity Defendants, in furtherance of the Khrapunov Racketeering Enterprise, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

163. Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or transferring funds stolen from the people of Almaty and laundered through various off-shore accounts and entities into and within the United States in order to, among other things, purchase real estate and assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, including the Entity Defendants, in furtherance of the Khrapunov Racketeering Enterprise, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

164. Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting financial transactions using those stolen funds by, among other things, using stolen funds laundered through various off-shore accounts and entities to purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, including the Entity Defendants, in furtherance of the Khrapunov Racketeering Enterprise, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

165. Defendants engaged and conspired to engage in money transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 by, among other things, knowingly transferring funds in excess of $10,000 stolen from Almaty into and within the United States via United States financial institutions to purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, including the Entity Defendants,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

41

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  knowing that such funds were derived from and traceable to funds stolen from the

2  people of Almaty.

3       166.  Defendants engaged and conspired to engage in the foreign transport

4  of stolen money or property known to be stolen, converted or taken by fraud in

5  violation of 18 U.S.C. § 2314 by transferring funds derived from and traceable to

6  funds stolen from the people of Almaty into and within the United States, in excess

7  of $5,000, knowing those funds to have been stolen from the people of Almaty

8  and/or obtained from the people of Almaty by means of false or fraudulent

9  pretenses, representations, or promises by, among other things, transferring such

10  funds from bank accounts in Switzerland into the United States via United States

11  financial institutions and using those funds to purchase real estate and other assets

12  in Beverly Hills, Studio City, and elsewhere and to fund business entities,

13  including the Entity Defendants.

14       167.  Defendants, and each of them, conspired to commit the violations of

15  U.S. law described herein, and one or more of the Defendants or their co-

16  conspirators acted to violate such laws.  Defendants, and each of them, thus also

17  violated 18 U.S.C. § 371.

18       168.  Defendants engaged and conspired to engage in mail fraud in

19  violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by

20  knowingly using the United States mails and wires to transfer illegally obtained

21  funds into and within the United States, for the purpose of furthering the

22  Khrapunov Racketeering Enterprise and, while concealing the funds' illegal

23  source, used those funds to purchase real estate in Beverly Hills and Studio City,

24  California and to fund business entities, including the Entity Defendants, to enable

25  those entities to conduct business in the United States using the illegally-obtained

26  funds.

27       169.  Defendants engaged and conspired to engage in the above violations

28  of U.S. law in order to implement the objectives and accomplish the unlawful

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

42

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

purposes of the Khrapunov Racketeering Enterprise as set forth herein, and thereby engaged in predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B).

170.   Each of the Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Khrapunov Racketeering Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c), consisting as applicable of multiple acts of money laundering, conducting money transactions in property derived from specified unlawful activity, foreign transport of stolen money or property known to be stolen, converted or taken by fraud, mail fraud, and/or wire fraud, as specified herein.  Each of the Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO (*i.e.*, October 15, 1970).

171.   From in or about 1997, and continuing to the present, Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Khrapunov Racketeering Enterprise and in order to implement the schemes and employ the devices described herein.

172.   In so doing, Defendants unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together, with each other and with others to commit RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated 18 U.S.C. § 1962(d).  In furtherance of the conspiracy and to effect the objects thereof, Defendants committed in the Central District of California and elsewhere the overt acts as described herein, among others.

173.   As a direct and proximate result of RICO violations by the Defendants of 18 U.S.C. §§ 1962(a), 1962(b), 1962(c), and/or 1962(d), Almaty has suffered damages in an amount to be determined at trial and presently estimated to be not less than $300 million.  Almaty has been injured in its business or property by reason of each such Defendant's violations and, pursuant to the civil remedy

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

43

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

provisions of 18 U.S.C. § 1964(c), is thereby entitled to recover threefold the damages it has suffered, together with its costs of suit and reasonable attorneys' fees.

### SECOND CLAIM FOR RELIEF

(For Violations of RICO, 18 U.S.C. §§ 1962(a), 1962(d), 1964(c), against all Defendants)

174. Almaty hereby incorporates by reference the allegations in paragraphs 1 through 173, as though fully set forth herein.

175. From in or about 1997 and continuing to the present, by reason of its organization, structure, and activities, the Khrapunov Racketeering Enterprise constituted a RICO enterprise within the meaning of 18 U.S.C. § 1961(4). The Khrapunov Racketeering Enterprise was comprised of myriad individuals and entities, all associated in fact as part of the Khrapunov Racketeering Enterprise, including but not limited to the Individual Defendants and Entity Defendants named herein. The Khrapunov Racketeering Enterprise was engaged in, and the activities of the Khrapunov Racketeering Enterprise affected, interstate and foreign commerce.

176. Each of the Defendants was at the center of and was a principal perpetrator of a fraudulent scheme and is liable under 18 U.S.C. § 1962(a) as a direct and indirect beneficiary of the pattern of racketeering herein alleged.

177. As alleged herein, the Khrapunov Racketeering Enterprise participants, including Defendants and each of them, engaged and conspired to engage in acts in the United States to further the goals of their criminal enterprise, in violation of U.S. law.

178. Defendants engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting numerous financial transactions using illegally obtained funds laundered through various off-shore accounts and entities to, among other things, purchase real estate and other assets in Beverly Hills,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

44

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Studio City, and elsewhere and to fund business entities, including the Entity Defendants, in furtherance of the Khrapunov Racketeering Enterprise, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

179. Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or transferring funds stolen from the people of Almaty and laundered through various off-shore accounts and entities into and within the United States in order to, among other things, purchase real estate and assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, including the Entity Defendants, in furtherance of the Khrapunov Racketeering Enterprise, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

180. Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting financial transactions using those stolen funds by, among other things, using stolen funds laundered through various off-shore accounts and entities to purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, including the Entity Defendants, in furtherance of the Khrapunov Racketeering Enterprise, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

181. Defendants engaged and conspired to engage in money transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 by, among other things, knowingly transferring funds in excess of $10,000 stolen from Almaty into and within the United States via United States financial institutions to purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, including the Entity Defendants,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

45

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  knowing that such funds were derived from and traceable to funds stolen from the

2  people of Almaty.

3       182.  Defendants engaged and conspired to engage in the foreign transport

4  of stolen money or property known to be stolen, converted or taken by fraud in

5  violation of 18 U.S.C. § 2314 by transferring funds derived from and traceable to

6  funds stolen from the people of Almaty into and within the United States, in excess

7  of $5,000, knowing those funds to have been stolen from the people of Almaty

8  and/or obtained from the people of Almaty by means of false or fraudulent

9  pretenses, representations, or promises by, among other things, transferring such

10  funds from bank accounts in Switzerland into the United States via United States

11  financial institutions and using those funds to purchase real estate and other assets

12  in Beverly Hills, Studio City, and elsewhere and to fund business entities,

13  including the Entity Defendants.

14       183.  Defendants, and each of them, conspired with each other and with

15  others to commit the violations of U.S. law described herein, and one or more of

16  the Defendants or their co-conspirators acted to violate such laws.  Defendants, and

17  each of them, thus also violated 18 U.S.C. § 371.

18       184.  Defendants engaged and conspired to engage in mail fraud in

19  violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by

20  knowingly using the United States mails and wires to transfer illegally obtained

21  funds into and within the United States, for the purpose of furthering the

22  Khrapunov Racketeering Enterprise and, while concealing the funds' illegal

23  source, used those funds to purchase real estate in Beverly Hills and Studio City,

24  California and to fund business entities, including the Entity Defendants, to enable

25  those entities to conduct business in the United States using the illegally-obtained

26  funds.

27       185.  Defendants engaged and conspired to engage in the above violations

28  of U.S. law in order to implement the objectives and accomplish the unlawful

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

46

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Case 8:20-mc-00126-DOC-DFM Document 14-1 Filed 12/02/20 Page 66 of 149 Page ID
Case 2:14-cv-09601-PM-GW Document 141 Filed 08/24/15 Page 48 of 54 Page ID #:6738
#:211

1   purposes of the Khrapunov Racketeering Enterprise as set forth herein, and thereby

2   engaged in predicate acts of racketeering within the meaning of 18 U.S.C. §

3   1961(1)(B).

4       186.   Furthermore, each Defendant received income derived directly or

5   indirectly from a pattern of racketeering in which each of said Defendants

6   participated as a principal within the meaning of 18 U.S.C. § 2.

7       187.   During the period commencing in or about 1997 and continuing to the

8   present, the Defendants, having received income derived, directly or indirectly,

9   from a pattern of racketeering activity, used or invested, directly or indirectly, in

10  violation of 18 U.S.C. § 1962(a), income or the proceeds of income from said

11  illegal racketeering activity in the acquisition of an interest in, or the establishment

12  or operation of the Khrapunov Racketeering Enterprise or one or more affiliated

13  entities, including without limitation, the Entity Defendants.  Said uses and

14  investments in enterprises affecting interstate or foreign commerce include without

15  limitation the uses and investments described herein.

16      188.   In so doing, Defendants unlawfully, willfully, and knowingly did

17  combine, conspire, confederate, and agree together, with each other and with

18  others to commit RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated

19  18 U.S.C. § 1962(d).  In furtherance of the conspiracy and to effect the objects

20  thereof, Defendants and their co-conspirators committed in the Central District of

21  California and elsewhere the overt acts as described herein, among others.

22      189.   As a direct and proximate result of RICO violations by the Defendants

23  of 18 U.S.C. § 1962(a) and/or 18 U.S.C. § 1962(d), Almaty has suffered damages

24  in an amount to be determined at trial and presently estimated to be not less than

25  $300 million.  Almaty has been injured in its business or property by reason of

26  each such Defendant's violations in that financial assets stolen or otherwise

27  diverted from and thereby lost to Almaty have been used and invested, directly or

28  indirectly, to acquire an interest in and to establish and operate numerous

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

47

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

enterprises affecting interstate or foreign commerce without benefit to Almaty or its people.  Accordingly, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Almaty is entitled to recover threefold the damages it has suffered, together with its costs of suit and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF

(For Breach of Fiduciary Duty against Viktor)

190.   Almaty hereby incorporates by reference the allegations in paragraphs 1 through 189, as though fully set forth herein.

191.   As alleged above, Viktor owed a fiduciary duty to Almaty and its people to hold and control the assets of the Almaty government for the benefit of Almaty and its people, and not for his personal benefit or the personal benefit of his relatives, associates, and accomplices.

192.   By engaging in the acts alleged above, Viktor breached his fiduciary duty to Almaty and its people.  As a direct and proximate result of such breaches, Almaty has suffered damages in an amount to be determined at trial and presently estimated to be not less than $300 million.

193.   In committing the acts and perpetrating the schemes alleged herein, Viktor intended to injure Almaty and acted with malice and oppression and with a willful and conscious disregard for the rights of Almaty and its people.  In so doing, Viktor has acted toward Almaty and its people in such manner as to warrant disgorgement of his uses and investments of Almaty's money and property together with an award of punitive and exemplary damages in an amount no less than $300 million.

### FOURTH CLAIM FOR RELIEF

(For Conversion and Conspiracy to Convert against all Defendants)

194.   Almaty hereby incorporates by reference the allegations in paragraphs 1 through 193, as though fully set forth herein.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

48

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

195.   Defendants, and each of them, have wrongfully converted, aided and abetted, and caused to be converted, to their own use, and that of their friends, families, associates, and accomplices, money, funds, and property belonging to Almaty and its people.  Such conversions have been for the benefit of the Defendants and their friends, families, associates, and accomplices, and to the detriment of the true owners of the property, Almaty and its people.  Such acts of conversion include the acts alleged herein.

196.   Defendants unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together, with each other, and with others to convert money, funds, and property belonging to Almaty and its people to their own use, and that of their friends, families, associates, and accomplices.  In furtherance of the conspiracy and to affect the objects thereof, Defendants committed the overt acts, among others, referenced above.

197.   As a direct and proximate result of these acts of conversion by Defendants, Almaty has suffered damages in an amount to be determined at trial, and presently estimated to be not less than $300 million.

198.   In committing the acts and perpetrating the schemes alleged herein, Defendants intended to injure Almaty and acted with malice and oppression and with a willful and conscious disregard for the rights of Almaty and its people.  In so doing, Defendants acted toward Almaty and its people in such manner as to warrant disgorgement of their uses and investments of Almaty's money and property together with an award of punitive and exemplary damages in an amount no less than $300 million.

## **FIFTH CLAIM FOR RELIEF**

(For Fraud and Deceit and Conspiracy to Defraud against Viktor and Leila)

199.   Almaty hereby incorporates by reference the allegations in paragraphs 1 through 198, as though fully set forth herein.

LATHAM&WATKINS LLP  US-DOCS\91976251.11

ATTORNEYS AT LAW
LOS ANGELES

49

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

200.   In the course of conducting and participating in the conduct of the affairs of the Khrapunov Racketeering Enterprise, Viktor and Leila made representations to Almaty and others, which representations were false and necessary to implement the unlawful looting, laundering, investment and obstruction schemes described above.

201.   As set forth above, Viktor, who owed a fiduciary duty to Almaty, and Leila failed to disclose and otherwise concealed facts from Almaty and others, the disclosure of which was necessary to make the representations made by them to Almaty not materially misleading.  Viktor and Leila knew that said facts were not being disclosed and were material, and they intended by concealment of these facts to facilitate continuation of their unlawful diversion of assets belonging to Almaty and its people.

202.   Almaty relied to its detriment on the representations of integrity by Viktor and Leila.  Viktor and Leila flagrantly breached the trust and confidence of Almaty by committing numerous acts of fraud, deceit, conversion, and racketeering alleged herein, through which they plundered the assets of Almaty.

203.   In the course of developing their elaborate scheme to defraud, Viktor and Leila secured the assistance, among others, of associates and accomplices, who with Viktor and Leila unlawfully, willfully and knowingly did combine, conspire, confederate, and agree together, with each other and with others to facilitate, aid and abet, and conceal the scheme and artifice to defraud, and to obtain money and property by false representations and promises, thereby enabling the massive diversions and concealment of looted funds identified in this Complaint.

204.   As a direct and proximate result of the foregoing fraudulent conduct and conspiracy to defraud, Almaty has suffered damages in an amount to be determined at trial, and presently estimated to be not less than $300 million.

205.   In committing the acts and perpetrating the schemes alleged herein, Viktor and Leila intended to injure Almaty and acted with malice and oppression

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

50

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  and with a willful and conscious disregard for the rights of Almaty and its people.

2  In so doing, Defendants acted toward Almaty and its people in such manner as to

3  warrant disgorgement of their uses and investments of Almaty's money and

4  property together with an award of punitive and exemplary damages in an amount

5  no less than $300 million.

6  **SIXTH CLAIM FOR RELIEF**

7  (For an Accounting, Imposition of a Constructive Trust and Equitable Lien against

8  all Defendants)

9  206.   Almaty hereby incorporates by reference the allegations in paragraphs

10  1 through 205, as though fully set forth herein.

11  207.   During Viktor's mayoralty of Almaty, he, acting as mayor, controlled

12  virtually all of the valuable assets of the Almaty government.  These assets

13  included money and real and personal property owned by the Almaty government,

14  the right to convey, for the benefit of the people of Almaty, real and personal

15  property owned by the Almaty government, and the right to decide who could do

16  business in Almaty through the granting of licenses, concessions, and permits.

17  Viktor further was entrusted with the ability to cause privately owned property to

18  be seized by the Almaty government, purportedly for the benefit of Almaty and its

19  people.

20  208.   Viktor owed a fiduciary duty to Almaty and its people to hold and

21  control these assets for the benefit of Almaty and its people, and not for his

22  personal benefit or the personal benefit of his friends, families, associates, and

23  accomplices.  As alleged above, Viktor, aided and abetted by the other Defendants

24  and co-conspirators, converted the assets of the Almaty government to his personal

25  benefit and the personal benefit of his friends, families, associates, and

26  accomplices.  They did so by looting money and property owned by the Almaty

27  government and/or by private parties and by accepting bribes, kickbacks,

28  gratuities, and commissions in exchange for the granting of the legal right to do

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

51

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

business in Almaty.  All such conversions of assets were done in violation of Viktor's duties to the beneficial owners of such assets, Almaty and its people.  If Viktor or the other Defendants are permitted to retain these assets, they will be unjustly enriched at Almaty's expense.

209.   Defendants other than Viktor received money and property stolen from the Almaty government by Viktor and other economic benefits taken or conferred upon them by Viktor in violation of his fiduciary duty.  These Defendants received such money, property, and other economic benefits without giving value for them or with notice to Almaty that such assets had been stolen or otherwise acquired in violation of Viktor's duties to Almaty and its people.  If these Defendants are permitted to retain such assets, they will be unjustly enriched at Almaty's expense.

210.   As a result of the foregoing, Almaty is entitled to an accounting by each of the Defendants of all real and personal property held, acquired, or disposed of by them at any time since 1997.

211.   As a result of the foregoing, Almaty is entitled to an imposition of a constructive trust for the benefit of Almaty over all monies or assets belonging to Almaty currently held or controlled by Defendants and Almaty is further entitled to an  equitable lien upon all real and personal property of Defendants, wherever located worldwide.

212.   Defendants regularly misused and continue to misuse the corporate and other forms of business organization as a cloak for committing fraud and as a means of perpetrating injustice.  By reason of the elaborate and fraudulent schemes used by Defendants to conceal transfers of stolen money and property and to conceal ownership of Defendants' assets, it would be unjust and inequitable to require Almaty to trace the source of money used to acquire specific assets, or to prove that specific assets were acquired with money or property stolen from Almaty.  Instead, the burden should be shifted to Defendants to prove that they had

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

52

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  sources of income other than the unlawful looting and investment schemes

2  described herein, and to prove that particular assets were acquired by them with

3  such independent, lawful income.

4  ### **PRAYER**

5  WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

6  A.  For compensatory damages;

7  B.  For treble damages;

8  C.  For punitive damages;

9  D.  For prejudgment interest;

10  E.  For a constructive trust;

11  F.  For an accounting;

12  G.  For injunctive relief;

13  H.  For disgorgement;

14  I.  For all costs and fees incurred in prosecuting this Complaint; and

15  J.  For such other and further relief as this Court deems just and proper.

16  ### **JURY DEMAND**

17  Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Civil L.R.

18  38-1, Plaintiff hereby demands a trial by jury.

19  Dated:  August 21, 2017                    LATHAM & WATKINS LLP

20

21                                            By: /s/ David J. Schindler

22                                            David J. Schindler
                                              Julie R. F. Gerchik
                                              Kendall M. Howes

23                                            *Attorneys for Plaintiff*
                                              The City of Almaty

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

53

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

# Exhibit C

# This California Manor Has a Thing for Abstract Art

Each room is more striking and one-of-a-kind than the last.

BY **LAUREN SMITH MCDONOUGH**     APR 25, 2016



ZILLOW

When you walk through the halls of this Newport Beach, California mansion, each room feels like a different piece of work in an abstract art gallery. The reason it's so unique is because Elvira Kud, the homeowner and interior designer at Style Life Decor, custom-designed nearly every inch by taking the house down to its studs. With seven bedrooms, nine bathrooms, and precisely 7,542-square-feet, she had a huge blank canvas to work with.

From the outside, it looks like any other English manor-style home — well, with the exception of the ornate animal statues by the front door. Once you walk inside, everything changes. We're talking about a bright green jungle-inspired dining room, deer "heads" in every color of the rainbow on the living room walls, and a kitchen table and chair set covered in graffiti art. And some of the details are even a bit more

personal, like the walls in the teen room covered in Hulk comic book pages (perhaps her kiddo has a favorite hero?).

---

**MORE FROM HOUSE BEAUTIFUL**
**Max Humphrey has created the ultimate hang-out zon**

---

But it's no surprise that Kud's favorite room in the house is the kitchen, which used to be three different rooms until she got ahold of it. Now it's a true chef's space amenity-wise, and a black and white masterpiece design-wise. The black and white subway tile walls, patterned floors, and a marbled countertop work surprisingly together seamlessly. Brass finishings add a modern touch to the eclectic space, which is big enough to meet any party host's standards.

Take a look:



ZILLOW



ZILLOW



ZILLOW



ZILLOW

Case 8:20-mc-00126-DOC-DFM   Document 1-4   Filed 12/02/20   Page 80 of 149   Page ID #:225



ZILLOW



ZILLOW



ZILLOW



ZILLOW



ZILLOW



ZILLOW



ZILLOW

Case 8:20-mc-00126-DOC-DFM Document 1-4 Filed 12/02/20 Page 87 of 149 Page ID #:232



ZILLOW

Like what you see? Well, prepare yourself: The home will cost you a steep $7.395 million. But when you consider that it's also a wise investment into your art collection, it's so worth it.

*[via Zillow*

**LAUREN SMITH MCDONOUGH**  **Senior Editor**
**Lauren is a senior editor at Hearst.**

## Tired of the same old design ideas?

Sign up for new trends, tips, and tricks.

| ✉ What's your email address? | **LET'S GO.** |

# Exhibit D

Bruno Mars Buys Studio City Estate - Variety



**VARIETY**

Login ▼

HOME > DIRT > REAL ESTALKER

Dec 29, 2014 11:00am PT

# Bruno Mars Buys Big Studio City Estate

**By Mark David** ∨








View Gallery

**BUYER:** Bruno Mars
**LOCATION:** Studio City, Calif.
**PRICE:** $6,500,000
**SIZE:** 9,033 square feet, 7 bedrooms, 8 bathrooms

**YOUR MAMA'S NOTES:** Thanks to an entirely unexpected but certainly most welcomed Christmas Day communique from tireless real estate yenta Yolanda Yakketyyak, Your Mama learned that wildly popular singer-songwriter-choreographer and budding voice actor Bruno Mars recently made an under-the-radar, $6.5 million acquisition — via an opaque corporate entity — of a private, multi-acre estate in a discreet gated enclave in the heavily celebrified Fryman Canyon area of Studio City, Calif.

The famously fancy-footed, two-time Grammy winner purchased the property, as per public records, from Elvira Kudryashova, a young gal otherwise known as the daughter of immensely rich and allegedly shady Kazakh oligarch Viktor Khrapunov. Miz Kudryashova, who apparently goes by at least a couple other names, purchased the property, along with a man we'll just assume without any direct knowledge is or was her husband, in July 2013 for $5.7 million and flipped it back on the market just eight months later with an optimistic asking price of $7.787 million.

ADVERTISEMENT

## Related Stories



VIP
**Twitter "Fleets" Meet Tepid Early Reception: Survey**



**'All Arts Organizations Are Media Companies Now': How the Pandemic Is Transforming Theater**

A long, hedge-lined and tree-shaded driveway leads up from the gated cul-de-sac to a roomy motor court and a front-facing, three-bay garage that will shelter six cars, per digital marketing materials. A double-height rotunda entry links to generous formal living and dining rooms done up for the seller by and unnamed "European interior designer" with a brazen and unrestrained *thing* for jewel-toned furnishings and intricately patterned wallpaper set off against intricately patterned rugs and intricately patterned window treatments. It's really quite something, ain't it, kids?

Anyhoodles, poodles, the sprawling manse also includes a wood-paneled office, a spacious family room with muscular coffered ceiling treatment and built-in bar; a temperature controlled wine room; and a center-island kitchen and an adjoining breakfast room lined with a curving wall of glass doors that open to the poolside entertainment areas.

A discrete guest wing has four en suite bedrooms, according to the listing description, and a separate a children's wing offers two more en suite bedrooms plus a children's family room and kitchenette. The sizable master suite is complete with a fireplace regrettably set a sad, cock-eyed angle just a little too close to the bed for this property gossip's personal taste, as well as a private office/sitting room, a kitchenette/coffee bar, dual walk-in closets and a pair of bathrooms decked out with both steam and dry saunas.

The backyard has over the shrubbery and roof top views over the San Fernando Valley and resort-style amenities that include an infinity-edged swimming pool and spa, a built-in grill station and outdoor kitchen, and children's

playground, and an open-air cabana with stone fireplace and built-in heaters.

Fryman Canyon, at the northern mouth of Laurel Canyon, has long been a draw to a slew of Tinseltowners such as George Clooney, Teri Hatcher, Alex Trebek and "Modern Family" star Julie Bowen; other residents of Mister Mars' itty-bitty gated enclave include sitcom veteran and famous ex-Scientologist Leah Remini and film and television soundtrack guru Kathy Nelson.

ADVERTISEMENT



'Time' Director Garrett

READ MORE

SKIP AD

Our research shows Mister Mars continues to own a 4,000-square-foot-plus, modern-minded quasi-Hollywood Regency-style residence above Laurel Canyon that he scooped up over the summer of 2012 for $3.254 million. Mister Mars also continues to own a 4,300-square-foot-plus home in the affluent eastern suburbs of Honolulu that he bought from the heir to a firearms fortune in early 2012 for $3.1 million and, coincidentally enough, had listed on the open market late in 2013 and for a good part of this year, first at $3.5 million and later at $3.35 million.

Listing photos: Hilton & Hyland (via Zillow)



COMMENTS

Want to read more articles like this one?    SUBSCRIBE TODAY →

MORE FROM VARIETY



# Exhibit E

# Application Notice

- You must complete Parts A **and** B, **and** Part C if applicable
- Send any relevant fee and the completed application notice to the court with any draft order, witness statement or other evidence
- It is for you (and not the court) to serve this application notice

| | In the | **High Court of Justice<br>Queen's Bench Division<br>Commercial Court**<br>Royal Courts of Justice   27 Nov 2020 |
|---|---|---|
| | **Claim No.** | Claim No. CL-2015-000549 |
| | **Warrant no.**<br>(if applicable) | |
| | **Claimant(s)**<br>(including ref.) | **JSC BTA Bank**   CL-2015-000549 |
| | **Defendant(s)**<br>(including ref.) | **(1) MUKHTAR ABLYAZOV; (2) ILYAS KHRAPUNOV (Defendants)<br>(3) BULAT UTEMURATOV; (4) ELVIRA KUDRYASHOVA; (5) CHRISTOPHE KOSMAN; (6) XAVIER DE SARRAU; (7) VERNY CAPITAL JSC; (8) PANOLOS LIMITED; (9) DARELIA LIMITED; (10) JANUS SARL;  (11) VILDER COMPANY SA (12) CROWNWAY LIMITED (intended defendants)** |
| | **Date** | 12 November 2020 |

**You should provide this information for listing the application**

Time estimate          2  (hours)              (mins)

Is this agreed by all parties?   ☐ Yes  ☒ No

Please always refer to the Commercial Court Guide for details of how applications should be prepared and will be heard, or in a small number of exceptional cases can be dealt with on paper.

## Part A

The Claimant intends to apply for the following orders (drafts of which are attached):

(a)     an order that the stay of these proceedings ordered by Mr Justice Baker on 28 September 2018 shall be lifted;

(b)     permission to add the following parties to the proceedings as Defendants: Bulat Utemuratov; Elvira Kudryashova; Christophe Kosman; Xavier de Sarrau; Verny Capital JSC; Panolos Limited; Darelia Limited; Janus SARL; Vilder Company SA; Crownway Limited (the "**Further Defendants**");

(c)     permission to re-amend the Claim Form in accordance with the draft attached to this application notice;

(d)     a freezing order and an order for disclosure of assets by affidavit against the Third, Fourth, Seventh, Eighth, Ninth, Tenth, Eleventh and Twelfth Further Defendants;

(e)     permission to serve the Further Defendants out of the jurisdiction as set out in the attached draft order at paragraph 4; and

(f)     permission to serve the Further Defendants by alternative service as set out in the attached draft order at paragraphs 5-6,

The court office at the Admiralty and Commercial Registry, The Rolls Building, 7 Rolls Building, Fetter Lane, London, EC2A 1NL is open from 10am to 4.30pm Monday to Friday. When corresponding with the court please address forms or letters to the Clerk to the Commercial Court and quote the claim number.

**N244(CC)** Application Notice (04.14)                                                                                                          © Crown copyright 2014

**Part B**

*(The claimant)(The defendant)[1] wishes to rely on: *tick one*

the attached (witness statement)(affidavit) ☒   (the claimant)(the defendant)'s[1] statement of case ☐

evidence in Part C overleaf in support of this application ☐

**Signed** *Greenberg Traurig LLP*   **Position or office held**
(Applicant) ('s legal representative)
(if signing on behalf of firm, company or corporation)

| | |
|---|---|
| | |

4. If you are not already a party to the proceedings, you must provide an address for service of documents

Address to which documents about this claim should be sent (including reference if appropriate)[4]

| Greenberg Traurig LLP<br>The Shard, Level 8<br>32 London Bridge Street<br>London | If applicable | |
|---|---|---|
| | Tel. no. | 020 3349 8700 |
| | Fax no. | |
| | DX no. | 144373 SOUTHWARK 4 |
| Postcode SE1 9SG | e-mail | |

**Part C**

Claim No.

**(Note: Part C should only be used where it is convenient to enter here the evidence in support of the application, rather than to use witness statements or affidavits)**

*(The claimant)(The defendant)(1) wishes to rely on the following evidence in support of this application:

---

**Statement of Truth**

*(I believe)(The applicant believes) that the facts stated in this application notice are true

*I am duly authorised by the applicant to sign this statement

Full name....................................................................................................................................

Name of*(Applicant)('s litigation friend)('s legal representative)........................................................................

................................................................................................................................................

| **Signed** | | **Position or office held** | |
| --- | --- | --- | --- |
| | *(Applicant)('s legal representative) | (if signing on behalf of firm, company or corporation) | |

*delete as appropriate

**Date**

# Exhibit F



# Claim Form

Name and address of Defendant receiving this claim form

In the High Court of Justice
Queen's Bench Division
Commercial Court
Royal Courts of Justice   27 Nov 2020

| | |
|---|---|
| Claim no. | CL-2015-000549 |
| Issue date | 17 July 2015 |



for court use only

CL-2015-000549

**Claimant**

**JSC BTA BANK**
97 Zholdasbekova
Samal-2
Almaty 05001
Kazakhstan

**Defendant(s)**

(1) Mukhtar Ablyazov



(2) Ilyas Khrapunov
(3) Bulat Utemuratov
(4) Elvira Kudryashova
(5) Christophe Kosman
(6) Xavier de Sarrau
(7) Verny Capital JSC
(8) Panolos Limited
(9) Darelia Limited
(10)    Janus SARL
(11)    Vilder Company SA
(12)    Crownway Limited

See further Schedule 1 attached

SEAL

| | £ |
|---|---|
| Amount claimed | |
| Court fee | |
| Legal representative's costs | |
| **Total amount** | |

The court office at the Admiralty and Commercial Registry, The Rolls Building, 7 Rolls Building, Fetter Lane, London, EC2A 1NL is open between 10 am and 4.30 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

© Crown copyright 2014.

| Claim No. | |
|---|---|

Brief details of claim

This claim is for:

(1)     an injunction restraining further acts in furtherance of conspiracy;

(2)     damages;

(2A)   relief under section 423 of the Insolvency Act 1986;

(2B)     declarations concerning any assets they hold as nominees for the First and/or Second Defendants and orders for payment;

(3)     interest on any sums due to it at such rate and for such period as the Court thinks fit pursuant to section 35A of the Senior Courts Act 1981;

(4)     such further or other relief as the Court deems appropriate; and

(5)     costs

~~Amended Particulars of Claim attached.~~

(SEE CONTINUATION SHEET)

---

**Statement of Truth**
* The claimant believes that the facts stated in this claim form are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

* I am duly authorised by the claimant to sign this statement

Full  name Masoud Zabeti (Greenberg Traurig, LLP)

Name of *~~(claimant)~~(‘s legal representative’s firm)

Claimant's legal
representative

(if signing on behalf of firm, company or corporation)

Claimant's or legal representative's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

## SCHEDULE 1 – DEFENDANTS

(1) Mukhtar Ablyazov



(2) Ilyas Khrapunov



(3) Bulat Utemuratov



(4) Elvira Kudryashova
    Ant Hill ShopNplay
    1800 Newport Blvd
    Costa Mesa
    CA 92627
    United States

(5) Christophe Kosman



(6) Xavier de Sarrau
    Gordon S Blair



(7) Verny Capital JSC
    Talan Towers
    16 Dostyk Street
    010000
    Nur-Sultan
    Kazakhstan

(8) Panolos Limited
    Trust House
    112 Bonadie Street
    Kingstown
    St Vincent

(9) Darelia Limited
    Maples Corporate Services Limited
    PO Box 309
    Ugland House
    Grand Cayman
    KY KY1-1104

(10)   Janus SARL
       Le Panorama
       57 Rue Grimaldi
       Monaco

(11)   Vilder Company SA
       53 E Street
       Urbanization Marbella
       MMG Tower
       16th Floor
       Panama City
       Republic of Panama

(12)   Crownway Limited
       Accord Consulting Inc
       1 Mapp Street
       Belize City
       Belize

## BRIEF DETAILS OF CLAIM – CONTINUATION SHEET

Between around 2005 and 2009, the First Defendant, who was the majority shareholder and chairman of the Claimant, misappropriated from it sums estimated at over US$6 billion.

Starting in August 2009, the Claimant commenced a number of sets of proceedings against the First Defendant and from August 2009 sought and obtained worldwide freezing orders against him and from August 2010 sought and obtained receivership orders which ultimately covered 1000 companies and other assets believed to be beneficially owned by him. These proceedings ultimately resulted in judgments for sums in excess of US$4.6 billion and freezing and receivership orders over approximately 1000 companies.

In 2015, the Claimant commenced these proceedings against the Second Defendant and obtained judgment in relation to parts of its claim for the sum of US$499.9 million under an order dated 21 June 2018.

In about 2009, the First and Second Defendant entered into a combination or understanding with each other with the intention to injure or cause financial loss to the Claimant (by hindering or preventing the Claimant from recovering the monies that the First Defendant had misappropriated from it) by the use of unlawful measures and/or reached an understanding to embark upon concerted action with an intention to use unlawful means to injure the Claimant and as a consequence loss and damage has been caused to the Claimant.

On dates unknown (but by the latest 2016) each of the Third to Twelfth Defendants joined in that combination and/or understanding and/or reached an understanding to embark on concerted action with the same intention to injure or cause financial loss to the Claimant (by hindering or preventing the Claimant from recovering the monies that the First Defendant misappropriated from it and in particular to prevent the Claimant from enforcing the judgments it was seeking to obtain and did subsequently obtain against the First and/or Second Defendants) by the use of unlawful measures or means and as a consequence loss and damage to the Claimant has continued. The Defendants (alternatively any two or more of them) combined to use unlawful means, including the contempt of court orders, the laundering of the proceeds of crime and/or the entering into of transactions whose purpose was to defraud the Claimant as creditor, with the intention to injure the Claimant and such unlawful means caused loss and damage to the Claimant, including damage to the value of the freezing and receivership orders made in its favour and the value of its choses in action and judgments against the First and Second Defendants and the costs the Claimant has and will incur in attempting to enforce its judgments against the First and/or Second Defendant. The Defendants are jointly and severally liable in tort to the Claimant for that loss and damage.

Further or alternatively, the First and/or Second Defendants have entered into transactions with the Second, Third, Fourth, Seventh, Eighth, Ninth, Tenth, Eleventh and/or Twelfth Defendants at an undervalue for the purpose of putting their assets beyond reach of the Claimant and/or for the purpose of otherwise prejudicing the Claimant's interests as creditor (alternatively, such purpose was one of the purposes of those transactions). As a result of these transactions the assets of the First and/or Second Defendant (or a substantial portion of them) have been put beyond reach of the Claimant, with the effect that it has been prevented from enforcing the judgment debts it holds against the First and/or Second Defendants. The Claimant therefore seeks orders under section 423 of the Insolvency Act 1986 against the Second, Third, Fourth, Seventh, Eighth, Ninth, Tenth, Eleventh and/or Twelfth Defendants to restore the position to what it would have been if the transactions had not been entered into and/or to protect its interests as the victim of these transactions.

# Exhibit G

**CL-2015-000549**

13 Nov 2020

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**QUEEN'S BENCH DIVISION**

CL-2015-000549

**COMMERCIAL COURT**

**IN PRIVATE**

**Before: Mr Justice Calver**

**13 November 2020**

**BETWEEN:**

**JSC BTA BANK**

<u>**Claimant**</u>

**- and –**

**(1) MUKHTAR ABLYAZOV**
**(2) ILYAS KHRAPUNOV**
**(3) BULAT UTEMURATOV**
**(4) ELVIRA KUDRYASHOVA**
**(5) CHRISTOPHE KOSMAN**
**(6) XAVIER DE SARRAU**
**(7) VERNY CAPITAL JSC**
**(8) PANoLOS LIMITED**
**(9) DARELIA LIMITED**
**(10) JANUS SARL**
**(11) VILDER COMPANY SA**
**(12) CROWNWAY LIMITED**

<u>**Defendants**</u>

---

**ORDER**

---

_____

_____

UPON THE CLAIMANT'S APPLICATION BY APPLICATION NOTICE

AND UPON HEARING LEADING COUNSEL FOR THE CLAIMANT

IT IS ORDERED THAT:

1. The Claimant's new solicitors shall file a notice of change by 4pm on 20 November 2020 and shall then serve notice of change on the First and Second Defendants and the Claimant's existing solicitors as soon as practicable thereafter.

2. The stay of these proceedings ordered by Mr Justice Baker on 28 September 2018 shall be lifted.

3. The Claimant be permitted to add the following parties to the proceedings as Defendants:

   a. Bulat Utemuratov;

   b. Elvira Kudryashova;

   c. Christophe Kosman;

   d. Xavier de Sarrau;

   e. Verny Capital JSC;

   f. Panolos Limited;

   g. Darelia Limited;

   h. Janus SARL;

   i. Vilder Company SA;

   j. Crownway Limited.

   "the Further Defendants".

4. The Claimant be permitted to re-amend the Claim Form in accordance with the draft provided to the Court.

5. The Claimant be permitted to serve the application notice, this Order, the Re-Amended Claim Form, the Re-Amended Particulars of Claim, the Freezing Injunction (and all associated papers) and the application notice for the return date out of the jurisdiction on the Further Defendants as follows:

   a. Bulat Utemuratov in Kazakhstan;

   b. Elvira Kudryashova in the United States of America;

    c. Christophe Kosman in Monaco;

    d. Xavier de Sarrau in Monaco;

    e. Verny Capital JSC in Kazakhstan;

    f. Panolos Limited in St Vincents and the Grenadines;

    g. Darelia Limited in the Cayman Islands;

    h. Janus SARL in Monaco;

    i. Vilder Company SA in Panama;

    j. Crownway Limited in Belize.

6. The Claimant be permitted pursuant to CPR 6.15 and 6.27 to serve:

    a. The application notice, this Order, the Freezing Injunction (and all associated papers) and the application notice for the return date on the Further Defendants by alternative service in accordance with paragraph 7 below.

    b. The Re-Amended Claim Form and the Re-Amended Particulars of Claim on the Further Defendants (apart from the Fifth and Sixth Defendants) by alternative service in accordance with paragraph 7 below.

7. The forms of alternative service permitted in relation to the Further Defendants are as follows:

    a. Bulat Utemuratov: by hand to the Bulat Utemuratov Foundation at 77 Kunayev Street, Park View BC, Almaty, Kazakhstan or by email to office@utemuratovfund.org

    b. Elvira Kudryashova: by hand at Ant Hill ShopNplay 1800 Newport Blvd, Costa Mesa, CA 92627, United States or by email to elvirakudryashova@me.com

    c. Christophe Kosman: by hand at ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ or his Linked-In account (https://mc.linkedin.com/in/christophe-kosman-600a251)

    d. Xavier de Sarrau: by hand to the office of Gordon S Blair at Gildo Pastor Center, 7, Rue du Gabian, BP 449, MC 98011 Monaco or his Linked-In account (https://uk.linkedin.com/in/xavier-de-sarrau-1403b6158)

    e. Verny Capital JSC: by hand at Talan Towers, 16 Dostyk Street, 010000, Nur-Sultan, Kazakhstan or by email at info@vernycapital.com

    f. Panolos Limited: by hand at Trust House, 112 Bonadie Street, Kingstown, St Vincent or by service on Mr Ablyazov

    g. Darelia Limited: by hand to Maples Corporate Services Limited at PO Box 309, Ugland House, Grand Cayman, KY KY1-1104 or by hand to Bulat Utemuratov Foundation at 77 Kunayev Street, Park View BC, Almaty, Kazakhstan

    h. Janus SARL: by hand at Le Panorama - 57, rue Grimaldi – Monaco or the Bulat Utemuratov Foundation at 77 Kunayev Street, Park View BC, Almaty, Kazakhstan

    i. Vilder Company SA: by hand at 53 E Street, Urbanization Marbella – MMG Tower 16th Floor, panama, Republic of Panama or by email to mg@chabrier.ch

    j. Crownway Limited: by hand at Accord Consulting Inc at 1 Mapp Street, Belize City, Belize or by email to dzoulficar@blueline.mg

8. The Freezing Order shall be deemed served on each Defendant immediately upon that Defendant becoming aware that a Freezing Order has been made against him/her/it.

9. The Claim Form and Particulars of Claim shall be deemed served on each Defendant on the second business day after the date on which the documents are delivered by hand or the relevant electronic communication is sent (whichever is earlier).

10.     Each of the Third, Fourth, Fifth, Sixth, Seventh and Tenth Defendants shall:

    a. File an acknowledgment of service or admission within 21 days of service of the re-amended Claim Form upon that party;

    b. File a defence within 35 days of service of the Particulars of Claim.

11.     The Eighth Defendant shall:

    a. File an acknowledgment of service or admission within 24 days of service of the re-amended Claim Form;

    b. File a defence within 38 days of service of the Particulars of Claim.

12.     The Ninth Defendant shall:

    a. File an acknowledgment of service or admission within 31 days of service of the re-amended Claim Form;

    b. File a defence within 45 days of service of the Particulars of Claim.

13.     The Eleventh Defendant shall:

    a. File an acknowledgment of service or admission within 26 days of service of the re-amended Claim Form;

    b. File a defence within 40 days of service of the Particulars of Claim.

14.     The Twelfth Defendant shall:

    a. File an acknowledgment of service or admission within 23 days of service of the re-amended Claim Form;

    b. File a defence within 37 days of service of the Particulars of Claim.

15.     Costs Reserved.

# Exhibit H

CL-2015-000549

13 Nov 2020

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

CL-2015-000549

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**IN PRIVATE**

**Before: Mr Justice Calver**

**13 November 2020**

**BETWEEN:**

**JSC BTA BANK**

**Claimant**

**- and -**

**(1) MUKHTAR ABLYAZOV**

**(2) ILYAS KHRAPUNOV**

**(3) BULAT UTEMURATOV**

**(4) ELVIRA KUDRYASHOVA**

**(5) CHRISTOPHE KOSMAN**

**(6) XAVIER DE SARRAU**

**(7) VERNY CAPITAL JSC**

**(8) PANALOS LIMITED**

**(9) DARELIA LIMITED**

**(10) JANUS SARL**

**(11) VILDER COMPANY SA**

**(12) CROWNWAY LIMITED**

**Defendants**

---

**WORLDWIDE FREEZING INJUNCTION**

---

## PENAL NOTICE

**IF YOU ILYAS KHRAPUNOV DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.**

**ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENT TO BREACH THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

1.  This order is made on 13 November 2020 by Mr Justice Calver on the application of JSC BTA BANK ("the Applicant") against the Second Defendant, ILYAS KHRAPUNOV ("the Respondent"). The Judge read the Affidavits listed in Schedule A.

2.  The Worldwide Freezing Order against the Second Defendant, ILYAS KHRAPUNOV, made by Mr Justice Teare on 23 March 2016 (as attached at Annex A hereto) ("the Freezing Order") is hereby amended so as to add the assets set out below to paragraph 5 of the Freezing Order which sets out a list of assets specifically covered by the Freezing Injunction in paragraph 3 thereof. The inclusion of these assets is without prejudice to the generality on the prohibition in paragraph 3 of the Freezing Order. The terms of the Freezing Order otherwise remain in full force and effect.

3.  The prohibition in paragraph 3 of the Freezing Order includes any direct or indirect interest of the Second Defendant, ILYAS KHRAPUNOV, or the First Defendant, MUKHTAR ABLYAZOV, in the following assets:

    **(1)** Bank accounts in the name of Ilyas Khrapunov with:
    (a) Pictet & SIE with unknown account number(s);
    (b) EFG International Monaco with unknown account number(s);
    (c) CFM Indosuez Monaco with unknown account number(s);
    (d) LGT Bank (Lichtenstein) with unknown account number(s);
    (e) Swiss Banks with unknown account number(s);
    (f) UBS Park Avenue, with account number ▮▮▮▮▮▮

(2) The shares in and assets of:

    (a) Vilder Foundation (of which Mr. Khrapunov has previously affirmed he is the sole-beneficiary) and the shares and assets if its subsidiaries including Vilder Company SA, a company incorporated in Panama.

    (b) Swiss Development Group SA (a Swiss company, currently in liquidation, with registered number CHE-113.751.926);

    (c) SDG Capital SA (a Swiss company, currently in liquidation, with registered number CH-660.6.685.008-6) including the shares and assets of its subsidiaries HDP Hotel du Parc; Holding SARL; Mont Pelerin SA; SaaFee Hotels and Residence Development Group SA; Thermal Developments SA; and Thermals Developments 2SA.

**4.** This order was made at a hearing without notice to the Respondent. The Respondent has a right to apply to the Court to vary or discharge the order—see paragraph 5 below.

## VARIATION OR DISCHARGE OF THIS ORDER

**5.** Anyone served with or notified of this order may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but they must first inform the Applicant's solicitors. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicant's solicitors in advance.

## DISPENSE WITH PERSONAL SERVICE

**6.** For the avoidance of doubt, there is no requirement for the Claimant to effect personal service of this order on the Respondent and the Claimant will be free to bring contempt proceedings in relation to any breach of this order regardless of the fact that personal service was not effected.

## SERVICE

**7.** The Claimant be permitted pursuant to CPR 6.27 to serve this Order, the Freezing Order against the new Defendants and all associated papers on the Second Defendant by alternative service by:

(a) Sending a message to his Facebook account notifying him that an order has been made against him by the English Court and providing a link to the documents; and

(b) Delivery by email to Andrew Todd of Solomon & Cramer LLP at asolomon@solomoncramer.com.

8.  Certificates be issued, pursuant to CPR 74.12 and Article 54 of the Lugano Convention in relation to this Order. Such certificates shall, as appropriate, attach an office copy of the relevant order. The said certificates shall be signed by Mr Justice Calver or a Master of the Queen's Bench Division.

9.  Costs Reserved.

## NAME AND ADDRESS OF APPLICANT'S LEGAL REPRESENTATIVES

The Applicant's legal representatives are—

>Greenberg Traurig, LLP
>Level 8, The Shard
>32 London Bridge Street
>London
>SE1 9SG

>Office Hours: 9:00 AM to 6:00 PM

>Attn: Masoud Zabeti
>T +44 (0) 203 349 8891
>M +44 (0) 781 313 9961
>zabetim@gtlaw.com

Schedule A – Affidavits



(1)

(2)

# Exhibit I



**CL-2015-000549**

13 Nov 2020

CL-2015-000549

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**IN PRIVATE**

**Before: Mr Justice Calver**

**BETWEEN:**

**JSC BTA BANK**

**Claimant**

-      **and -**

**(1) MUKHTAR ABLYAZOV**

**(2) ILYAS KHRAPUNOV**

**(3) BULAT UTEMURATOV**

**(4) ELVIRA KUDRYASHOVA**

**(5) CHRISTOPHE KOSMAN**

**(6) XAVIER DE SARRAU**

**(7) VERNY CAPITAL JSC**

**(8) PANOLOS LIMITED**

**(9) DARELIA LIMITED**

**(10) JANUS SARL**

**(11) VILDER COMPANY SA**

**(12) CROWNWAY LIMITED**

**Defendants**

---

**WORLDWIDE FREEZING INJUNCTION AND DISCLOSURE ORDER**

---

## PENAL NOTICE

**IF YOU <u>BULAT UTEMURATOV</u> DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.**

**IF YOU <u>ELVIRA KUDRYASHOVA</u> DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.**

**IF YOU <u>VERNY CAPITAL JSC</u> DISOBEY THIS ORDER YOU AND/OR YOUR DIRECTORS MAY BE HELD IN CONTEMPT OF COURT, YOU MAY BE FINED OR HAVE YOUR ASSETS SEIZED AND YOUR DIRECTORS MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**IF YOU <u>PANOLOS LIMITED</u> DISOBEY THIS ORDER YOU AND/OR YOUR DIRECTORS MAY BE HELD IN CONTEMPT OF COURT, YOU MAY BE FINED OR HAVE YOUR ASSETS SEIZED AND YOUR DIRECTORS MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**IF YOU <u>DARELIA LIMITED</u> DISOBEY THIS ORDER YOU AND/OR YOUR DIRECTORS MAY BE HELD IN CONTEMPT OF COURT, YOU MAY BE FINED OR HAVE YOUR ASSETS SEIZED AND YOUR DIRECTORS MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**IF YOU <u>JANUS SARL</u> DISOBEY THIS ORDER YOU AND/OR YOUR DIRECTORS MAY BE HELD IN CONTEMPT OF COURT, YOU MAY BE FINED OR HAVE YOUR ASSETS SEIZED AND YOUR DIRECTORS MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**IF YOU <u>VILDER COMPANY SA</u> DISOBEY THIS ORDER YOU AND/OR YOUR DIRECTORS MAY BE HELD IN CONTEMPT OF COURT, YOU MAY BE FINED OR HAVE YOUR ASSETS SEIZED AND YOUR DIRECTORS MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**IF YOU <u>CROWNWAY LIMITED</u> DISOBEY THIS ORDER YOU AND/OR YOUR DIRECTORS MAY BE HELD IN CONTEMPT OF COURT, YOU MAY BE FINED OR HAVE YOUR ASSETS SEIZED AND YOUR DIRECTORS MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENT TO BREACH THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE**

**THEIR ASSETS SEIZED.**

**<u>THIS ORDER</u>**

1.   This is a Freezing Injunction made against:

- The Third Defendant, **BULAT UTEMURATOV**

- The Fourth Defendant, **ELVIRA KUDRYASHOVA**

- The Seventh Defendant, **VERNY CAPITAL JSC**

- The Eighth Defendant, **PANOLOS LIMITED**

- The Ninth Defendant, **DARELIA LIMITED**

- The Tenth Defendant, **JANUS SARL**

- The Eleventh Defendant, **VILDER COMPANY SA**

- The Twelfth Defendant, **CROWNWAY LIMITED**

("the Respondents")

on 13 November 2020 by Mr Justice Calver on the application of JSC BTA BANK ("the Applicant"). The Judge read the Affidavits listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2.   This order was made at a hearing without notice to the Respondent. The Respondent has a right to apply to the Court to vary or discharge the order—see paragraph 21 below.

3.   There will be a further hearing in respect of this order on 4 December 2020 ("the return date" ).

4.   If there is more than one Respondent— (a) unless otherwise stated, references in this order to "the Respondents" mean all of them; and (b) this order is effective against any Respondent on whom it is served or who is given notice of it.

**FREEZING INJUNCTION**

5.   Until the return date or further order of the Court, each of the Respondents must not—

(1) remove from England and Wales any of its, her or his assets which are in England and Wales; or

(2) in any way dispose of, deal with or diminish the value of any of its, her or his assets whether they are in or outside England and Wales.

(3) in any way dispose of, deal with or diminish the value of any of Mukhtar Ablyazov's assets or any of Ilyas Khrapunov's assets whether they are in or outside England and Wales.

**6.** In relation to each Respondent, paragraph 5 applies to all of that Respondent's assets and all of Mukhtar Ablyazov's assets and all of Ilyas Khrapunov's assets whether or not they are in the Respondent's own name or in the name of Mukhtar Ablyazov or Ilyas Khrapunov, whether they are solely or jointly owned and whether the Respondent or Mukhtar Ablyazov or Ilyas Khrapunov is interested in them legally, beneficially or otherwise (which for the avoidance of doubt and without limitation includes assets held as nominee or trustee). For the purpose of this order each Respondent's assets, Mukhtar Ablyazov's assets and Ilyas Khrapunov's assets include any asset which the relevant Respondent or Mukhtar Ablyazov or Ilyas Khrapunov has the power, directly or indirectly, to dispose of or deal with as if it were its, her or his own. Each Respondent, Mukhtar Ablyazov and Ilyas Khrapunov is to be regarded as having such power if a third party (which shall include any body corporate) holds, controls, deals with or administers the asset in accordance with the direct or indirect instructions of the relevant person or entity.

**7.** In relation to the Third Defendant, **BULAT UTEMURATOV**, the prohibition in paragraph 5 includes the following assets in particular (without prejudice to the generality of that prohibition) —

    a. The shares in, and/or ownership interest and/or participation interest and/or partnership interest in, and the assets of, the following companies and/ entities, namely:

        i. Verny Investments Holding LLP (a Kazakhstan entity);

        ii. The Seventh Defendant, Verny Capital JSC (a Kazakhstan company with registered offices at Talan Towers, 16, Dostyk Street, 010000 Nur-Sultan, Kazakhstan) including the following assets of Verny Capital or its subsidiaries: (i) the blocking stake in KaR-Tel LLP; (ii) the 40% interest in Sky Service LLP; (iii) the interest in Bank Kassa Nova

JSC; and (iv) the businesses trading under the following names, ForteBank, Global Development, The Ritz Carlton, Moscow, The Ritz Carlton, Vienna, The Ritz Carlton, Astana, Rixos Borovoe, Astana Property Management, Sary-Arka airport, RG Gold, 31 Channel, Vi Kazakhstan, InformBuro, Burger King franchise Kazakhstan;

iii. Crowell Investments Limited (a Cypriot company with registered number HE115669) and its subsidiaries, including but not limited to, its interest in KaR-Tel LLP;

iv. Myrina Services Sarl (a Swiss company with registered number ch-660.0.475.009-5) and its subsidiaries;

v. the Thyrea Trust (a Swiss entity);

vi. Cannana Limited (a Cypriot company with registered number UN 365622), and its subsidiaries;

vii. KEA Holding SA (a Swiss company with registered number CHE-319.336.159), and its subsidiaries;

viii. Galaxy SA (a French company with registered number 533 332 904), and its subsidiaries;

ix. Aureglia Limited (a Hong Kong company with company number 1880340), and its subsidiaries;

x. Timberlay SA (a Swiss company with registered number 993888);

xi. Verny International SA SICAR (a Luxembourg entity with registered number B224479);

xii. Notus Sarl (a Luxembourg company with registered number B196106), and its subsidiaries;

xiii. Pantech Sarl (a Luxembourg company with registered offices at 1 Rue Hildegard Von Bingen Luxembourg, with universal entity code 2626-7152-1025-6451), and its subsidiaries;

xiv. Leria Sarl (a Luxembourg company with company code 2271-2899-1860-2774), and its subsidiaries;

    xv.  Thala SA (a Swiss company with registered number CH-600.5.840.008-5), and its subsidiaries;

    xvi.  the Ninth Defendant, Darelia Limited (a Cayman Islands company with registered number 223996) and its subsidiaries;

    xvii.  the Tenth Defendant, Janus SARL, (a Monaco company with registered offices Le Panorama - 57, rue Grimaldi Monaco) and its subsidiaries, including but not limited, to its 5 percent interest in SAM L'Anse du Portier development in Monaco;

(b)    the property known as Villa La Carriere, Saint-Jean-Cap-Ferrat France or the net sale money after payment of any mortgages if it has been sold;

(c)    any money in the following bank accounts in the name of the Third Defendant:

    i.  Bank Account with UBS Geneva with an unknown account number;

    ii.  Bank Account with Credit Suisse Geneva with an unknown account number;

    iii.  Bank Account with EFG International Monaco with an unknown account number;

    iv.  Bank Accounts with Compagnie Monegasque de Banque with an unknown account numbers (Mr Utemuratov is believed to have at least 10 bank accounts with Compagnie Monegasque de Banque);

    v.  Bank Account with DBS Bank HK with account number: ███████;

    vi.  Bank Account with DBS Bank HK with account number: ███████

    vii.  Bank Account with DBS Bank HK with account number: ███████;

    viii.  Bank Account with DBS Bank HK with account number: ███████;

    ix.  Bank Account with DBS Bank HK with account number: ███████;

    x.  Bank Accounts with DBS Bank HK with unknown account numbers; and

    xi.  Bank Accounts with DBS Bank Singapore with unknown account numbers.

(d)    Money in the following bank accounts over which the Third Defendant is in a position of influence so as to be able to procure the company to receive or make payments as required:

    i.  KEA Holding SA /Tortola Bay Sarl Bank Account with UBS Geneva with account number: ███████████;

    ii.  Thala SA Bank Account with LGT Geneva with account number: ████████;

    iii.  Crowell Investments Limited Bank Account with UBS Geneva with account number: ██████████;

    iv.  Notus Sarl Bank Account with Credit Suisse Geneva with account number: ████████████;

    v.  Myrina Services Sarl Bank Account with UBS Geneva with an unknown account number;

    vi.  Myrina Services Sarl Bank Account with Credit Suisse with account number: ████████████;

    vii.  KEA Holding SA/Tortola Bay Sarl Bank Account with CFM Indosuez with account number: ██████████████;

    viii.  KEA Holding SA/Tortola Bay Sarl Bank Account with HSBC Monaco with account number 3███████████ (latest intelligence states that this is now the above account with CFM Indosuez);

    ix.  KEA Holding SA/Tortola Bay Sarl Bank Account with Credit Agricole with an unknown account number;

    x.  KEA Holding SA/ Tortola Bay Sarl Bank Account with Compagnie Monegasque de Banque with an unknown account number;

    xi.  Cannana Limited Bank Account with CMB Monaco with account number: ██████████████;

xii.    Crowell Investments Limited Bank Account with CMB Monaco with an unknown account number

xiii.   Crowell Investments Limited Bank Account with EFG International Monaco with account number: ███████;

xiv.    Galaxy SC Bank Accounts with SMC Monaco, with an unknown account number;

xv.     Galaxy SC Bank Accounts with Credit Agricole with unknown account numbers (at least two accounts with this bank);

xvi.    Galaxy SC Bank Accounts with HSBC Monaco, with an unknown account number;

xvii.   Galaxy SC Bank Accounts with CFM Indosuez Monaco, with an unknown account numbers (at least two accounts with this bank);

xviii.  Notus Sarl Bank Account with BGL BNP Paribas with account number: ████████;

xix.    Pantech Limited Bank Account with Compagnie Monegasque de Banque with an unknown account number;

xx.     Timberlay SA Bank Account with Compagnie Monegasque de Banque with an unknown account number;

xxi.    Tortola Inc. Bank Account with Credit Agricole Monaco, with an unknown account number;

xxii.   Tortola Corp Bank Account with HSBC Monaco, with an unknown account number;

xxiii.  KEA Holding SA/Tortola Bay Sarl Bank Account with ICBC Hong Kong with account number: ██████;

xxiv.   Cannana Limited Bank Account with DBS Bank HK with account number: ██████;

xxv.    Cannana Limited Bank Account with DBS Bank HK with account number: ███████;

xxvi.   Cannana Limited Bank Account with DBS Bank HK with unknown account number;

xxvii.  Cannana Limited Bank Account with DBS Bank in Singapore;

xxviii.  Cannana Limited Bank Account with HSBC with account number: ▮▮▮▮▮▮▮▮▮;

xxix.  Cannana Limited Bank Account with Bank of East Asia with unknown account number;

xxx.  Leria Sarl Bank Account with DBS Bank HK with account number: ▮▮▮▮▮▮;

xxxi.  Crowell Investments Limited Bank Account with DBS Bank HK with account number: ▮▮▮▮▮▮▮;

xxxii.  Aureglia Limited Bank Account with DBS Bank HK, with unknown account number;

xxxiii.  Cannana Limited Bank Account with DBS Bank Singapore with an unknown account number;

xxxiv.  Pantech Limited Bank Account with National Commercial Bank Cayman Islands, with account number: ▮▮▮▮▮▮▮;

xxxv.  Timberlay SA Bank Account with National Commercial Bank Caymans with unknown account number;

xxxvi.  Notus Sarl Bank Account with Banque de Luxembourg with account number: ▮▮▮▮▮▮▮▮;

xxxvii.  Thyrea Trust Bank Account with ING Luxembourg, with unknown account number; and

xxxviii.  Cannana Limited Bank Account with Bank of China, with an unknown account number.

(e)  any interest under any trust or similar entity including any interest which can arise by virtue of the exercise of any power of appointment, discretion or otherwise howsoever.

8.  In relation to the Fourth Defendant, **ELVIRA KUDRYASHOVA**, the prohibition in paragraph 5 includes the following assets in particular (without prejudice to the generality of that prohibition):

(a)  The property and assets of the Fourth Defendant's business known as Anthill shopNplay, 1800 Newport Blvd, Costa Mesa,

CA 92627 or the sale money if any of them have been sold.

(b)    any money in the following bank accounts in the name of the Fourth Defendant:

        i.   Bank Account with EFG International Monaco, with account number: ▮▮▮▮▮▮▮;

        ii.  Bank Account with Wells Fargo Newport Beach with account number ▮▮▮▮;

        iii. Bank Account with Wells Fargo Newport Beach with account number ▮▮▮▮;

        iv. Bank Account with Barclays Bank (UK) with account number ▮▮▮▮▮▮;

        v.   Bank Account with SG Monaco with unknown account number;

        vi. Further bank accounts in Switzerland specific details of which are unknown;

        vii. Bank account in Panama specific details of which are unknown;

(c)    Money in the Kasan Family Trust Bank Account with EFG International Monaco, with an unknown account number, over which the Fourth Defendant is in a position of influence so as to be able to procure the company to receive or make payments as required.

**9.**   In relation to the Seventh Defendant, **VERNY CAPITAL JSC**, the prohibition in paragraph 5 includes the following assets in particular (without prejudice to the generality of that prohibition):

      a.  The shares in, and/or ownership interest and/or participation interest and/or partnership interest in the following assets: (i) the blocking stake in KaR-Tel LLP; (ii) the 40% interest in Sky Service LLP; (iii) the interest in Bank Kassa Nova JSC; and (iv) the businesses trading under the following names, ForteBank, Global Development, The Ritz Carlton, Moscow, The Ritz Carlton, Vienna, The Ritz Carlton, Astana, Rixos Borovoe, Astana Property Management, Sary-Arka airport, RG Gold, 31 Channel, Vi Kazakhstan, InformBuro, Burger King franchise Kazakhstan.

b. any money in the following bank accounts in the name of the Seventh Defendant:

    i. Bank Account with UBS Monaco with an unknown account number;

    ii. Bank Account with Compagnie Monegasque de Banque with an unknown account number;

    iii. Bank Account with Danske Bank Estonia, with an unknown account number;

    iv. Bank Account with DBS Bank HK with account number: ██████████ ;

    v. Bank Account with DBS Bank HK with account number: ████████████ ;

    vi. Bank Account with DBS Bank HK with account number: ██████████ ; and

    vii. Bank Account with Unicredit Banca Milano with account number ████████████ .

**10.** In relation to the Eighth Defendant, **PANOLOS LIMITED**, the prohibition in paragraph 5 includes the following assets in particular (without prejudice to the generality of that prohibition):

a. any money in the following bank accounts in the name of the Eighth Defendant:

    i. Bank Account with National Commercial Bank Cayman Islands, with unknown account number;

    ii. Bank Account with Credit Suisse Geneva with account number: ████████████████ ; and

    iii. Bank Account with Credit Suisse with an unknown account number.

**11.** In relation to the Ninth Defendant, **DARELIA LIMITED**, the prohibition in paragraph 5 includes the following assets in particular (without prejudice to the generality of that prohibition):

a. any money in the following bank accounts in the name of the Ninth Defendant:

    **i.** Bank Account with Compagnie Monegasque de Banque with an unknown account number;

    **ii.**    Bank Account with National Commercial Bank, Cayman Islands, with unknown account number; and

    **iii.**    Account with Pireaus Bank (UK) with account number ▇▇▇▇▇▇.

**12.** In relation to the Tenth Defendant, **JANUS SARL**, the prohibition in paragraph 5 includes the following assets in particular (without prejudice to the generality of that prohibition):

    a. any money in the following bank accounts in the name of the Tenth Defendant:

        i.    Janus Sarl Bank Account with UBS Zurich with account number: ▇▇▇▇▇▇▇▇;

        ii.    Janus Sarl Bank Account with Pilatus Bank with unknown account number.

    b. Any shares in, and/or ownership interest and/or participation interest and/or partnership interest in the Tenth Defendant's interest in the SAM L'Anse du Portier development in Monaco.

**13.** In relation to the Eleventh Defendant, **VILDER COMPANY SA**, the prohibition in paragraph 5 includes the following assets in particular (without prejudice to the generality of that prohibition): Any money in bank accounts in the name of the Eleventh Defendant at Credit Andorra Panama including account number ▇▇▇▇▇▇.

**14.** In relation to the Twelfth Defendant, **CROWNWAY LIMITED**, the prohibition in paragraph 5 includes the following assets in particular (without prejudice to the generality of that prohibition): Any money in bank accounts in the name of the Twelfth Defendant at Credit Suisse Zurich including account number: ▇▇▇▇▇▇▇▇.

## PROVISION OF INFORMATION

**15.** (1) Unless paragraph (2) applies, each the Respondent must within 10 days of service of this order and to the best of her, his or its ability inform the Applicant's solicitors of:

    (a) all its, her or his assets worldwide exceeding £50,000 in value whether in its, her or his own name or not and whether solely or jointly owned and whether the Respondent is interested in said

assets legally, beneficially or otherwise, giving the value, location and details of all such assets.

(b) The most up-to-date information available to that Respondent (in any capacity) relating to the value, location and details of all assets exceeding $200,000 in value which the Respondent, any entity which is owned (legally, beneficially or otherwise) or controlled by it, her or him, or any individual acting on its, her or his instructions, has received, administered or otherwise dealt with since 1 August 2009 and which meet one or more of the following criteria:

    (i)    Assets which the Respondent believes or suspects belong or belonged to or are or were controlled by Mr Ablyazov (whether directly or indirectly) or by a company which the Respondent believes or suspects belongs or belonged to or are or were controlled by Mr Ablyazov (whether directly or indirectly);

    (ii)    Assets which the Respondent believes or suspects belong or belonged to or are or were controlled by Mr Khrapunov (whether directly or indirectly) or by a company which the Respondent believes or suspects belongs or belonged to or are or were controlled by Mr Khrapunov (whether directly or indirectly);

    (iii)    Assets which were administered or dealt with in accordance with the direct or indirect instructions of Mr Ablyazov and/or Mr Khrapunov;

    (iv)    Assets which have at any time since 1 August 2009 been held (whether directly or indirectly) by any of the following:

        - Tortola Bay Sarl / Tortola Bay SA / Kea Holding SA;

        - Crowell Invesments Ltd;

        - Pantech Sarl.

(c) (Insofar as not provided pursuant to paragraph (b) above), the nature of the instructions received or given by that Respondent (in any capacity) in relation to the administration or dealing with the assets identified in paragraph (b) above and the manner in which that Respondent, any entity which is owned (legally, beneficially or

otherwise) or controlled by it, her or him, or any individual acting on its, her or his instructions, has (in any capacity), administered or dealt with those assets.

16. Within 5 days after providing the information pursuant to paragraph 9 above, that Respondent must swear and serve on the Applicant's solicitors an affidavit confirming the truth of the information provided. The said affidavit shall be prepared to the best of that Respondent's ability and shall exhibit all such documents in that Respondent's control (which shall mean documents, as defined by CPR 31.4, which are at the moment of service in its, her or his physical possession or readily available to him) which evidence the information required to be provided pursuant to paragraphs 15(b) and (c) above.

17. To the extent that the information and documents required to be provided pursuant to paragraphs 15 and 16 above cannot reasonably be collated within the time periods provided, that Respondent shall provide such information and documents as can be collated within these time periods and (absent agreement with the Applicant) shall provide all further information and documents required to be provided within such further time as the Court shall direct.

18. If the provision of any of this information or documents is likely to incriminate a Respondent in any jurisdiction or disclose matters which are subject to legal professional privilege, she or he may be entitled to refuse to provide it, but is recommended to take legal advice before so doing. Wrongful refusal to provide the information and documents is contempt of Court and may render the Respondent liable to be imprisoned, fined or have its, her or his assets seized.

## EXCEPTIONS TO THIS ORDER

19.

(1) This order does not prohibit each of the Third and Fourth Defendants from spending £10,000 a week towards her or his ordinary living expenses.

(2) This order does not prohibit the Respondents from each spending a reasonable sum on legal advice and representation.

(3) This order does not prohibit the Third Defendant, Bulat Utemuratov, the Fourth Defendant, Elvira Kudryashova, the Seventh Defendant, Verny Capital JSC or the Tenth Defendant, Janus Sarl, from

dealing with or disposing of any of its, her or his assets in the ordinary and proper course of business, but (in relation to any dealing or disposal or series of connected dealings or disposals with a value exceeding $200,000 the relevant Defendant must give the Applicant's legal representatives 3 clear days' written notice of the nature and value of the proposed transaction.

(4) In relation to the Eighth Defendant, Panolos Limited, the Ninth Defendant, Darelia Limited, the Eleventh Defendant, Vilder Company SA and the Twelfth Defendant, Crownway Limited, this order prohibits each of them from in any way disposing of, dealing with or diminishing the value of their assets (save as set out in sub-paragraph (2) above), unless they produce to the Applicant's legal representatives written evidence with supporting evidence that they do conduct ongoing business. 3 clear days after the provision of such evidence, that Respondent will be free to deal with or dispose of any of its assets in the ordinary and proper course of business in accordance with paragraph (3) above, unless the Court has made an order to the contrary.

(3) Each Respondent may agree with the Applicant's legal representatives that the above spending limits should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

**COSTS**

**20.** The costs of this application are reserved to the Judge hearing the application on the return date.

**VARIATION OR DISCHARGE OF THIS ORDER**

**21.** Anyone served with or notified of this order may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but they must first inform the Applicant's solicitors. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicant's solicitors in advance.

**DISPENSE WITH PERSONAL SERVICE**

**22.** For the avoidance of doubt, there is no requirement for the Claimant

to effect personal service of this order on any of the Defendants and the Claimant will be free to bring contempt proceedings in relation to any breach of this order regardless of the fact that personal service was not effected.

## INTERPRETATION OF THIS ORDER

**23.** A Respondent who is an individual who is ordered not to do something must not do it herself or himself or in any other way. She/he must not do it through others acting on his/her behalf or on his/her instructions or with his/her encouragement.

**24.** A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

## PARTIES OTHER THAN THE APPLICANT AND RESPONDENT

### 25. Effect of this order

It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

### 26. Set off by banks

This injunction does not prevent any bank from exercising any right of set of it may have in respect of any facility which it gave to the respondent before it was notified of this order.

### 27. Withdrawals by the Respondent

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this order.

### 28. Persons outside England and Wales

(1)    Except as provided in paragraph (2) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this Court.

(2)    The terms of this order will affect the following persons in a

country or state outside the jurisdiction of this Court —

(a)    the Respondent or its officer or its, her or his agent appointed by power of attorney;

(b)    any person who–
    (i)    is subject to the jurisdiction of this Court;
    (ii)    has been given written notice of this order at it, her or his residence or place of business within the jurisdiction of this Court; and
    (iii)    is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order; and

(c)    any other person, only to the extent that this order is declared enforceable by or is enforced by a Court in that country or state.

## 29.  Assets located outside England and Wales

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party (save for the persons referred to in paragraph 28(2) above) from complying with—

(1)    what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(2)    any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's solicitors.

## 30.  Certificate

Certificates be issued, pursuant to CPR 74.12 and Article 54 of the Lugano Convention in relation to this Order. Such certificates shall, as appropriate, attach an office copy of the relevant order. The said certificates shall be signed by Mr Justice Calver or a Master of the Queen's Bench Division.

## COMMUNICATIONS WITH THE COURT

All communications to the Court about this order should be sent to the Admiralty and Commercial Court Listing Office, 7 Rolls Building, Fetter Lane, London, EC4A 1NL quoting the case number. The telephone number is 020 7947 6826. The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

## SCHEDULE A—AFFIDAVITS

The Applicant relied on the following (unsworn) affidavits —

(1) 

(2) ██████████████████████████

## SCHEDULE B—UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT

(1)     If the Court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, the Applicant will comply with any order the Court may make.

(2)     The Applicant will, within 7 days, pay the sum of $10,000,000 into the client account of its legal representatives, Greenberg Traurig, LLP, to be held in respect of any order the Court may make pursuant to paragraph (1) above and (7) below.

(2A)    The Applicant will, as soon as practicable, cause the affidavits listed in Schedule A to be sworn.

(3)     The Applicant will, within 7 days (unless an extension of time is granted by the Court), issue and serve an amended claim form in the form of the draft produced to the Court.

(4)     The Applicant will, within 7 days (unless an extension of time is granted by the Court), make arrangements through the appropriate channels for the service of a copy of this Order upon each Respondent together with—
    (i)     copies of the affidavits and exhibits containing the evidence relied upon by the Applicant, and any other documents provided to the Court on the making of the application;
    (ii)    the amended claim form; and
    (iii)   an application notice for continuation of the order.

(5)     Anyone notified of this order will be given a copy of it by the Applicant's legal representatives.

(6)     The Applicant will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the Court may make.

(7)     If this order ceases to have effect (for example, if the

Respondent provides security or the Applicant does not provide a bank guarantee as provided for above) the Applicant will immediately take all reasonable steps to inform in writing anyone to whom he has given notice of this order, or who she, he or it has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(8)     The Applicant will not without the permission of the Court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim or civil proceedings in any jurisdiction against the First or Second Defendants and/or the taking of steps in any jurisdiction to secure and/or enforce the judgments in the Applicant's favour against the assets of the First or Second Defendants.

## NAME AND ADDRESS OF APPLICANT'S LEGAL REPRESENTATIVES

The Applicant's legal representatives are—

Greenberg Traurig, LLP
Level 8, The Shard
32 London Bridge Street
London
SE1 9SG

Office Hours: 9:00 AM to 6:00 PM

Attn: Masoud Zabeti
T +44 (0) 203 349 8891
M +44 (0) 781 313 9961
zabetim@gtlaw.com

# Exhibit J



**FT Investigations**   **World**

# Dirty money: Trump and the Kazakh connection

FT probe finds evidence a Trump venture has links to alleged laundering network



Donald Trump and his Trump Soho tower © FT montage

**Tom Burgis** OCTOBER 19 2016

Ever since a series of bankruptcies left banks unwilling to lend to him, Donald Trump
has been on the lookout for partners willing to fund the buildings that bear his name.

Over the years the US presidential candidate has assembled an eclectic collection of
backers and collaborators. Some had chequered pasts, with links to organised crime
or fraud schemes. But perhaps the biggest risk for Mr Trump's complex, often opaque,
business empire was that it might be used for a purpose US officials fear is rife in the
country's real estate sector: laundering dirty money.

A Financial Times investigation has found evidence that one Trump venture has
multiple ties to an alleged international money laundering network. Title deeds, bank
records and correspondence show that a Kazakh family accused of laundering
hundreds of millions of stolen dollars bought luxury apartments in a Manhattan tower
part-owned by Mr Trump and embarked on major business ventures with one of the
tycoon's partners.

As Mr Trump runs for the White House, the revelations raise questions about what steps his business takes to ensure that the funds that pour through it are clean.

Jennifer Shasky Calvery, then director of the US Financial Crimes Enforcement Network, warned in January that "corrupt foreign officials, or transnational criminals, may be using premium US real estate to secretly invest millions in dirty money".

One former executive at a developer that worked with Mr Trump accused him of "wilful obliviousness" to the details of his partners' dealings. But a spokesman for the Trump Organisation said it conducted "extensive" background checks on its partners, including hiring outside investigators.

One of those partners, Bayrock, has already been a source of controversy. Now the details of Bayrock's association with the family of Viktor Khrapunov, a former Kazakh energy minister and ex-mayor of the city of Almaty, show it was connected to an alleged laundering scheme at the same time as it was collaborating with Mr Trump.

Lawyers for Almaty told a US court in March that Mr Khrapunov and his family "conspired to systematically loot hundreds of millions of dollars of public assets . . . and to launder their ill-gotten gains through a complex web of bank accounts and shell companies . . . particularly in the United States".



Viktor Khrapunov denies the Kazakh government's allegations that he and his family laundered millions of dollars

Mr Khrapunov, who now lives in Switzerland, says he is being targeted for opposing the man he used to serve, President Nursultan Nazarbayev, Kazakhstan's authoritarian ruler since 1989. His supporters say the family's fortune comes from business success, not embezzlement.

Among the dozens of companies the Almaty lawyers say the Khrapunov laundering network used were three called Soho 3310, Soho 3311 and Soho 3203. Each was a limited liability company, meaning their ownership could easily be concealed.

The companies were created in April 2013 in New York. A week later, property records show, they paid a total of $3.1m to buy the apartments that corresponded with their names in the Trump Soho, a 46-storey luxury hotel-condominium completed in 2010 in a chic corner of Manhattan.

## Trump's Russian connections

© Ben Kirchner

Read our guide to the Republican candidate's links to Russia over the past 30 years

Bank statements submitted by Almaty's lawyers indicate that the ultimate beneficiary of the Soho companies was Elvira Kudryashova, Mr Khrapunov's California-based daughter. According to the Kazakh government, she, with her brother Ilyas, is a key link in the family's laundering network.

Shortly before the Soho companies bought the apartments, more than $3.1m flowed out of Ms Kudryashova's Wells Fargo account to the firm of Martin Jajan, a New York lawyer. Mr Jajan proceeded to sign purchase documents for the Trump Soho apartments as buyer's agent. Other bank records show further links between Ms Kudryashova and her relatives and the Soho shell companies. Mr Jajan did not respond to a request for comment.

On the face of it, Mr Trump was not a beneficiary of the apartment sales. The vendor was another limited liability company, Bayrock/Sapir Organization LLC. It was named after the developers that jointly built Trump Soho: the Sapir Organisation, founded by Tamir Sapir, from Georgia, and Bayrock, founded by Tevfik Arif, a Kazakhstan-born former Soviet official.

According to regulatory filings, however, Bayrock/Sapir Organization LLC had a third co-owner — the man who licensed his personal brand to the project.

The Trump Soho, announced in 2006, was an early example of a building that bore the Trump name but was built by someone else. Mr Trump's access to finance had been curtailed by bankruptcies. But as the star of *The Apprentice*, his celebrity stock was rising. Partners such as Sapir and Bayrock were prepared to pay to license his name.



Until it fell into financial trouble and changed hands in a 2014 foreclosure sale, Mr Trump enjoyed an 18 per cent share of the profits of the Trump Soho. Alan Garten, general counsel of the Trump Organisation, said Bayrock and the Sapir Organisation were responsible for apartment sales and for conducting due diligence on buyers. Both companies declined to comment.

Mr Garten said he had "no doubt" that "every legal requirement" had been fulfilled. Asked how a member of the Khrapunov family could nonetheless have bought apartments in the Trump Soho — two years after the family was charged in Kazakhstan with financial crimes — he said: "Maybe there's something wrong with the law but we can't fault [Bayrock and Sapir] for complying with the laws."

The laws regulating US real estate deals are scant, experts say. Provisions against terrorism financing in the Patriot Act, passed in the aftermath of the September 11 2001 attacks, obliged mortgage lenders to conduct "know your customer" research. But money launderers pay in cash. Sales such as those of the Trump Soho apartments have passed through this loophole, which was partially closed only this year.

In January, the US launched a pilot programme designed to identify the ultimate owners of shell companies used to buy premium property in Manhattan and Miami. In July officials reported that the new rules had corroborated concerns that "all-cash luxury purchases of residential property by a legal entity are highly vulnerable to abuse for money laundering".

A spokesman for the Khrapunov family declined to answer detailed questions about the Soho apartment transactions and other deals. "Kazakhstan is using the legal systems of western countries to harass, wear down and destroy political opponents," the spokesman said. All the Khrapunov family's business activities "have been conducted in full accordance with Swiss laws," he added.

## US election poll tracker

Mr Garten of the Trump Organisation said: "We have no knowledge of who [the Khrapunov family] are and have done no business with them."

Mr Trump's former partners Bayrock, however, have dealt with them.

Which White House candidate is leading in the polls?

As work on Trump Soho got under way in 2007, the partnership between Mr Trump and Bayrock was gathering momentum. Another tower, in Fort Lauderdale, was rising. A 2008 [Bayrock presentation](#) includes a picture of Mr Trump grinning beside Mr Arif and names him as a referee. Bayrock had its office on the 24th floor of Trump Tower and calls the Trump Organisation a "strategic partner".

The same presentation says Bayrock was one of the backers of the redevelopment of the 101-year-old Hotel du Parc on the shores of Lake Geneva, owned by Swiss Development Group, a Geneva-based company. In May this year, Nicolas Bourg, a Belgian businessman who says he worked with Viktor Khrapunov's son Ilyas on US real estate deals, claimed in a separate dispute that Swiss Development Group was "owned and controlled by Ilyas and his family and used to conceal the movement and investment of his family's money".



Donald Trump and three of his children with representatives of Bayrock and Sapir at the launch of Trump Soho in 2007, including Tevfik Arif (second from left)

Swiss Development Group said it had been sold in 2013 but that it was still suffering "relentless and unsubstantiated pressure . . . for the sole reason [that] it was linked at some point in time to someone the Kazakh government wants to prosecute".

The Kazakh government has also accused Helvetic Capital SA, another Swiss company, of being a vehicle for Khrapunov laundering. According to a 2007 draft contract, seen by the FT, Helvetic Capital planned to enter a $1.5m joint venture called KazBay. Its partner was to be Bayrock.

In a 2011 deposition, given in a dispute over the Fort Lauderdale project, Mr Trump said he had "never really understood who owned Bayrock". Jody Kriss, a former Bayrock finance director, has claimed in racketeering lawsuits against his former employer that Bayrock's backers included "hidden interests in Russia and Kazakhstan". Bayrock has denied Mr Kriss's allegations but declined to answer questions about the source of its funds and its relationship with the Khrapunovs.

Asked if the Trump Organisation had known where Bayrock's money came from, Mr Garten said: "No. I had no reason to question the source of funds. Its principal investor [Mr Arif] had a successful track record." He added: "When you do due diligence you act in good faith and try to look at all relevant material but there's only a certain degree that you can look at things. You can do as much as possible but you are limited to public records."

## Bayrock-Trump alumni worked for Khrapunovs

At least two alumni of the Bayrock-Trump partnership have gone on to work directly with the Khrapunovs.

One is Daniel Ridloff, whose LinkedIn profile says he worked for Bayrock for five years until 2010, then spent eight months in "acquisitions and finance" at the Trump Organisation. The other is Felix Sater, a Russian-born convicted fraudster and FBI informant with mob connections who was number two at Bayrock until 2008. On his LinkedIn profile, Mr Sater says he spent 2010 working at the Trump Organisation as "Senior Advisor to Donald Trump". Mr Ridloff did not respond to a request for comment; Mr Sater declined to comment.

According to correspondence and company documents seen by the FT, both Mr Sater and Mr Ridloff worked closely with Elvira Kudryashova in 2012. They agreed to serve as directors of a company through which she would pour $3m into a business venture as part of her efforts to secure a US investor visa. The idea was to put vending machines selling gadgets on US military bases. Mr Sater even offered to take Ms Kudryashova and her husband out for dinner along with his own wife.

Copyright The Financial Times Limited 2020. All rights reserved.

# Exhibit K





## Welcoming Bradshaw Residential Group to Coldwell Banker Residential Brokerage Newport Beach



Published on December 21, 2017



Coldwell Banker Residential Brokerage Newport Beach is excited to welcome Bradshaw Residential Group to the brokerage. Learn more at Bradshaw Residential Group's website, get in touch via email or connect by phone at 949.433.3001. For more information about Coldwell Banker Newport Beach, please contact branch manager Debbie Lewandowski at 9496441600 or Debbie.Lewandowski@camoves.com.

Bradshaw Residential Group is the Number

One Real Estate Team in Newport Coast



for the most homes sold for the second consecutive year in a row. With over a quarter of a billion dollars since 2015 alone, Bradshaw Residential Group is on the cutting edge of luxury. Coupled with Coldwell Banker Residential Brokerage®'s renowned international luxury brand power, the alliance solidifies the team's position in the global luxury market as an unstoppable force. "The choice was simple...with phenomenal management, support staff and the talented in-house marketing team coupled with a vast 100+ year national network, Coldwell Banker was an indisputable decision," Jason C. Bradshaw, Bradshaw Residential founder said. "The opportunities to grow our business are limitless with the brand's powerful International presence and cutting-edge technology. Our marketing will now reach even more quality buyers for our properties." Jason and Darren have an intuitive ability to achieve higher sales prices for their sellers and outperform the market with each transaction. How they seem to have innately landed on the formula for success is embedded in the details. Each element of their process is meticulous. From pre-marketing and pairing the right photographer to the property, to heightening the design of the home and delivering the home to the market is their art form. And it works. As a result of their marketing prowess, approximately 30 percent of the time, they have been able to procure the buyer for their listed properties directly. And their client experience doesn't end with representing Sellers. Over 40 percent of Bradshaw Residential's business is a result of enthusiastically representing buyers in the real estate process. "Clients repeatedly choose to list and sell their luxury properties with Bradshaw Residential Group because their involvement results in quality-based transactions, record sales prices

and unprecedented customer satisfaction," Debbie Lewandowski, Coldwell Banker

Newport Beach Manager said. "Jason Bradshaw and Darren Smith are commanding

the price points these properties deserve. They truly speak to the luxury market."

Experience their success formula for yourself and be counted on the list of Bradshaw

Residential's discriminating clients. Call for an appointment. 🏠

## Welcome Bradshaw Residential Group to the Brokerage

   

**INSIDE OUT** is your insider's guide to home and style. From exclusive peeks inside the most luxurious homes to architecture and interior design stories, stay informed on current real estate news and more by signing up for email updates!

**Search for Properties · Real Estate Careers · Announcements**
**Sign Up for Email Updates**



©2020 Coldwell Banker Realty. Coldwell Banker is a registered trademark licensed to Coldwell Banker Realty. An Equal Opportunity Company. Equal Housing Opportunity Equal Housing Opportunity. Each Coldwell Banker Realty office is own subsidiary of NRT LLC. Real estate agents affiliated with Coldwell Banker Realty are independent contractor sales associates and are not employees of Coldwell Banker Realty.